## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ZAKIRJAN,

      Petitioner,

v.

GEORGE W. BUSH, et al.,

      Respondents.

Civil Action No. 05-2053 (HHK)

### RESPONDENTS' MEMORANDUM IN OPPOSITION TO
### PETITIONER'S MOTIONS FOR TEMPORARY RESTRAINING ORDER AND
### PRELIMINARY INJUNCTION BARRING TRANSFER OR RELEASE OR
### REQUIRING ADVANCE NOTICE OF TRANSFER OR RELEASE

Respondents hereby respond to petitioner's motions for a temporary restraining order and

preliminary injunction barring his transfer or release from Guantanamo or requiring respondents

to provide the Court and petitioner's counsel with advance notice of any transfer or release from

Guantanamo (dkt. nos. 5, 8). Petitioner's motions should be denied for the reasons set forth

herein.[1] Moreover, petitioner's filing of a second, follow-up motion, seeking a temporary

---

[1] This Court has previously granted similar motions brought by Guantanamo detainees detained as enemy combatants on the basis that Fed. R. App. P. 23(a) requires advance notice of any transfer. See, e.g., Abdah v. Bush, Civ. A. No. 04-1254(HHK), 2005 WL 711814, *5 (D.D.C. Mar. 29, 2005), notice of appeal filed, D.C. Cir. No. 05-5224, (May 31, 2005). Other Judges of this District ruling on similar motions after this Court's decision in Abdah, however, have reached divergent results, with a number of Judges denying relief in whole or in part. Compare, e.g., Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court of any decision to transfer a particular individual to a particular country); with Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL), slip op. (D.D.C. Sept. 1, 2005) (same).

restraining order on the basis of feigned emergency, was entirely unnecessary because, as petitioner concedes in that motion, respondents' counsel had advised petitioners' counsel that there was no reason this matter could not be briefed and dealt with on a normal preliminary injunction schedule.

## **BACKGROUND**

**A.    Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it.  In the course of those hostilities, the United States has captured or taken custody of a number of foreign nationals as enemy combatants, some of whom are being held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.    Combatant Status Review Tribunals**

Beginning in the summer of 2004, the Department of Defense convened Combatant Status Review Tribunals ("CSRTs") to review the enemy combatant status of each detainee at Guantanamo.  During the CSRT proceedings, the detainees were provided with notice of the factual basis for their classification as enemy combatants, they were allowed to present evidence on their own behalf, and the tribunal members then made an independent determination as to whether the detainees should continue to be designated as enemy combatants.[2]  If an individual in

---

[2] See generally July 7, 2004 Order Establishing Combatant Status Review Tribunal, available online at <<http://www.defenselink.mil/news/Jul2004/d20040707review.pdf>>; July

(continued...)

the custody of the Department of Defense at Guantanamo is determined to be no longer classified as an enemy combatant, the government releases that individual as soon as practicable.

Petitioner alleges, and respondents hereby confirm, that he was determined in his CSRT to be no longer classified as an enemy combatant. Thus, respondents are actively engaged in efforts to determine an appropriate destination country so that the necessary arrangements can be made with that country to enable petitioner to be released pursuant to the procedures described below.

**C.    Transfers of Guantanamo Detainees for Release**

Because the detainees at Guantanamo are foreign nationals, a release involves transferring the detainee to another country, including most typically his home country. See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3.[3]  In any transfer, a key concern is whether the foreign government

---

[2](...continued)
29, 2004 Memorandum re: Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Naval Base, Cuba, available online at <<http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf>>.

[3] The June 2, 2005 Waxman Declaration submitted herewith replaced and superseded two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases, including Abdah. See Waxman Decl. ¶ 1. While the declaration is written broadly to address all transfer scenarios involving individuals detained by the Department of Defense at Guantanamo (including transfers of individuals confirmed to be enemy combatants), the policies and practices described therein for addressing concerns about possible treatment of an individual after transfer or repatriation are equally applicable to transfers for release of individuals determined to no longer be enemy combatants. In addition, information in the declaration concerning the number of individuals transferred is subject to updating. As of November 2, 2005, 247 detainees have been transferred by the Defense Department from Guantanamo, of which 179 were transferred for release. See Department of Defense Press Release, "Detainee Transfer Announced," Oct. 1, 2005, available at <<http://www.defenselink.mil/news/detainees.html>>.

3

will treat the detainee humanely and in a manner consistent with its international obligations.

Declaration of Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2;[4]

Waxman Decl. ¶¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee

to a country where the United States believes it is more likely than not that the individual will be

tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is

undertaken, typically involving the Department of State, in which appropriate assurances

regarding the detainee's treatment are sought from the country to whom the transfer of the

detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense

approves a transfer and requests the assistance of the Department of State, the Department of

State initiates transfer discussions with the relevant foreign government.  Waxman Decl. ¶ 6;

Prosper Decl. ¶ 6.  Such discussions include an effort to obtain assurances that the United States

Government considers necessary and appropriate for the country in question, including

assurances of humane treatment and treatment in accordance with the international obligations of

the foreign government accepting transfer.  Id.  Among other things, the Department of State

considers whether the nation in question is a party to relevant treaties such as the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues

---

[4] The Prosper Declaration submitted herewith was originally submitted in Abdah.
Ambassador Prosper left office on or about October 11, 2005, but the policies and practices set
forth in his March 8 declaration remain in effect and are applicable to the instant case.  Again,
while the declaration is written broadly to address all transfer scenarios involving transfers of
individuals detained by the Department of Defense at Guantanamo (including transfers of
individuals confirmed to be enemy combatants), the policies and practices described therein for
addressing concerns about possible treatment of an individual after transfer or repatriation are
equally applicable to transfers for release of individuals determined to no longer be enemy
combatants.  The information in the declaration concerning the number of individuals transferred
is subject to updating.  See supra n.3.

more specific assurances if the nation concerned is not a party or other circumstances warrant.

Id.

        The determination whether it is more likely than not an individual would be tortured by a receiving foreign government – including, where applicable, evaluation of foreign government assurances – involves senior level officials and may take into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  The Department of State develops its recommendations through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the Department of State's annual Country Reports on Human Rights Practices) and the relevant Department of State regional bureau, country desk, or U.S. Embassy.  Prosper Decl. ¶ 7.[5]  When evaluating the adequacy of assurances, Department of State officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its

_____

      [5] It is important to note that the Country Reports on Human Rights Practices are relevant but not necessarily dispositive in assessing whether it is more likely than not that a particular individual faces a likelihood that he will be tortured by a receiving foreign government.  For example, the Country Reports may describe problems that are confined to a particular facility or component of a government, may reflect certain types of fact patterns that are not applicable to the situation at hand, or may raise concerns that can be appropriately addressed through assurances from the receiving government and, in appropriate cases, monitoring mechanisms. Thus, the fact that a Country Report on Human Rights Practices discusses issues with respect to a country does not per se make that country forever off-limits as a potential repatriation or transfer destination.

assurances to the United States.[6]  Prosper Decl. ¶ 8.  In an appropriate case, the Department of

State may consider various monitoring mechanisms for verifying that assurances are being

honored.  Id.  If a case were to arise in which the assurances obtained from the receiving

government were not sufficient when balanced against treatment concerns, the United States

would not transfer a detainee to the control of that government unless the concerns were

satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen

in the past where the Department of Defense decided not to transfer detainees to their country of

origin because of mistreatment concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

## ARGUMENT

I.  **LEGAL STANDARD FOR PRELIMINARY INJUNCTION/ TEMPORARY RESTRAINING ORDER**

It is well-established that a request for preliminary injunctive relief "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton,

391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a

---

[6] Diplomatic sensitivities surround the Department of State's communications with foreign governments concerning assurances relating to torture, and the United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations.  Prosper Decl. ¶ 9.  Disclosure of communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels may cause that government and potentially other governments to be reluctant to communicate frankly with the United States concerning such issues in the future.  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time; the party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (citations and internal quotation marks omitted; emphasis in original).[7]

The same factors that apply to a motion for preliminary injunction also govern the issuance of temporary restraining orders. Vencor Nursing Ctrs. v. Shalala, 63 F. Supp. 2d 1, 7 n.5 (D.D.C. 1999).

---

[7] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings pending related appeals. However, as Judge Bates concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)). Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.

## II.    PETITIONERS FAIL TO SHOW IRREPARABLE INJURY

### A.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

This Court has previously found irreparable harm in the prospect that a repatriation or transfer of Guantanamo detainees out of United States custody would "effectively extinguish those detainees' habeas claims by fiat." Abdah, 2005 WL 711814, at *4. Respondents respectfully ask the Court to revisit this finding (a) in light of the subsequent analysis by other Judges confronted with the same issue, and (b) in particular because this petitioner has been determined to no longer be classified as an enemy combatant, meaning that the only type of transfer would be a transfer for release, as described in the accompanying declarations.[8] The ultimate relief sought by petitioner in this habeas case is obviously release from custody. Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in

---

[8] To be clear, a transfer for release would consist of, in the first instance, a transfer to the control of the government of the destination country. See Waxman Decl. ¶ 3 ("a detainee may be transferred to the control of another government for release"). This is necessary because sovereign nations have borders and any transfer must be coordinated with the foreign government concerned. The United States is not in a position to transport individuals to foreign countries and introduce them into civil society there without the involvement of the government concerned. Even though the foreign government is not (and could not be) constrained from engaging in its own law enforcement efforts, such a transfer is, of course, with the understanding that from the perspective of the United States, release would be appropriate. Petitioner's rhetoric that respondents are "contemplating removal of Petitioner from Guantanamo to foreign territories for torture or indefinite imprisonment without due process of law" (Petr's PI Mot. at 1) is thus nonsensical and incoherent.

maintaining.[9]  "The ultimate objective of a habeas petition is release from custody."  <u>Almurbati</u>,

366 F. Supp. 2d at 78.  As Judge Walton found, "once the respondents release the petitioners

from United States custody . . . they will have obtained the result requested and at that point there

will be no further need for this Court to maintain jurisdiction."  <u>Id.</u> at 80; <u>see also</u> <u>Al-Anazi</u>, 370

F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining

release from detention, and where, as here, the United States will relinquish custody of the

detainee to the home government there is nothing more the Court could provide to petitioners."

(citation omitted)).

     **B.**     **Speculation that the United States Will Defy its Own**
             **Policy by Transferring Detainees to Countries in**
             **Circumstances Where it is Believed They Will be Tortured**
             **Does Not Warrant a Preliminary Injunction**

     Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . .

actual and not theoretical," <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985), by

rife speculation that, contrary to the policies and processes attested to in the sworn declarations

of high-level Executive Branch officials, the United States has designs to send petitioner – who

has been determined to no longer be classified as an enemy combatant – to a foreign country in

---

[9] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 <u>Rasul</u> Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  As Judge Bates noted, 131 transfers (<u>i.e.</u>, more than half of the transfers to date) had occurred three months or longer before <u>Rasul</u> was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts." <u>Al-Anazi</u>, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, <u>Transfer of Afghani and Pakistani Detainees Complete</u> (Mar. 15, 2004), <u>available at</u> http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); <u>see also</u> <u>supra</u> note 3 (citing documents showing that administrative review process for considering transfers and repatriations predates <u>Rasul</u> and the filing of this and most other detainee habeas petitions).

circumstances where he will be tortured. Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer any detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. This policy is implemented through a process that contains several levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext. There is no valid basis for such an assumption.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78. Moreover, Judge Bates found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases – including petitioner here – failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196. Thus, petitioner has failed to meet his burden of showing that either the prospect of release from United States custody or unfounded speculation about possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

III.     **PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS IN OBTAINING A COURT ORDER PREVENTING A TRANSFER IN ACCORDANCE WITH THE POLICIES EXPRESSED IN RESPONDENTS' DECLARATIONS**

Petitioner fares no better on the second prong of the preliminary injunction analysis, which requires him to show that he is likely to succeed, following notice, in preventing a transfer from Guantanamo.  To be clear, whatever the merits of the issues currently before the D.C. Circuit in the ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos. 05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.), and of petitioner's claim that he is being unlawfully detained, it is not the likelihood of success on those issues or claims that matters for purposes of the instant motion for preliminary injunction.  Rather, the likelihood of success analysis must focus on the legal basis for petitioner to obtain an order preventing termination of detention by the United States in the manner described in the declarations submitted herewith.  As this Court previously held, "if there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted."  Abdah, 2005 WL 711814, at *4 (emphasis in original).  Accord Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's detention does not at all imply that there exists a sound basis to challenge the legality of one's transfer.  Put differently, the 'merits,' if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their transfer from Guantanamo, not to their detention at Guantanamo (emphasis in original)).

11

**A.      No Valid Legal Basis Exists for a Judicial Order
Enjoining Transfer or Repatriation of an Individual
Being Released Upon a Determination That He is No
Longer an Enemy Combatant**

Petitioner relies solely on Fed. R. App. P. 23(a) as a putative legal basis for the order

barring a transfer that he claims he would be likely to succeed in obtaining.  This reliance is

misplaced for two reasons.  First, Fed. R. App. P. 23(a) does not even apply to this case in its

present procedural posture, because, unlike in Abdah, there is no decision in this case that is on

appeal, as required by the plain language of the Rule.  See Fed. R. App. P. 23(a) (applying

"[p]ending review of a decision in a habeas corpus proceeding" and only to "the prisoner" in

whose proceeding that decision was made); see also Fed. R. App. P. 1(a)(1) ("These rules govern

procedure in the United States courts of appeals."); Order dated May 3, 2005, in Battayav v.

Bush, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R. App. P. 23(a) argument in

case that, like this one, did not have a pending appeal); see also Al-Anazi, 370 F. Supp. 2d at 199

n.11 ("The Court notes that petitioners did not even attempt to argue in their papers that Federal

Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas

petition is not presently on appeal.").[10]

Second, even if Federal Rule of Appellate Procedure 23(a) could somehow be deemed to

find application here notwithstanding the absence of any decision in this case that is on appeal,

that Rule does not apply to a situation in which the United States relinquishes custody of an

individual altogether.  Respondents appreciate that this Court previously held that Fed. R. App.

---

[10] The fact that now pending before the D.C. Circuit are habeas cases brought by other
Guantanamo detainees does not somehow convert this case into one that is somehow deemed
constructively on appeal or otherwise governed by the Federal Rules of Appellate Procedure.

12

P. 23(a) barred transfer of confirmed enemy combatant detainees whose habeas cases had decisions pending on appeal. See Abdah, 2005 WL 711814, at *5. This case, however, in addition to not having a pending appeal, involves an individual who has been determined to no longer be classified as an enemy combatant, of whom any transfer would be a transfer for release, as described in the attached declarations. In any event, respondents respectfully urge the Court to reconsider its prior interpretation of Rule 23(a), particularly in light of Judge Bates' conclusion in another Guantanamo detainee case that "[n]othing in the Rule indicates a desire to extend it to situations where the United States (or a state) is transferring an individual out of federal or state custody entirely." O.K. v. Bush, 377 F. Supp. 2d 102, 116 (D.D.C. 2005). Rule 23(a) is designed to ensure that, in situations where a prisoner is transferred from one custodian subject to federal habeas jurisdiction to another custodian subject to federal habeas jurisdiction, but remains in the custody of the United States (or relevant state thereof), the court is able to appropriately substitute the successor custodian as the respondent. See Fed. R. App. P. 23(a) ("the court, justice, or judge rendering the decision under review may authorize the transfer and substitute the successor custodian as a party"); Wood v. United States, 873 F. Supp. 56, 57 (W.D. Mich. 1995) (declining to adopt expansive construction of Rule 23(a) where "the purposes of Rule 23(a) would not be furthered," which purposes are "reflected in the provisions of the rule for substituting the successor custodian as a party"). Critically, nothing in Rule 23(a), nor any other provision of law, operates to restrict the United States from relinquishing custody of an individual, which, after all, is the ultimate object of a habeas corpus case. See O.K., 377 F. Supp. 2d at 116-17; cf. Brady v. United States Parole Comm'n, 600 F.2d 234, 236 (9th Cir. 1979) (Rule "does not touch upon release" by government).

In light of its focus on "substitut[ing] the successor custodian as a party," Fed. R. App. Proc. 23(a), the Rule should not be read to cover situations that involve not a transfer from one United States custodian to another United States custodian, but rather a relinquishment of United States custody altogether in connection with a transfer or repatriation to a foreign nation for release. In that situation, there is no "successor custodian" subject to federal habeas jurisdiction who could be substituted as a party.[11] See O.K., 377 F. Supp. 2d at 116 (noting that petitioners' interpretation of the word "another" to include a foreign government "immediately runs into difficulty in the next sentence of the Rule"). Moreover, upon relinquishment of United States custody, the relief available in habeas would have been received and the habeas case therefore would be moot, making substitution of a successor custodian unnecessary.

Indeed, until this Court's prior decision in Abdah, 2005 WL 711814, our research has not uncovered any case where Federal Rule of Appellate Procedure 23(a) has been held to apply to the transfer of a detainee to a foreign country for release and concomitant relinquishment of custody by the United States, even assuming arguendo that petitioner could be considered a "prisoner" within the meaning of the Rule. Rather, Rule 23(a) cases have involved transfers from one United States (or state) custodian to another United States (or state) custodian where the prisoner remained in the custody of the United States (or state authorities). See, e.g., Goodman v. Keohane, 663 F.2d 1044, 1047 (11th Cir. 1981) (involving transfer from federal correctional facility in Miami, Florida to a federal penitentiary in Terre Haute, Indiana); see also Brady, 600

---

[11] This is so regardless of whether the foreign nation to which the former Guantanamo detainee is repatriated or transferred may itself detain the individual as a function of its own law enforcement, criminal justice, or other interests, as would be its prerogative. Neither respondents, nor this Court, are in a position to confer upon ex-detainees some kind of worldwide immunity from law enforcement by other sovereign governments.

F.2d at 236 (Rule 23 "was promulgated to alleviate jurisdictional problems sometimes created by geographical limits on habeas corpus jurisdiction").  As Judge Bates held, in light of the "well-settled canon of statutory interpretation providing that a court should not construe a statute to interfere with the province of the Executive over military affairs in the absence of a clear manifestation of Congressional intent to do so," these cases involving detainees captured in the course of ongoing military hostilities do not present an appropriate occasion for indulging a creative interpretation that "would transform a technical and procedural rule that addresses the identity of the parties in a habeas proceeding into a sweeping prohibition on the transfer and release of military detainees while a case is on appeal." O.K., 377 F. Supp. 2d at 117 (citing Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988)).

The Court should also be mindful of the practical implications of extending its Fed. R. App. P. 23(e) analysis in Abdah to the situation of detainees who are slated for release based on determinations that they are no longer classified as enemy combatants and in whose cases there has been no decision awaiting appellate review.  As discussed above, for diplomatic and logistical reasons, any release of a foreign national detained at Guantanamo but determined no longer be classified as an enemy combatant necessarily involves, in the first instance, a transfer to the control of the government of the destination country.  See supra note 8.  If Fed. R. App. P. 23(e) were construed to cover such situations, it would thus effectively impose a requirement of affirmative court approval for the release of detainees whom the Combatant Status Review Tribunals have already determined shall no longer be classified as enemy combatants.  Whatever may be the appropriate application of Fed. R. App. P. 23(a) to confirmed enemy combatants as in Abdah, there is no warrant for reading "a technical and procedural" (O.K., 377 F. Supp. 2d at

117) rule of appellate procedure to dictate such an extraordinary result in a case that is not even

on appeal.

### B.    Separation-of-Powers Principles Militate Heavily Against Petitioner's Likelihood of Success

Further, even if some valid claim or other legal basis existed for judicial involvement in

the transfer or repatriation of individuals formerly detained by the Military as enemy combatants,

or for an advance notice requirement to support and facilitate such involvement, the separation of

powers would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign

policy decisions of the Executive Branch." People's Mojahedin Org. v. Dep't of State, 182 F.3d

17, 23 (D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship

Corp., 333 U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972)

("In situations such as this, '[t]he controlling considerations are the interacting interests of the

United States and of foreign countries, and in assessing them [the courts] must move with the

circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the

conduct of our international relations.'") (quoting Romero v. International Terminal Operating

Co., 358 U.S. 354, 383 (1959)).[12]  If the Court were to entertain petitioner's claim to a right to

contest repatriation or removal from Guantanamo, it would insert itself into the most sensitive of

diplomatic matters.  Judicial review of a transfer or repatriation decision could involve scrutiny

---

[12] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court." 459 F.2d at 1225.

of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein. Prosper Decl. ¶¶ 9-12. Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments. Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8. In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns. Prosper Decl. ¶¶ 10, 12. This chilling effect would jeopardize the cooperation of other nations in the war on terrorism. Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

    Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference"). This principle is sometimes called the Rule of Non-Inquiry. For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack. While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper. "The

17

interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." Id. at 1067. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch" (internal quotation marks omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61 (E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of release from Guantanamo, rather than merely trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[13] See

---

[13] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is narrowly limited to extradition cases, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. Kin-Hong, 110 F.3d at 111 n.12. In that later

(continued...)

Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess any Executive judgments about matters such as custodial conditions or the adequacy of legal procedures in a foreign country, nor the credibility and adequacy of a foreign government's assurances. Cf.

---

[13](...continued)
case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to move him out of Guantanamo would be pursuant to an extradition treaty or statute, such a contention would lead to the absurd result that he could not be released unless some other country sought him for purposes of initiating a law enforcement proceeding against him. In any event, that contention would be wholly without merit. See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioner to seek a judicial order blocking it.  Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of transfer or repatriation for that of the appropriate Executive Branch officials.

## IV.    AN INJUNCTION REQUIRING ADVANCE NOTICE WOULD TRAMPLE ON THE SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question.  See Petr's PI Mot. at 9 (stating that purpose of advance notice is so that petitioner is "provided with a meaningful opportunity to contest his transfer" in federal court); Petr's TRO Mot. at 2 ("contest[ing] the legality of such a transfer" is "precisely the relief sought by the pending

Preliminary Injunction motion").  Such an advance notice requirement foreshadows judicial

review and intervention that would be accompanied by the attendant harms discussed in the

declarations of Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted

herewith.  See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Even if such judicial review did not

ultimately result in an injunction against transfer, the mere inquiry into the United States'

dialogue with foreign nations and into the terms of a transfer and any assurances that may have

been obtained would cause grave harm.  See supra Section III.B (describing interests of

international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶

10, 12.  Moreover, the very prospect of judicial review, as exemplified by an advance notice

requirement, causes separation-of-powers harm by undermining the ability of the Executive

Branch to speak with one voice in its dealings with foreign nations.  See Crosby v. Nat'l Foreign

Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the

very capacity of the President to speak for the nation with one voice in dealing with other

governments").  An advance notice requirement, after all, would make the results of diplomatic

dialogue between the Executive Branch and a foreign government regarding repatriations or

transfers inherently contingent because the effective acquiescence of another Branch (i.e., the

Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement

would also inject delays into future transfers.  These harms weigh heavily against entry of a

preliminary injunction.

21

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.  Petitioner may invoke truisms such as that the public interest disfavors torture, but that aspect of the public interest is already well served by the existing policies and processes governing transfers and repatriations of Guantanamo detainees, as described in the accompanying declarations.[14]  As Judge Bates held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

_____

[14] While this Court held in Abdah that "this factor tilts in Petitioners' favor, because the public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process," 2005 WL 711814, at *6 (emphasis added), here, the government intends to release petitioner as soon as the appropriate destination country can be determined and necessary arrangements made with that country.  And, to the extent petitioner subsequently, if ever, becomes subject to law enforcement or detention in a country to which he is transferred, that would be a function of that country's laws, not the laws of the United States or its public. Moreover, the proposition that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), begs the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)) are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioner may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motions for a temporary restraining order and for a preliminary injunction be denied.

Dated: November 3, 2005    Respectfully submitted,

         PETER D. KEISLER
         Assistant Attorney General

         KENNETH L. WAINSTEIN
         United States Attorney

         DOUGLAS N. LETTER
         Terrorism Litigation Counsel


           _/s/_ Robert J. Katerberg
         JOSEPH H. HUNT (D.C. Bar No. 431134)
         VINCENT M. GARVEY (D.C. Bar No. 127191)
         TERRY M. HENRY
         JAMES J. SCHWARTZ
         PREEYA M. NORONHA
         ROBERT J. KATERBERG
         ANDREW I. WARDEN
         NICHOLAS J. PATTERSON
         Attorneys
         United States Department of Justice
         Civil Division, Federal Programs Branch
         20 Massachusetts Ave., N.W.
         Washington, DC  20530
         Tel:  (202) 514-4107
         Fax:  (202) 616-8470

         Attorneys for Respondents