# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABU BAKKER QASSIM, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-0497 (JR) |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |
| JAMAL KIYEMBA, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-1509 (RMU) |
| | ) | |
| GEORGE W. BUSH, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR AN ORDER
AMENDING ACCESS PROCEDURES PERTAINING TO NON-ENEMY
COMBATANTS**

Respondents hereby oppose the November 4, 2005 motions filed by counsel on behalf of

petitioner Saddiq Turkestani in Kiyemba and petitioners in Qassim, seeking wholesale revision

of currently applicable procedures concerning counsel access to wartime detainees determined to

be "no longer enemy combatants" ("NLECs"), currently in the custody of the Department of

Defense at the U.S. Naval Base at Guantanamo Bay, Cuba, pending their release.  The two

motions are essentially the same; thus, respondents are responding to the motions in this

combined opposition.

Contrary to petitioners' arguments, respondents retain legitimate interest in the security and other measures contained in the current counsel access regime.  Petitioners' counsel are permitted appropriate access to petitioners under the current regime, and respondents have gone to great lengths to provide special accommodations in light of petitioners' status as NLECs. Moreover, consideration of petitioners' proposed revisions to the current counsel access procedures reveals that virtually all of the proposed revisions are problematic, either because the proposals pertain not to appropriate counsel access procedures, but rather to conditions of confinement of petitioners – a matter that is not appropriately addressed in a protective order and counsel access regime – or because the proposals are impractical, burdensome, or otherwise inappropriate with respect to legitimate governmental security needs or the legitimate role and discretion of the military in managing the detentions at issue.  Petitioners' motion for revision of the current counsel access procedures as they pertain to NLECs, therefore, should be denied.

## BACKGROUND

_____I.    **The Protective Order Regime.**

On November 8, 2004, Senior Judge Joyce Hens Green, in the context of the then-pending and coordinated Guantanamo Bay detainee habeas cases, entered an Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba ("Protective Order"), followed shortly thereafter by certain supplementary orders clarifying and detailing certain matters involved the Protective Order.  See In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004); Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order in In re Guantanamo Detainee Cases, No. 02-CV-0299, et al. (D.D.C. Dec. 13,

2004); Order Addressing Designation Procedures for "Protected Information" in In re Guantanamo Detainee Cases, No. 02-CV-0299, et al. (D.D.C. Nov. 10, 2004).  The Court entered these orders in these cases, as it routinely has been done in the pending Guantanamo detainee habeas cases.  See Order of May 5, 2005 (Qassim); Memorandum Order of September 13, 2005 (Kiyemba).

The regime established by the Protective Order addresses the unique context of these cases, involving litigation on behalf of individuals detained at a military facility in wartime. Among other things, the regime provides procedures for litigation filings and other matters in order to protect legitimate government security interests.  The Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba, annexed to the Protective Order as Exhibit A ("Access Procedures"), in turn, provide procedures regarding habeas counsel's access to properly represented detainees and for the handling of information obtained from and delivered to detainees.

For example, the Access Procedures provide a system for privileged legal correspondence and face-to-face communication between counsel and represented detainees.  In recognition of the unique, wartime setting of these cases and detentions, including that information possessed by detainees could have national security or base and personnel security implications warranting potential treatment of the information as classified, however, the Access Procedures require that counsel and interpreters involved with detainees obtain security clearances and that information learned from detainees be treated as classified pending review by a Privilege Team.  Access Procedures §§ III.A., IV.A.6., VI., VII.  The Privilege Team reviews information habeas counsel wish to treat as other than classified and determines whether the information is classified or

otherwise protected.  Id. § VII.  The Team is composed of DoD personnel who are prohibited

from participation in litigation concerning detainees and cannot disclose information learned

from their review activities, except upon discovery indicating an "immediate and substantial

harm to national security" or "imminent acts of violence."[1]  See id. § II.D., VII.A., VII.D.-F.

Furthermore, for common-sense security purposes, the Access Procedures provide that packages

of legal mail sent to detainees undergo an inspection for non-legal mail contraband.  Id. § IV.A.

The Access Procedures also provide procedures for the handling of information pending

classification review.  Id. §§ IV.A.6., VI.A., VI.B.

In addition, the Access Procedures address the logistics of habeas counsel visits to

represented detainees at Guantanamo, including with respect to requesting visits, numbers of

counsel participating in visits, and procedures related to certain clearances needed to visit a

foreign military base such as Guantanamo.  See id. § III.D.  The Access Procedures also

recognize the fact that the detention setting is that of a secure military base and acknowledge the

role of the military with respect to the detentions by reserving to military authorities prerogatives

related to security and management of the detention facility.  See, e.g., §§ III.D.,  X.

The regime established by the Protective Order has been in place for over a year while the

Guantanamo detainee cases have been pending.  The regime was developed after extensive

negotiations between counsel for the government and for petitioners in the habeas cases pending

at the time, and after both briefing and a hearing before Judge Green.  Over 85 visits by a total of

more than100 attorneys or translators to some 115 detainees in scores of cases, have taken place

---

[1] Any such permissible disclosure, however, is not to litigation counsel, but to officials
with a role in responding to such potential harms or violence.

in the Guantanamo detainee cases, the vast majority of those after the entry of Judge Green's protective order and counsel access regime.

## II.      Petitioners Classified as No Longer Enemy Combatants.

With respect to the petitioners in the two above-captioned cases who have been determined by Combatant Status Review Tribunals ("CSRTs") to be classified as no longer enemy combatants ("NLECs"), respondents have made significant accommodations with respect to their interactions with counsel and, though not the subject of the Access Procedures, petitioners' living conditions.   Respondents have permitted or will permit[2] habeas counsel to meet with petitioners in the more liberal environment of Camp Iguana, instead of Camp Echo, a special facility in which counsel visits with enemy combatant detainees almost invariably take place.   Respondents have also permitted telephone calls between counsel and petitioners, subject to appropriate security considerations.   In addition, with respect to the Qassim petitioners, respondents also approved counsel's use, during a prior counsel visit and telephone call, of a Uighur-language translator despite the fact that the translator was not a U.S. citizen and did not have a security clearance, again, subject to appropriate security considerations.[3]   See also August 8, 2005 Declaration of Jay W. Hood ¶ 8 (attached hereto as Exhibit A). [4]

_____

[2] Counsel for petitioner Saddiq Turkestani in Kiyemba are visiting Guantanamo this week and meeting with petitioner for the first time.   Counsel are also meeting with the Qassim petitioners, with whom they have met before, and other represented detainees at Guantanamo this week.

[3] Counsel now have hired citizen translators with security clearance and are utilizing these translators during their current visit to Guantanamo.

[4] The declaration was originally submitted as Exhibit 1 to respondent's August 8, 2005 Supplemental Memorandum Pursuant To the Court's Invitation at the August 1, 2005 Hearing in Qassim.   Then-Brigadier General, now Major General, Hood is the Commander of Joint Task

Though properly not addressed by the Access Procedures, respondents also have liberalized petitioners' living conditions since their classification as NLECs. In August 2005 NLECs such as petitioners began to be housed in Camp Iguana, providing the least restrictive detainee living conditions available at the detention facility. Camp Iguana provides a communal living situation, overlooking the Caribbean Sea, in which NLECs have their own bunk house, activity room, air conditioning in all living areas, recreational yard, around-the-clock access to a television set with VCR, DVD, and video game capability; a stereo system; recreational items (such as board games, soccer, volleyball, and ping pong); unlimited access to a shower facility; and library materials. See Hood Declaration ¶¶ 5-6. In addition, at the request of and with the assistance of counsel, respondents have also permitted telephone calls between one of the petitioners and a family member, subject to appropriate security considerations.[5] See also id. ¶ 9.

## ARGUMENT

I.  **PETITIONERS' STATUS AS NLECs DOES NOT NEGATE THE GOVERNMENT'S INTEREST IN AN APPROPRIATE COUNSEL ACCESS REGIME OR WARRANT THE WHOLESALE REVISIONS PETITIONERS PROPOSE.**

Petitioners' introductory and background arguments and explanations for their seeking wholesale revision of the Access Procedures applicable in the Guantanamo detainee cases address a number of matters that have already been addressed in prior filings in these cases. Particularly, petitioners challenge respondents' authority to detain them given their status as NLECs. As respondents have previously explained, with respect to all detainees accorded NLEC

---

Force-Guantanamo.

[5] Additional requests by counsel for telephone calls between petitioners and other family members are under consideration.

- 6 -

status through CSRTs, the government intends to release the NLECs as soon as suitable countries

for transfer can be found that, consistent with United States policy, avoid a situation where

petitioners would be returned to a country where it is more likely than not that they would be

tortured.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ¶ 6 (submitted as Ex. 1 to dkt. no. 22 in Qassim);

Declaration of Ambassador Pierre-Richard Prosper dated March 8, 2005 ¶¶ 3, 4 (submitted as

Ex. C to dkt. no. 7 in Qassim).[6]  Uighur NLECs such as petitioners currently present a situation

where they are unable to be repatriated; efforts are underway, however, to locate a suitable

country for transfer.  During the interim period, as noted above, NLECs are held in the least

restrictive conditions available.

     Contrary to petitioners' assertions, and as respondents also have already explained, the

Executive's firmly established authority to detain suspected enemy combatants, see, e.g., Hamdi

v. Rumsfeld, 124 S. Ct. 2633, 2640 (2004) (explaining that "[t]he capture and detention of lawful

combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement

and practice,' are 'important incident[s] of war'") (citation omitted), necessarily includes the

authority to wind up that detention in an orderly fashion after a detainee has been determined to

no longer be an enemy combatant, or after hostilities have ended.  See Resp's Recon. Opp.

(Kiyemba) at 12-13 n. 9; Resp's Supp. Memo. (filed Aug. 8, 2005 in Qassim) at 13-14 n.11.  The

---

    [6] See also Respondents' Opposition to (1) Petitioners' Motion for Leave to File Surreply
to Respondents' Reply in Support of Motion for Order to Show Cause Why Case Should Not Be
Dismissed for Lack Of Proper "Next Friend" Standing and (2) Petitioners' Motion for
Reconsideration of September 13, 2005 Order (filed Oct. 11, 2005 in Kiyemba) ("Resp's Recon.
Opp.") at 12 n.8.

United States has historically exercised that authority,[7] and is exercising it in these cases while it continues efforts to release the NLEC petitioners to a suitable country as soon as one can be found.

Petitioners also erroneously assume that government security-related interests must all but evaporate during this interim period when arrangements for appropriate resettlement of the NLEC petitioners are being pursued.  Petitioners' views, however, fail to take account for a number of factors, including that classification of a detainee as "no longer an enemy combatant" simply reflects an informed determination that an individual should no longer be classified as one "who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.  This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."[8] It does not necessarily imply a finding that an individual is benign in all respects, provide a character reference, or serve as a guarantee regarding future conduct.  For example, the petitioners in Qassim received military training in Afghanistan, at a camp provided by the Taliban, and they were apprehended with other suspected enemy combatants.  See Hood Declaration ¶ 2.  Furthermore, during this interim period while resettlement efforts are pending, safety and security of the camp, its personnel, and the detainees themselves remain serious

---

[7] See Resp's Recon. Opp. (Kiyemba) at 12-13 n. 9 (noting that U.S. or its allies have continued the detention of prisoners of war following the end of major conflicts to which the U.S. has been a party in order to properly resolve repatriation issues or effectuate resettlement where repatriation was not appropriate due to humanitarian or other concerns); Resp's Supp. Memo. (filed Aug. 8, 2005 in Qassim) at 13-14 n.11 (same).

[8] See Order Establishing Combatant Status Review Tribunal (July 7, 2004) (available at http://www.defenselink.mil/news/Jul2004/d20040707review.pdf).

concerns, requiring appropriate precautions and measures. Indeed, petitioners cite no legal authority requiring the revisions to the Access Procedures they seek,[9] nor can they in the unique context of these cases, and, as explained in more detail infra, their proposals are based on erroneous or misleading bases or assertions.

In addition, petitioners' requested relief fails to take account of the need for uniformity and coordination with respect to applicable Access Procedures among the Guantanamo detainee cases. Petitioners are moving for revision of the Access Procedures in only two of the six cases before the Court involving NLECs,[10] and multiple counsel access regimes – concerning visits, security clearance requirements (or not), incoming and outgoing mail, family mail and other communications, definitions of contraband, and security practices with the detention facility – among the cases involving NLECs or among the Guantanamo detainee cases in general, could create a burdensome, confusing, and unmanageable system.

At bottom, counsel are permitted access to their clients through the current regime of Counsel Access Procedures. For the reasons discussed, the most appropriate way to proceed with respect to the applicable Access Procedures in these cases is not wholesale revision of the Access Procedures, but rather, maintenance of uniform procedures among the Guantanamo cases, with case-by-case, or situation-by-situation allowances or concessions, where legally required or where appropriate in the exercise of respondents' discretion, with respect to petitioners in the

---

[9] The only legal authority referenced in petitioners' submission is FED. R. CIV. P. 26(c).

[10] See also Alladeen v. Bush, No. 05-CV-0833 (JR); Mamet v. Bush, No. 05-CV-1886 (EGS); Zakirjan v. Bush, No. 05-2053 (HKK); Muhammed v. Bush, No. 05-CV-2087 (RMC). In Mamet, a jurisdictional challenge to the standing of the alleged next-friend petitioner in the case is pending.

cases who are NLECs.  As noted above, the government has already made a number of access-related allowances with respect to petitioners, including with respect to the situs of counsel visits, telephone communications, and the use of an uncleared translator where needed, and, thus, wholesale revision of the Access Procedures is simply not appropriate or needed.

Moreover, as discussed below, closer inspection of petitioners' proposed wholesale revision of the Access Procedures reveals that virtually all of the proposed changes to the procedures are problematic, either because the proposals pertain not to appropriate counsel access procedures, but rather to conditions of confinement of petitioners – a matter that is not appropriately addressed in a protective order/counsel access regime – or because the proposals are impractical, burdensome, or otherwise inappropriate with respect to legitimate governmental security needs or the legitimate role and discretion of the military in managing the detentions at issue.  Petitioners' motion for revision of the Access Procedures, therefore, should be denied.

## II.     PETITIONERS' PROPOSED REVISIONS TO EXISTING COUNSEL ACCESS PROCEDURES ARE OVERREACHING, CONTRARY TO LAW, OR OTHERWISE IMPROPER OR PROBLEMATIC AND SHOULD BE REJECTED.

### A.     Many of Petitioners' Proposed Revisions Improperly Seek Changes to Petitioners' Conditions of Confinement.

A primary flaw in petitioners' proposals is that, while masquerading as revisions to the Access Procedures, they actually seek more generally to significantly revise petitioners' conditions of confinement.  For example, while the current Access Procedures provide mechanisms for privileged legal communications while appropriately prohibiting counsel from acting as conduits for mail and communications from family and others with whom the detainee has no privileged relationship, mail and communications that are subject to content and security

screening, see Access Procedures §§ IV.A.5., B.5., petitioners' proposed "Revised Procedures for

Counsel Access to Non-Enemy Combatant Detainees At The U.S. Naval Base in Guantanamo

Bay, Cuba," see Petr's Mot. (Qassim and Kiyemba), Decl. of Susan Baker Manning, Ex. C

(hereinafter "Proposed NEC Procedures"), require the military to permit NLECs to receive

virtually anything via mail or delivery from counsel.  The Proposed NEC Procedures go beyond

the current system of privileged legal mail and permit counsel to act as a conduit for "written and

electronic material," which is broadly defined as any CDs, videos, audio tapes, newspapers,

books, magazines, radio and TV transcripts, photographs, and correspondence from "any

person."  See Proposed NEC Procedures §§ IV.A.1., V.A.; id. §§ II.D., H. (defining "electronic

material" and "written material" broadly).  In addition the Proposed NEC Procedures appear to

prohibit Guantanamo from screening or withholding from detainees any such materials, id.

§ IV.A.4.[11]

Furthermore, whereas the current Access Procedures provide for telephonic access by

counsel to detainees on a case-by-case basis given the logistical and other burdens associated

with such access[12] and appropriately do not restrict Guantanamo's authority with respect to

---

[11] The Proposed NEC Procedures also seek to impose time-limits on when even non-legal mail must be delivered to Guantanamo.  See infra § II.C (noting impropriety of proposed delivery time limits on mail).

[12] Telephones are not maintained in the camps, and the logistics of arranging telephone communications with detainees are complicated and time-consuming.  A detainee must be moved to another facility for a telephone call, and each movement of a detainee requires a number of logistical and security measures, including orders from military supervisors to move the detainee, arrangements for vehicular transport, and arrangements for multiple guards and support personnel for the movement of the detainee.  Nonetheless, as noted above, respondents have undertaken to permit NLECs telephone calls with counsel and family, subject to appropriate security considerations.

- 11 -

telephone communications with persons other than counsel, Access Procedures § VIII.A., C., petitioners' Proposed NEC Procedures require the military to provide NLECs with unlimited and unrestricted telephone access, apparently for both incoming and outgoing calls. In fact, detainees are to be given the number of the telephone(s) and apparently are permitted to hand out the number through counsel or otherwise, so others from around the world can call-in whenever they would like. See Proposed NEC Procedures § VIII. The Proposed NEC Procedures even restrict Guantanamo's ability to monitor calls with outsiders. See id. § VIII.C. (calls with "persons other than counsel" may be monitored "solely" to prevent release of classified information concerning JTF-Guantanamo security or others detained as enemy combatants).[13]

Of course, the unreasonable and unsupportable aspects of these proposals are legion, from, for example, the inconceivable virtual cessation of any control by the government over non-privileged materials coming into a secure military facility; to the equally inconceivable notion of unrestricted calls from Guantanamo to countries around the world, including nations that would be concerned about incoming calls from a U.S. military facility; to the incredible notion that any person in the world able to get the number of the Camp Iguana telephone could call in at any time to chat with NLECs. Aside from these very real concerns, petitioners' proposals improperly attempt to revise petitioners' and other NLECs' conditions of confinement. The Court certainly does not have the authority to issue an order altering petitioners' conditions of confinement under FED. R. CIV. P. 26(c), a provision dealing primarily with discovery and the

---

[13] See also infra § II.B (noting impropriety of petitioners' limitation of what information may be legitimately considered classified).

- 12 -

only authority cited by petitioners,[14] and, in any event, conditions of confinement should not be

an appropriate topic to be addressed in procedures for counsel access.  Accordingly, petitioners'

requested revisions to the Access Procedures should be rejected.

> **B.    Petitioners' Proposed Revisions Improperly Restrict Respondents'**
> **Ability to Protect Against Disclosure of Classified Information.**

Petitioners' Proposed NEC Procedures should also be rejected because they improperly

restrict the government's ability to assess and protect classified information.  Under the existing

Access Procedures, in recognition of the unique, wartime setting of these cases and detentions,

including that information possessed by detainees could have national security or base and

personnel security implications warranting potential treatment of the information as classified,

---

[14] This Circuit has not even affirmatively approved the use of a writ of *habeas corpus* to address conditions of confinement.  See Brown v. Plaut, 131 F.3d 163, 168-69 (D.C. Cir. 1997) (acknowledging that habeas corpus might conceivably be used to challenge prison conditions, but indicating that requiring use of *habeas corpus* in such cases would extend the writ beyond its core); see also Bell v. Wolfish, 441 U.S. 520, 526 n.6 (1979) ("Thus, we leave for another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement itself.").  Courts in other jurisdictions that have squarely addressed the issue, however, have affirmatively held that conditions of confinement claims that do not seek accelerated release from custody are not within the scope of the writ of *habeas corpus*.  See, e.g., Cochran v. Buss, 381 F.3d 637, 639 (7th Cir. 2004); Carson v. Johnson, 112 F.3d 818, 820-21 (5th Cir.1997); McIntosh v. United States Parole Commission, 115 F.3d 809, 811-12 (10th Cir. 1997); Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991).  Separation of powers principles likewise would counsel against addressing conditions of confinement in a *habeas* context, or at the very least would require petitioners to satisfy very stringent standards before judicial intervention into conditions of confinement could ever be warranted, in light of the fact that petitioners are challenging the practices of a military detention center during a time of war. See, e.g., Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2647 (2004) (plurality opinion) (stating that "[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them"); Khalid v. Bush, 355 F. Supp. 2d 311, 328-30 (D.D.C. 2005) (explaining that management of wartime detainees' confinement conditions is the province of the Executive and Legislative branches, thus precluding judicial scrutiny of such conditions), appeal pending.

counsel and interpreters in contact with detainees are required to obtain security clearances, and

any information learned from detainees is treated as presumptively classified, pending

classification review by the DoD Privilege Team, if such review requested by counsel.  Access

Procedures §§ III.A., IV.A.6., VI., VII.  Petitioners' Proposed NEC Procedures, however,

essentially gut this regime.  Whereas the Access Procedures permit the government, through the

Privilege Team, to determine whether any information sought to be disclosed or handled as

unclassified is, in fact, unclassified, the Proposed NEC Procedures invest petitioners' counsel

with the power to decide whether information they learn from a detainee is classified.  See

Proposed NEC Procedures § IX.B.; see also id. §§ IV.A.6., VI.A., B., VII.D.  Unless the

information, in petitioners' counsel's view, concerns "(i) the security of JTF Guantanamo

facilities or (ii) persons not classified as [NLECs] who are detained there," and, apparently, is not

already public, the information need not be treated as classified or protected in any way.  Id.

§ IX.B.; id. § VI.A.-C. (notes from counsel visits must be treated as classified only if they contain

"nonpublic" information regarding "security of JTF Guantanamo facilities" or "persons not

classified as [NLECs] who are detained there").  Furthermore, neither counsel nor translators in

contact with detainees are required to possess security clearances.[15]  See id. §§ III.A.3, D.4.

Petitioners' proposed arrangement is neither legally nor practically appropriate.  Under

applicable authorities, it is the Executive that is charged with and responsible for protection of

classified information.  See Executive Order 12958, as amended by Executive Order 13292, 68

Fed. Reg. 15315 (Mar. 28, 2003); Dep't of the Navy v. Egan, 484 U.S. 518, 529 (1988) ("[f]or

---

[15] The Proposed NEC Procedures state that "counsel," which includes supporting personnel, cannot be denied access to detainees though they are not eligible for a security clearance due to lack of U.S. citizenship.  Proposed NEC Procedures § III.A.3.

reasons . . . too obvious to call for enlarged discussion, . . . the protection of classified

information must be committed to the broad discretion of the agency responsible, and this must

include broad discretion to determine who may have access to it") (internal quotation omitted).

Cf. Center for National Security Studies v. U.S. Dep't of Justice, 331 F.3d 918, 928 (D.C. Cir.

2003) (courts should not second-guess Executive's judgment in the area of national security);

Sims v. CIA, 471 U.S. 159, 180 (1985) ("[I]t is the responsibility of [the Executive], not that of

the judiciary, to weigh the variety of complex and subtle factors in determining whether [to

disclose sensitive information]."); Fitzgibbon v. CIA, 911 F.2d 755, 766 (D.C. Cir. 1990)

(impermissible for trial court to "perform its own calculus as to whether or not harm to the

national security . . . would result from disclosure" of national security information).  Thus,

petitioners' proposal that their counsel determine whether information is classified, as well as

their proposal that only certain narrow categories of information be initially treated as classified,

pending Privilege Team review, are both improper and should be rejected.

Petitioners' counsel dismiss as "unnecessary" the Access Procedure regime under which

information learned from detainees is treated as presumptively classified.  See Petr's Mot.

(Qassim) at 5, Petr's Mot. (Kiyemba) at 6.  As noted supra § I, however, such a regime is

appropriate here, given the circumstances of these cases, including the circumstances of how

NLECs may have come to be detained, as well as the fact that they are currently detained on a

secure military base.  It may be that information learned by counsel from NLECs is ultimately

determined to be classified only infrequently, but it is not for petitioners' counsel to make the

determination either as to categories of information that are classified[16] or as to whether any particular piece of information falls into those categories. Such a function is uniquely reserved to the Executive. For the same reasons, the deletion in the Proposed NEC Procedures of the requirement for a security clearance for counsel and translators, which could result in the disclosure of classified information to persons the Executive has not determined to be eligible to receive it, is improper.[17] The Access Procedures recognize the Executive's proper role in these

_____

[16] There are serious concerns that the categories of information the Proposed NEC Procedures treat as presumptively classified, i.e., nonpublic information regarding "security of JTF Guantanamo facilities" and "persons not classified as [NLECs] who are detained there," are not only overly narrow, but also too permissive in that they exclude from classified treatment any information that is already public, regardless of whether the information is properly in the public domain. Thus, an improper leak of classified information, under petitioners' scheme, arguably would permit counsel to treat the same information learned from a detainee as unclassified, though the information, in fact, may remain properly classified. Cf. Knopf v. Colby, 509 F.2d 1362, 1369 (4th Cir. 1975) ("security of all official secrets would break down if speculative and unattributed reports were held to have removed all of their protection from them"). These types of considerations confirm the propriety of the regime created by the current Access Procedures.

[17] While respondents previously permitted counsel to use a Uighur-language translator who did not have a security clearance, due to the relative scarcity of such translators, the use of the translator was subject to appropriate security measures, in this case, participation of a member of the Privilege Team whose responsibility was to warn of and prevent any discussion of classified information. Petitioners' counsel, however, now has access to a translator with a security clearance.

In this vein, the provision in petitioners' Proposed NEC Procedures that asserts that, where the parties disagree, the Court may order "that particular translators or interpreters be given access" to NLECs, regardless of security clearance concerns, and imposes the burden upon respondents to make a "particularized showing . . . why that person should not be given access," Proposed NEC Procedures § III.A.4., is unnecessary and improper. As noted above, petitioners' counsel apparently have access to a security-cleared translator, and a matter presenting such an issue of grave concern as access to classified information should not be legislated via protective order unnecessarily. Moreover, the provision is an improper attempt by petitioners' counsel to make up and establish a legal standard for resolution of the matter a priori, when such resolution should await (1) an actual dispute, and (2) appropriate briefing regarding whether the issue may properly be addressed by court order and, if so, under what standard.

matters, have been in place for over a year now, and should be preserved; the Proposed NEC

Procedures should be rejected.

> ### C. Petitioners' Proposed Revisions Seek Improper and Impractical Revisions to Procedures Governing Mail Between Counsel and Detainees.

Petitioners' Proposed NEC Procedures also seek improper, impractical, and/or

impracticable revisions to procedures governing mail between counsel and detainees and

materials brought into meetings with detainees, and should be rejected.  Foremost, petitioners'

Proposed NEC Procedures permit counsel to serve as a conduit for nonprivileged, nonlegal mail

and other communications with detainees.  The impropriety of such an arrangement is discussed

supra § II.A, and the proposal should be rejected.

In addition, petitioners' Proposed NEC Procedures unjustifiably and impracticably

require that mail and packages to or from addresses in the United States from or to Guantanamo

be sent in a fashion that "ensures delivery . . . within seven (7) days of mailing."  See Proposed

NEC Procedures § IV.A.4., B.3., B.4.  Under the current Access Procedures, legal mail is sent to

and from Guantanamo via certified mail through the United States Post Office, and such mail

typically takes approximately two weeks for delivery.  As a practical matter, DoD is not in a

position to dictate to the Postal Service some arbitrarily shorter delivery time such as petitioners'

demand, and there is no direct overnight mail delivery to or from military addresses at

Guantanamo.  Thus, petitioners' arbitrarily chosen seven-day delivery turn-around would require

some as yet unspecified, extraordinary, and doubtless unduly burdensome, if even possible,

method of delivery imposed upon the government.

- 17 -

Petitioners assert that they seek a seven-day deadline for mail delivery because correspondence to and from Guantanamo "has been plagued by delay," citing circumstances surrounding the delivery of a single letter this past summer.  Petitioners' assertion is deceptively misleading, however.[18]  As counsel fail to explain, there were some significant delays associated with a number of legal mail packages sent from Guantanamo this past summer, but such delays were due to the inadvertent use by certain mailroom personnel at Guantanamo of an incorrect zip code that resulted in packages not being delivered in a timely fashion to the Court Security Officers ("CSOs") responsible for distribution of detainee legal mail to counsel in the secure facility.  Once the problem was discovered, the CSOs and respondents' counsel were able to track down and retrieve the misrouted packages for delivery, albeit significantly delayed, to petitioners' counsel.  Prophylactic steps, in cooperation with the CSOs, have been take to avoid a repeat of the inadvertent error in the future.  Thus, the example of delay cited by petitioners cannot form a legitimate basis for their demand for a burdensome and impracticable seven-day mail delivery deadline, and petitioners' proposal in this regard should be rejected.[19]

---

[18] This is not the first time petitioners' counsel have been inadvisably quick to assume the worst about mail delivery.  In a previous filing in <u>Kiyemba</u>, counsel complained that "[c]ounsel have only just received a letter written months before the Government's papers were filed, but not delivered to us until September 26 . . . ."  <u>See</u> Surreply to Resp's Omnibus Reply (dkt. no. 16) at ¶ 5.  Counsel was subsequently forced to retract that charge when he realized that the letter in question had actually been written on or about August 29, delivered to him on that date, and later provided by <u>him</u> to the Privilege Team for classification review.  <u>See</u> Motion to Hold Resp's in Contempt of the Protective Order (dkt. no. 18) at 6 n.6.

[19] In addition, petitioners' demand ignores a pilot program of alternative mail delivery to represented detainees that is being initiated by other counsel.  Under this program, counsel may submit legal mail for contraband inspection and invoicing in Washington, D.C., as required under the Access Procedures.  Once the package is inspected and sealed, it is sent via FedEx, at counsel's expense, to a charter airline company in Fort Lauderdale, Florida, that flies to Guantanamo, which then transports the package to Guantanamo.  Any then-visiting habeas

Also, petitioners' Proposed NEC Procedures additionally require Guantanamo to accept and deliver facsimile transmissions of "legal mail or other written material" from counsel to detainees. Proposed NEC Procedures § IV.A.3. Such a scheme, in which Guantanamo personnel receive faxes from counsel, raises practical problems as to how faxes of "legal mail" could be received by Guantanamo personnel in a fashion that preserves attorney-client privilege. Moreover, counsel's unrestricted ability to send faxes of "legal mail or other written material" to NLEC detainees presents the potential for significant burdens on Guantanamo staff. Such burdens are not warranted where alternative means of communication with detainees through mail and telephone are available, and petitioners' proposal should be rejected.

> **D.   Petitioners' Proposed Revisions Improperly and Unreasonably Seek to Constrain the Government with Respect to the Exercise of Discretion in Security and Other Matters Properly Within the Government's Role in Administering the Guantanamo Facility.**

Petitioners' Proposed NEC Procedures also seek to alter the Access Procedures in ways that improperly and unreasonably constrain the exercise of discretion in security and other matters that should be reserved to the judgment of government officials charged with administration of the Guantanamo facility:

1.   Petitioners' Proposed NEC Procedures improperly restrict the definition of "contraband" that is prohibited at Guantanamo and eliminates a requirement for government approval of non-mail items provided by counsel to detainees. The section entitled "JTF-Guantanamo Security Procedures" in the current Access Procedures restricts the bringing of "contraband" to JTF-Guantanamo and provides examples of such contraband to include

---

counsel may retrieve the package from the airline at Guantanamo and deliver it to Guantanamo staff for appropriate mail delivery.

"weapons, chemicals, drugs . . . materials that may be used in an escape attempt . . . money, stamps, cigarettes, writing instruments, etc." Access Procedures § X.B. The Access Procedures further provide that "[n]o items of any kind may be provided to the detainee without the advance approval of the Commander, JTF-Guantanamo." Id. Petitioners, however, attempt to revise these prohibitions so that "contraband" is restricted only to a somewhat different list, i.e., "weapons, chemicals, money, stamps, drugs, cigarettes, or physical articles reasonably susceptible to use for purposes of escape or inflicting injury on persons," and so that the requirement for approval of delivery of items to a detainee is deleted. See Proposed NEC Procedures §§ II.A., X.B. Petitioners provide no legitimate rationale for the proposed revision, except, apparently, that the government, in petitioners' view, cannot justify denying NLECs anything not on the proposed list of contraband. See Petr's Mot. (Qassim) at 10; Petr's Mot. (Kiyemba) at 10. Such security-related judgments as to what should constitute contraband or what may be provided to a detainee are properly reserved to Guantanamo officials and not petitioners' counsel.

      2.     As discussed supra § II.A, petitioners' Proposed NEC Procedures also permit the detainee to receive from counsel any and all materials including CDs, videos, audio tapes, newspapers, books, magazines, radio and TV transcripts, photographs, and correspondence from "others," all apparently without screening or review, despite the non-privileged nature of such materials. Not only is petitioners' attempt to legislate conditions of confinement through the protective order regime improper as noted supra, access to such non-privileged materials present potential security issues and improperly interfere with security prerogatives of officials at Guantanamo. Cf. Gassler v. Wood, 14 F.3d 406, 408 n.5 (8th Cir. 1994) (screening of

unprivileged mail in prison context appropriate); Gaines v. Lee, 790 F.2d 1299, 1304 (7th Cir.

1986) (upholding prison regulations permitting inspection of nonprivileged mail by authorities).

       3.     Petitioners' Proposed NEC Procedures also change the prohibition on

photography and recording at Guantanamo contained in the Access Procedures to a scheme under

which a detainee can consent to being photographed or recorded, presumably by counsel, with

military officials left in only a restricted position to prevent it.  See Proposed NEC Procedures

§ X.C. ("Photography or recording of any type is prohibited without the prior approval of the

Commander, JTF-Guantanamo, which shall not be unreasonably withheld.  An N[L]EC

detainee's informed consent to be photographed or recorded shall be presumptive evidence of the

reasonableness of such request.").  Petitioners, however, are not entitled to such a presumption,

and the discretion of Guantanamo officials with respect to controlling photography and recording

within a military facility should not be overridden in such a fashion.

       4.     Petitioners' Proposed NEC Procedures also improperly and unreasonably restrict

Guantanamo's discretion to arrange the logistics of and security measures related to counsel

meetings with detainees.  Consistent with the role of the military in managing the Guantanamo

facility, the current Access Procedures reserve to Guantanamo officials the discretion to

determine where in the facility counsel meetings with detainees may take place.  Access

Procedures § III.D.2. (meetings with counsel "shall take place in a room designated by JTF-

Guantanamo").  Normally, visits between counsel and detainees take place in Camp Echo, a set

of buildings reserved specifically for such meetings, with each meeting facility/cell containing a

living cell for the detainee and a separate area with table and chairs for a private meeting with

counsel.  Detainees are moved to Camp Echo typically no sooner than the day before a counsel

meeting and are returned typically no later than the day after.[20]  With respect to the NLEC

petitioners in these cases, however, the Commander, JTF-Guantanamo, has approved counsel

meetings with detainees in Camp Iguana, where the NLECs are housed.

Petitioners, however, seek to have the applicable access procedures dictate that any

meeting between counsel and detainee must take place in the camp where the detainee is housed,

apparently without exception.  See Proposed NEC Procedures § III.D.2.  This proposal should be

rejected for at least two reasons.  First, petitioners seek to address a "problem" that does not exist

since Guantanamo is permitting counsel to visit with NLEC petitioners in Camp Iguana where

they are housed.  Second, it is unreasonable and improper to restrict the judgment of officials at

Guantanamo as to the location of meetings with counsel within the military facility.  While

meetings have been permitted to take place at Camp Iguana, it is not inconceivable that special

circumstances, situations, or operational or security needs could arise that would dictate that a

meeting take place other than in the camp where the detainee is housed.   Thus, officials at

Guantanamo should not be constrained in deciding where an appropriate meeting place would be,

and they certainly should not be required to seek advance Court approval for relocating any

particular meeting from Camp Iguana, as petitioners' proposal in effect would mandate.  See Bell

v. Wolfish, 441 U.S. 520, 548, 562 (1979) (explaining that the operation of even domestic

"correctional facilities is peculiarly the province of the Legislative and Executive Branches of our

---

[20] Thus, detainees are not, as petitioners assert in support of their proposal, placed in "solitary confinement" or otherwise punished for meeting with counsel.  See Petr's Mot. (Qassim) at 8; Petr's Mot. (Kiyemba) at 8.  Rather, a move to Camp Echo for a counsel meeting is undertaken to address operational, security, and privacy needs.  Further, moves to and from Camp Echo are undertaken as quickly as operational needs permit.

Government, not the Judicial," and cautioning lower courts to avoid becoming "enmeshed in the minutiae of prison operations").

Petitioners also seek to improperly restrict the military's ability and responsibility to undertake appropriate security measures with respect to meetings between counsel and detainees. For instance, petitioners' Proposed NEC Procedures prohibit, apparently without exception, any "handcuff[ing], shackl[ing], or similar[] restrain[t]" during such meetings. Proposed NEC Procedures § III.D.2. As indicated above, however, counsel's meetings with NLEC petitioners currently take place in Camp Iguana and no manacles or other physical restraints are used in such circumstances;[21] thus, petitioners' proposed revision to the Access Procedures addresses a problem that does not exist, and the proposal should be rejected. In any event, Guantanamo officials should not be constrained in their ability and discretion to use personal restraints whenever they may be or become necessary – for example, with a detainee acting aggressively towards guards or others. Such judgments are core security matters that petitioners are not entitled to second-guess, especially *a priori*, as they attempt to do in their proposed procedures.[22]

In sum, petitioners' Proposed NEC Procedures improperly and unreasonably seek to constrain the exercise of discretion in security and other matters that should be reserved to the judgment of officials charged with managing the Guantanamo facility, and petitioners' attempts in this regard should be rejected.

---

[21] Manacles are normally used when detainees are moved between camps or in security-sensitive situations as a measure to ensure the safety of personnel and to prevent escape attempts.

[22] Likewise, petitioners' unexplained attempt to constrain appropriate visual (without audio) safety monitoring of meetings between detainees and counsel to prevent potential incidents of physical violence, compare Access Procedures § X.F. with Proposed NEC Procedures § X.F., should be rejected.

**E.    Petitioners' Proposed Revisions Improperly Attempt to Resolve By Fiat Potential Next Friend Standing Issues.**

One aspect of petitioners' Proposed NEC Procedures that petitioner fails to mention or address in any way is a small, but important deletion of the requirement in § III.C.1. of the Access Procedures that "[p]rior to being permitted access" to a detainee, "counsel shall provide evidence of his or her authority to represent the detainee." The effect of this proposed deletion would be to provide ammunition for petitioners' counsel against respondents' typical challenges to the standing of detainees who purport to act as next friends for other detainees who have access to the Court and with whom the purported next friends have no significant relationship. The proposed deletion is improper and should be rejected.

As the Court is aware, in <u>Kiyemba</u> respondents filed a Motion for Order to Show Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Friend" Standing Or, In the Alternative, to Stay Proceedings Pending Related Appeals and for Continued Coordination, and Memorandum in Opposition to Petitioners' Motion for Order to Show Cause (dkt. nos. 3, 4), demonstrating that no showing had been made in the case establishing that the alleged "next friend," Jamal Kiyemba, satisfied the requirements for standing to sue as next friend on behalf other named petitioners in the case.[23]  Furthermore, with respect to scheduling counsel visits, the Access Procedures provide that "[p]rior to being permitted access to [a] detainee," counsel must "provide evidence of his or her authority to represent the detainee."  <u>See</u> Access Procedures

---

[23] <u>See</u> <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 163-64 (1990) (requirements for "next friend" standing: (1) the inability of the detainees for whom habeas relief is sought to challenge or arrange for the challenge of the legality of their detention themselves; and (2) a significant relationship between the purported "next friend" and each detainee to show that the "next friend" is truly dedicated to each detainee's best interests).

- 24 -

§ III.C.1.  In a number of the Guantanamo detainee cases, this evidence has typically taken the form of affidavits and authorizations of "next friends" who have filed petitions on behalf of detainees.  Because the detainee "remains the real party in interest," see Whitmore v. Arkansas, 495 U.S. 149, 163 (1990), the access procedures further require a second, subsequent type of authorization, directly from the detainee, once counsel in a proper next friend case is provided access to the detainee.  See Access Procedures § III.C.2. (counsel must "provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with a detainee.").

In this context, a dispute previously existed between counsel for respondents and counsel for petitioners in Kiyemba with regard to counsel's request to schedule a visit with petitioner "Saddiq Doe," who was alleged at the time to be an NLEC.  Respondents justified their refusal to schedule such a visit on petitioners' counsel's failure to "provide evidence of his or her authority to represent the detainee," under § III.C.1. of the Access Procedures, i.e., through a proper authorization of a next friend with standing.  See Respondents' Opp. to Petr's Mot. to Hold Respondents in Contempt of Protective Order (Kiyemba, dkt. no. 18) at 13-18.   It is this same provision of the Access Procedures that petitioners' counsel now seek to erase.

The issue of a counsel visit with Saddiq Doe, that is, Saddiq Turkestani, was ultimately resolved, and a visit was permitted when petitioners' counsel produced evidence (a letter) showing that petitioner Turkestani had directly requested representation from counsel.  Nonetheless, petitioners' counsel's current surreptitious attempt to bolster their argument for entitlement to a visit with some other petitioner in the face of defective standing of a next friend

suing on behalf of that petitioner, should the issue ever arise again, should not be countenanced.

Petitioners' proposal to modify § III.C.1. of the Access Procedures should be rejected.

> **F.**      **Petitioners' Proposed Revision Requiring Reimbursement of Expenses Associated With Trips to Guantanamo Are Barred by Sovereign Immunity.**

Petitioners' Proposed NEC Procedures impose upon respondents a requirement to

reimburse petitioners' counsel for "out-of-pocket travel and billeting costs of one attorney and

translator" for "each counsel visit" with an NLEC detainee.  Proposed NEC Procedures § III.D.5.

This proposal should be rejected because it is barred by sovereign immunity.

The government is liable for an opponent's fees and expenses in litigation only when

such liability is expressly provided for by Congress.  See United States v. Horn, 29 F.3d 754, 761

(1st Cir. 1994).  Here, petitioners cite no waiver of sovereign immunity to support their proposal

that the Court order the United States to reimburse counsel for travel costs for each and every

counsel trip to Guantanamo, especially when the cases are not even finally resolved, nor can

petitioners cite any such waiver or authority.  Petitioners' attempt to justify their proposal simply

as "reasonable," see Petr's Mot. (Qassim) at 8-9; Petr's Mot. (Kiyemba) at 9, cannot overcome

the sovereign immunity bar.  Petitioners' proposal, therefore, must be rejected.

## CONCLUSION

For these reasons, petitioners' motion to revise the applicable and long-standing counsel

access procedures should be denied.

Dated: November 14, 2005                     Respectfully submitted,

                                              PETER D. KEISLER
                                              Assistant Attorney General

- 26 -

KENNETH L. WAINSTEIN
United States Attorney

DOUGLAS N. LETTER
Terrorism Litigation Counsel

            /s/ Terry M. Henry
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7212
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

# EXHIBIT  A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et al.,

     Petitioners,

v.

GEORGE W. BUSH, et al.,

     Respondents.

Civil Action No. 05-497 (JR)

Pursuant to 28 U.S.C. § 1746, I, JAY W. HOOD, hereby declare under penalty of perjury under the laws of the United States that to the best of my knowledge, information, and belief, the following is true, accurate, and correct:

1. I am a Brigadier General in the United States Army, with 30 years of active duty service. I currently serve as Commander, Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I have served in that position since March 2004. JTF-GTMO conducts detention and interrogation operations in support of the Global War on Terrorism, coordinates and implements detainee screening operations and supports law enforcement and war crimes investigations. Our detention mission is conducted in a humane manner that protects the security of both detainees and JTF personnel at GTMO. In my capacity as Commander, I am responsible for all aspects of JTF-GTMO operations.

2. The two petitioners in this case (A'Del Abdu Al-Hakim and Abu Baker Qassim) have been determined no longer to meet the criteria to be considered enemy combatants (NLEC). These decisions by the Combatant Status Review Tribunals (CSRT) do not equate to a determination that the detainees are benign in every respect. Prior to the NLEC determinations, these

1

individuals were held as enemy combatants.  Both men are ethnic Uighurs who left Kyrgyzstan

on or about June 2001 to travel to Afghanistan via Pakistan.  They were fleeing a military

training camp provided by the Taliban near Tora Bora, Afghanistan when they were captured.

Al-Hakim and Qassim admitted that they traveled to this camp to receive training in, among

other things, the use of small arms.  They both admitted to receiving training before U.S. forces

began bombing the region following the September 11th attack on the United States.  Al-Hakim

and Qassim fled with others to nearby caves, where they remained until Northern Alliance troops

forced them to flee towards Pakistan.  As Al Hakim and Qassim followed approximately 100

Arabs in search of safe haven in Pakistan, they were captured.

3.  I do not have jurisdiction over the Migrant Operations Center (MOC) at Guantanamo, which

is run by the Department of Homeland Security (DHS).  As such, I would not be in a position to

order housing of petitioners there.  In any event, in my judgment, it would not be appropriate to

house NLECs, including petitioners, at the MOC.

4.  Given the background of these NLECs, in my opinion, it would not be appropriate from a

security perspective related to the base, the over 5,000 Americans (service members and their

families), and the petitioners, for NLECs to have unguarded access to the military base.  Further,

housing the petitioners or other NLECs in a facility like the MOC, outside the current JTF-

GTMO detention operations area, would distance them from security resources, emergency and

other medical services, food services (including halal meals), and other humanitarian care

services associated with the JTF-GTMO operation.

5.  The living conditions for NLECs have been evolving and will continue to do so.  NLECs such

as petitioners who are currently housed in Camp 4 are provided privileges not afforded enemy

2

combatant detainees. Also, for several weeks, JTF-GTMO has been in the process of renovating a separate camp facility, called Camp Iguana, to house NLECs such as petitioners. This is scheduled to be completed on or about August 15, 2005. Once Camp Iguana is open, petitioners will move to and reside in a communal living situation with other NLECs in that camp. While there is a fence around the facility, Camp Iguana is located on a cliff overlooking and providing a view of the Caribbean Sea.

6. When the NLECs are in Camp Iguana, in addition to receiving the additional amenities and privileges that they currently receive at Camp 4, they will also have their own bunk house, activity room, air conditioning in all living areas, recreational yard, round-the-clock access to a television set with VCR and DVD capability, a stereo system, additional recreational items (such as soccer, volleyball, ping pong table), unlimited access to a shower facility, additional food items (including a microwave oven and coffee maker), and library materials including movies, books, and magazines. Additionally, I am currently considering providing further recreational activities and amenities at Camp Iguana in the future.

7. Two Uighur NLECs other than petitioners have been housed in Camp 1 for several weeks as a disciplinary measure for refusing to cooperate with guard instructions. This sanction is only temporary, and when Camp Iguana is ready for occupancy, these two Uighur NLECs will reside there along with the other NLECs provided they do not present disciplinary problems.

8. When authorized by appropriate DoD authority, I have the capability to support a limited number of telephone calls by NLECs. To date, I have not received a request from the counsel in the *Qassim* case for telephonic access to their two clients. I have been informed that the *Qassim* counsel have access to a Uighur translator who is a lawful permanent resident of the United

3

States but who does not have a security clearance. I understand that this is a unique situation, involving NLEC clients and habeas litigation, and the *Qassim* counsel cannot currently find a Uighur linguist who can qualify for a security clearance. These extraordinary circumstances set counsel in the *Qassim* case apart from other counsel in other habeas litigation.

Given the circumstances of petitioners' situation and the scarcity of Uighur translators, if a request for telephone access were submitted, I would be willing to permit the counsel to communicate with these two detainees by telephone every two weeks while their case is pending. However, it would be necessary to work out measures or restrictions to address security –related concerns regarding possible disclosure or discussion of classified information, including security procedures at Guantanamo (such as names of U.S. Government personnel stationed or working at Guantanamo and layout of camp facilities), and the status and location of any other detainee not directly related to this counsel's representation of these two clients. Such concerns arise in light of the fact that these petitioners, though NLECs, are aware of certain aspects of the camp layout, operations, and information learned during their prior confinement as enemy combatants with other enemy combatants, including other Uighur enemy combatants. I am willing to authorize these counsel to use the translator described above during their phone calls with the two petitioners, again subject to working out appropriate security measures or restrictions.

9. I have also not received any request that these detainees be permitted to communicate with members of their family over the telephone, although I understand that such a request was raised with the Court. Even before this motion came before the Court, I began exploring the possibilities of permitting all NLECS to make monthly telephone calls to family members. Given the circumstances of their situation, as authorized by DoD authority, I am willing to

4

authorize monthly phone calls between all NLEC detainees and immediate family members over a standard phone line.  However, it would be necessary to work out measures or restrictions to address security-related concerns.


Dated:  August 8, 2005

JAY W. HOOD
Brigadier General, USA