# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Abu Bakker Qassim and Adel Abdul Hakim,<br><br>        Petitioners/Plaintiffs,<br><br>  v.<br><br>George W. Bush, *et al.*,<br><br>        Respondents/Defendants. | Civil Action No. 05-CV-0497 (JR) |
| Jamal Kiyemba, *et al.*,<br><br>        Petitioners/Plaintiffs,<br><br>  v.<br><br>George W. Bush, *et al.*,<br><br>        Respondents/Defendants. | Civil Action No. 05-CV-01509 (RMU) |

**PETITIONERS' REPLY IN SUPPORT OF MOTION FOR AN ORDER AMENDING
ACCESS PROCEDURES PERTAINING TO NON-ENEMY COMBATANTS**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................2
II. PETITIONERS ARE INNOCENT MEN ....................................................................2
III. THE PROPOSED REVISED ACCESS PROCEDURES FOR NON-ENEMY COMBATANTS SHOULD BE ADOPTED ...............................................................3
    A. Revised Access Procedures are Warranted ......................................................3
    B. The Revised Access Procedures Appropriately Balance Petitioners' and Respondents' Interests ......................................................................................4
        1. Classified Information ..........................................................................5
        2. Contraband ............................................................................................7
        3. Petitioners' Access to Information .......................................................8
        4. Correspondence Procedures .................................................................8
            a. Timely mail procedures ............................................................8
            b. Faxes ..........................................................................................9
        5. Telephone access ..................................................................................9
        6. Photography and Recording ...............................................................10
        7. Petitioners Should Not be Forced to Endure Solitary Confinement In Order to Meet with Their Attorneys ..............................................11
    C. Evidence of Counsel's Authority to represent Petitioners ..............................11
IV. CONCLUSION ..........................................................................................................13

## I. INTRODUCTION

Respondents' apparently believe that there is no real difference between an innocent man and a guilty one. That is why they continue to imprison Petitioners Qassim, Hakim and Turkistani despite having determined months ago that they are not enemy combatants. And that same belief is the real basis of Respondents' Opposition to Petitioners' Motion For An Order Amending Access Procedures Pertaining To Non-Enemy Combatants. When Respondents assert that the current "Protective Order addresses the unique context of these cases" (Opp. at 3), they clearly mean the cases of enemy combatants and non-enemy combatants alike. But non-enemy combatants are not in the same situation as accused enemy combatants. The government may not ignore the findings of its own Combatant Status Review Tribunal ("CSRT") that Petitioners Qassim, Hakim and Turkistani are not enemy combatants. In short, innocence matters.

By its own terms, Judge Green's Amended Protective Order does not—and was never meant to—apply to non-enemy combatants. The Protective Order and Access Procedures assume that every detainee in Guantanamo is an alleged "enemy combatant" and specify access procedures for enemy combatant detainees. *See, e.g.,* Access Procedures at § II(C) ("Detainee: An individual detained by DoD *as an alleged enemy combatant* at the U.S. Naval Base in Guantanamo Bay Cuba.") (emphasis added). Because Petitioners are not enemy combatants, the Court should, at minimum, enter Revised Access Procedures that take this critical difference into account.

## II. PETITIONERS ARE INNOCENT MEN.

Respondents cannot have it both ways. The CSRT has determined that Petitioners are not "enemy combatants" and being an enemy combatant is the one and only justification the government has ever had for holding anyone at Guantánamo. The government argues that the CSRT's finding "does not necessarily imply a finding that an individual is benign in all respects, provide a character reference, or serve as a guarantee of future conduct." Opp. at 8. Indeed, the

- 2 -

government goes out of its way to imply that Petitioners Qassim and Hakim[1] are somehow associated with the Taliban when the CSRT has come to *exactly the opposite* conclusion as to all three Petitioners.[2] *Id.*

Respondents' argument turns our basic most notions of justice on their head. If a man is charged with a crime and imprisoned, but later found not guilty, he is released. He is not released because the not guilty determination means he is "benign in all respects, provide[s] a character reference, or serve[s] as a guarantee of future conduct." He is released because there is no justification for his imprisonment. It would be—or perhaps it already is—a terrifyingly Orwellian world in which our government imprisons anyone who it does not view as "benign in all respects" or whose future conduct cannot be "guaranteed" to the government's satisfaction.

Petitioners are not enemy combatants. They have not been accused of any crime or wrongdoing. They are not held on suspicion of any crime or wrongdoing. They are innocent men. Period.

### III.   THE PROPOSED REVISED ACCESS PROCEDURES FOR NON-ENEMY COMBATANTS SHOULD BE ADOPTED

**A.   Revised Access Procedures are Warranted.**

The fundamental fact of this case is that Petitioners should not be in jail. We are in the

---

[1] The government does not even try to imply that Petitioner Turkistani was somehow associated with anti-U.S. forces. Counsel traveled to Guantánamo last week, and met with Mr. Turkistani for the first time. Pursuant to the current protective order, all counsel notes and information counsel learned from Mr. Turkistani is presumed classified until reviewed and declassified by the Privilege Review Team. As of the date of this submission, counsel is therefore unable to provide unclassified information about how Mr. Turkistani came to be in U.S. custody. (We expect our notes to be declassified in the near future and will be happy to provide additional information on the public record at that time.) But we can certainly see why the government would not dare suggest that Mr. Turkistani was somehow affiliated with Al Qaeda or the Taliban.

[2] In determining that Petitioners are not "enemy combatants," government has determined that none of them are "an individual who was part of or supporting the Taliban or al Qaeda forces, or associated forces that are engaged ii hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." *See* Order Establishing Combat Status Review Tribunal issued by Deputy Secretary of Defense Paul Wolfowitz (July 7, 2004) at ¶ *d* (defining "enemy combatant") (available at www.defenselink.mil/news/Jul2004/d20040707review.pdf).

strange position of arguing about how much or little freedom should be afforded men who should in fact be entirely free. Given this surreal situation, Petitioners' Motion and their proposed Revised Access Procedures are guided by two principles. First, we think it incontrovertible that as long as these innocent men are imprisoned, they must be given full access their counsel, families, and friends, and as much freedom as possible during their continued detention. Second, we recognize that Respondents have a legitimate interest in ensuring the security of JTF-Guantánamo facilities and personnel. Despite Respondents refusal to meet and confer, the proposed Revised Access Procedures nonetheless attempt to strike an appropriate balance between these principles.

B. **The Revised Access Procedures Appropriately Balance Petitioners' and Respondents' Interests.**

Respondents concede in both word and deed that non-enemy combatant prisoners should be treated differently than accused enemy combatants. *See, e.g.,* Opp. at 8. But, they nevertheless argue, there should be one Protective Order for all Guantánamo detainees, and Respondents should hold all the cards when it comes to any deviation to accommodate the needs of non-enemy combatants. *Id.* (arguing for "case-by-case, situation-by-situation allowances or concessions, where legally required or where appropriate *in the exercise of respondents' discretion*"). That is little more than Respondents effort to tell the court to mind its own business and ignore the near-unique situation[3] of these non-enemy combatant Petitioners. The

---

[3]  As discussed in Petitioners' opening Motion, there are nine known non-enemy combatants imprisoned at Guantánamo. In addition to Petitioners Qassim, Hakim and Turkistani, there are three other Uighur non-enemy combatants, one Russian, one Egyptian, and one Algerian. The three other Uighurs (Ayoub Haji Mamet, Ahmad Doe, and Aktar Doe) are Petitioners in *Mamet v. Bush* (Case No. 05-1886). Zakerjain Hassan, the Russian, is Petitioner in *Zakerjain v. Bush* (Case No. 05-2053). Dr. Abu Mohammed, the Algerian, is also known as Fethi Boucetta and is petitioner in *Muhammed v. Bush* (Case No. 05-2087 RMC). Ala Abdu Kuduz Mohammed, the Egyptian, is also known as Alladeen and has filed suit in *Aladeen v. Bush* (Case No. 05-270 JR). Although Respondents appear to criticize Petitioners Qassim, Hakim and Turkistani for moving for Revised Access Procedures only in their cases, the obvious truth is that they have no standing to request modification of the Protective Order in other cases. That said, Petitioners believe the Revised Access Procedures would be appropriate as to all non-enemy combatant detainees, and the U.S. District Court for the District of Columbia clearly has the ability to make that change, whether in response to a motion or *sua sponte*.

Court is perfectly capable of setting appropriate parameters for counsel access to non-enemy combatants (and, of course, doing so does not remove Respondents' ability to make other case-by-case determinations so long as they are consistent with the overall access procedures ordered by the court).[4]

### 1. Classified Information

Information counsel learns from a detainee at Guantánamo is presumed to be classified only because Judge Green's Protective Order makes it so. Judge Green's Protective Order does not provide that information counsel learns from a detainee is in fact appropriately classified, only that it must be treated as such until declassified. Respondents' argument about the Executive's duty and authority to guard state secrets is therefore entirely misplaced. The issue is not about classified information, it is about how broad a presumption the Protective Order makes until information is submitted for declassification.

Respondents are incorrect to assert that Petitioners counsel would be in the position of determining what is or is not classified. On the contrary, the proposed Revised Access Procedures specifically delineate categories of information that would be treated as presumptively classified unless and until declassified by government authorities: "(i) nonpublic information concerning the security of JTF-Guantanamo facilities; or (ii) nonpublic information concerning detainees who counsel knows or reasonably believes to be classified currently as 'enemy combatants' by DoD." Revised Access Procedures at § VII(A). If the information provided by a non-enemy combatant detainee pertains to either of those two subjects, counsel is required to treat the information as classified and the information will be handled under the same strict procedures laid out in the Access Procedures. *Id.* at §§ VII(C)-(I); VI (governing attorney

---

[4] As noted in the opening Motion, Respondents rebuffed Petitioners' efforts to meet and confer regarding the proposed Revised Access Procedures, thus forcing Petitioners to seek the Court's assistance. Petitioners therefore have no information on Respondents' concerns other than Respondents' opposition. Unfortunately, that Opposition appears to be more focused on "no (because we said so)" than on reaching a reasonable compromise.

DCDOCS/640637.1

notes and other materials brought out of attorney-client meetings); IX (governing dissemination of information learned from detainee).

Respondents have offered this Court no evidence whatsoever to justify a broad presumption that every word a non-enemy combatant detainee speaks should be presumed classified. Respondents' only justifications are a generalized reference to the "circumstances of these cases"—by which they apparently mean all Guantánamo cases, of non-enemy combatants and enemy combatants alike—the circumstances of their capture, and their continued imprisonment on a military base. Without more, the first rationale is obviously hollow. The second makes no sense. How could the mistaken arrest of men who were *not* supporters of the Taliban, or Al Qaeda be a classified secret of the United States government?[5] Certainly, if it is Respondents' position that arrest information justifies the classification presumption, it must present something more than the bare assertion in its Opposition. Respondents' third concern is specifically addressed by the Revised Access Procedures. *See* Revised Access Procedures at § VII(A) ("nonpublic information concerning the security of JTF-Guantanamo facilities" is presumptively classified).

As to persons who have access to non-enemy combatant prisoners, the Revised Access Procedures add a provision stating that attorneys and translators "will not be denied access to NEC detainees on the ground that he or she is not a citizen of the United States, provided he or she is otherwise eligible for security clearance at the Secret level or higher, or its equivalent." Revised Access Procedures at § III(A)(3). The requirement that any attorney or translator meet all of the requirements for security clearance other than the citizenship requirement ensures that the security of JTF-Guantánamo will not be compromised in any way. The carve-out for

---

[5] Moreover, counsel's notes describing how Mr. Qassim and Mr. Hakim came to be in U.S. custody have already been declassified. As of the date of this submission, counsel are waiting to receive back their presumptively classified notes from their recent meeting with Mr. Turkistani. We will submit those notes for declassification as soon as possible. Based on our past experience, and that of other counsel in the Guantánamo habeas cases, we fully expect that all information about how Mr. Turkistani came to be in U.S. custody will also be declassified.

otherwise qualified non-citizens is warranted in light of the paucity of Uighur-language translators available.[6]

### 2. Contraband

Under the proposed Revised Access Procedures, "contraband" is absolutely forbidden. *See* Revised Access Procedures § X(B) (prohibiting contraband). The proposed Revised Access Procedures improve upon the previous Access Procedures by defining "contraband." They provide that "contraband" is any "physical article[] reasonably susceptible to use for purposes of escape or inflicting injury on persons" as well as "weapons, chemicals, money, stamps, drugs, [or] cigarettes" (which were previously identified in the Access Procedures as types of contraband). *Id.* § II(A).

Although Respondents oppose this clarification of what is and is not prohibited "contraband," their only rationale is that any decision about what prisoners are or are not allowed to have is a security decision that should be left to them. In other words, Respondents are once again telling the Court to butt out. Respondents apparently want absolute, unfettered control over what documents and information counsel may or may not give their clients, even if wholly unrelated to security issues. That is wholly unreasonable. The Revised Access Procedures go to great lengths to ensure appropriate security of JTF-Guantánamo facilities and personnel. If Respondents had specific security concerns, we would of course seek to address them. But Respondents' Opposition is not based on specific security concerns. It is apparently based on Respondents' desire to have complete and arbitrary control over these men. Nothing in Respondents' Opposition justifies continuing the current Protective Order regime as to non-enemy combatants.

---

[6]    Although counsel have, finally, been able to obtain the services of a cleared Uighur-speaking U.S. citizen, it is not at all clear that we will be able to obtain the services of a backup cleared Uighur-speaking U.S. citizen. For obvious reasons, we are reluctant to have our access to our clients depend entirely on the services of a single individual.

### 3. Petitioners' Access to Information

The Revised Access Procedures allow counsel to send traditional attorney-client communications (as also authorized by the Access Procedures), as well as other written materials (*e.g.*, books, magazines, photographs, etc.) and electronic materials (*e.g.*, CDs and DVDs) to non-enemy combatant detainees. Counsel's mail would not be subject to content-based restrictions. Revised Access Procedures § IV(A)(4). As discussed above, any item that could imperil the security of JTF-Guantánamo is absolutely forbidden. *Id.* §§ II(A) (defining contraband) & X(B) (prohibiting contraband). Although Respondents characterize this as "inconceivable," they never say why they object or what possible harm there could be in allowing counsel's communications to include these types of items. Certainly, Respondent's totally unexplained and unsubstantiated assertion that these materials "present potential security issues" (Opp. at 20) cannot itself justify content-based restrictions on what counsel includes in correspondence.[7] There is simply no reason to cut these men off from the outside world. Respondents have not even attempted to articulate a substantive reason for restricting their access to information. This provision of the Revised Access Procedures is entirely appropriate and should be adopted.

### 4. Correspondence Procedures

#### a. Timely mail procedures

Respondents argue strenuously against any requirement that mail attorney-client mail be delivered in a timely fashion. As an initial matter, it seems unlikely that the government lacks the resources to get mail to and from Guantánamo in seven days, as provided by the Revised Access Procedures. That said, Petitioners would be amenable to a ten-day or even fourteen-day requirement, if Respondents present evidence—which so far they have not—that the seven-day

---

[7] Although Respondents argue that this is an issue of the conditions of Petitioners' confinement, the content of counsel's communications with their clients—like all of the other issues raised in the Revised Access Procedures—are clearly within the Court's discretion, and directly related to matters addressed in the current Access Procedures.

requirement is unworkable. Given the severe mail problems that Respondents admit have existed, there should be some requirement of timely mail delivery. Respondents' argument that the Court and counsel should simply trust that there will be no problems in the future should be rejected.[8]

### b. Faxes

Respondents argue that it would be overly burdensome to allow counsel and client to communicate by facsimile, but do not say why this would be the case. They also suggest that attorney-client confidentiality could not be maintained. There are, however, a number of possible solutions. For example, the fax machine could be Camp Iguana where Petitioners are held. Or, if it were located outside the camp, JTF-Guantánamo personnel could simply be ordered not to review any portion of the communication other than the cover page identifying the recipient.

### 5. Telephone access

The Revised Access Procedures require that "DoD shall maintain one or more telephones within Camp Iguana for use by NEC detainees," and that the men have unlimited access to the telephones. Revised Procedures § VIII(A). Attorney-client communications are not to be monitored, *id.* § VIII(B), and telephone calls with friends and family "may be monitored solely for the purpose of preventing release of classified information concerning (1) the security of JTF Guantanamo facilities or (2) persons not classified as NEC detainees who are detained there." *Id.* § VIII(C).

Once again, Respondents profess shock and horror at this suggestion (*see* Opp. at 12) but

---

[8] Respondents correctly note in footnote 19 of their Opposition that there is a "pilot program" of alternative legal mail delivery. This pilot program is a step in the right direction *if* it works, and *if* the government chooses to allow it to continue. (The government has made it clear that counsel may use this alternative mail delivery method only at the government's discretion.) It is simply too soon to tell whether this will be an effective and timely alternative means for counsel to correspond with their clients. Because counsel have the option of relying upon the good offices of other counsel in other cases does not, however, mean the government should be absolved of its responsibility to provide reasonable and timely delivery of attorney-client mail.

never actually say why it is allegedly unworkable.[9] Respondents were equally at a loss when the same subject came up on August 25, 2005 before the *Qassim* court:

> Judge Robertson: "[I]t's unthinkable, I imagine, for the government to put a telephone booth in Camp Iguana."
>
> Mr. Henry: "That's correct Your Honor. If I could make one suggestion . . ."
>
> Judge Robertson: "It's difficult for me to understand why it's unthinkable, actually."

*Qassim v. Bush*, Transcript of August 25, 2005 hearing at 15:22-16:3. Respondents did not give Judge Robertson a reason why they should not be required to put a telephone in Camp Iguana, but instead merely suggested that Petitioners be required to raise suggested modifications to the Protective Order by motion—which we now do. Respondents' inability to articulate a real reason why Petitioners should not have access to a telephone in Camp Iguana is telling. Petitioners can and should be given a telephone.

### 6. Photography and Recording

Under the Revised Access Procedures, as under the current Access Procedures, photography and recording of detainees is permitted only with the agreement of the JTF-Guantánamo Commander. The difference, however, is that the Revised Access Procedures specify that authorization "shall not be unreasonably withheld" and that a non-enemy combatant's "informed consent to be photographed or recorded shall be presumptive evidence of the reasonableness of such request." Revised Access Procedures § X(C).

This change does not require the Commander to allow photography or recording, or limit

---

[9] The problem certainly is not with the telephones themselves. Although Respondents assert that telephones are "not maintained in the camps" it is their decision not to maintain them there. *See* Opp. at 11 n.12. Likewise, it is Respondents who have decided that a detainee "must" be moved to the Camp Echo solitary confinement facility for a telephone call. If Respondents are suggesting that it is literally impossible to put a telephone in Camp Iguana, the argument does not pass the straight-face test. If they are suggesting that it would be burdensome to do so, that too is doubtful. Moreover, the obvious answer would be to provide non-enemy combatants with the same thing carried by many JTF-Guantánamo personnel: a cell phone.

his ability to impose reasonable limitations such as those that address legitimate security concerns. His decision may not, however, be arbitrary. Moreover, his decision must take into account the wishes of the person to be photographed or recorded. This is perfectly reasonable.

### 7. Petitioners Should Not be Forced to Endure Solitary Confinement In Order to Meet with Their Attorneys

Camp Echo is a solitary confinement facility. It is simply counter-factual for Respondents to say that "detainees . . . are not placed in 'solitary confinement'" when they are brought to Camp Echo in advance of an attorney-client meeting, as per usual JTF-Guantánamo procedures. It is both true, and to its credit, that the military has deviated from previous procedures and allowed counsel to meet with non-enemy combatant detainees in Camp Iguana. It has done so presumably based on the conclusion that the procedures for enemy combatants are unnecessary and/or inappropriate for non-enemy combatants.

We agree. And we believe that the military nether needs nor should have the discretion to routinely put innocent men in solitary confinement or in shackles simply because they are meeting with counsel. If Respondents wish to propose further language that would allow for emergency exceptions to the rule, Petitioners would be amenable to considering such a proposal. But the default rule absolutely should be that Petitioners meet with counsel in their quarters, not in solitary, and are not shackled during such meetings. Absent a reasonable proposal from Respondents, the Revised Access Procedures should be adopted as proposed.

### C. Evidence of Counsel's Authority to represent Petitioners.

The current Access Procedures require new attorneys to provide evidence of their authority to represent a Guantánamo detainee.

> C.    Verification of Representation
>
> 1.    Prior to being permitted access to the detainee, counsel must provide DoD with a Notification of Representation. This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as the name of the detainee being represented by the counsel. *Additionally, counsel shall provide evidence of his or her authority to represent the detainee.*

> 2. Counsel shall provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with the detainee. The Court recognizes that counsel may not be in a position to present such evidence after the initial meeting with a detainee. Counsel for detainees and counsel for respondents shall cooperate to the fullest extent possible to reach a reasonable agreement on the number of counsel visits allowed. Should counsel for a detainee believe that the government is unreasonably limiting the number of visits with a detainee, counsel may petition the Court at the appropriate time for relief.

Access Procedures § III(C)(1)-(2).

The Government has taken the wholly unreasonable and counter-textual position that the language emphasized above requires new counsel to present evidence of his or her authority to represent a detainee both before *and* after a client meeting. If counsel cannot provide evidence of authority to represent a client that satisfies the government, the government will refuse to allow counsel access to his or her client. This Catch-22 is both untenable, and unsupported by the actual language of Judge Green's order.

The clear and obvious plain meaning of the passage emphasized above is that counsel must provide the specified Notification of Representation before having access to his or her client. Nothing more is required. When read in context, the last sentence of § III(C)(1) ("Additionally, counsel shall provide evidence of his or her authority to represent the detainee.") is quite obviously a reference to the post-meeting evidence of authority to represent required by the immediately following subsection. It is not another, separate precondition to access.

There is no dispute as to counsel's authority to represent these non-enemy combatant Petitioners. The proposed Revised Access Procedures delete this sentence because it is needless, and has led to unnecessary conflict and confusion as to other prisoners.[10]

---

[10] For these same reasons, this sentence should either be deleted from the current access procedures that apply to enemy combatants—relief not sought by Petitioners here—or the Court should clarify its meaning.

## IV.    CONCLUSION

Petitioners are innocent men, and should be treated as such. Adoption of the Revised Access Procedures is a small, and admittedly incomplete, step in that direction. They are at least a step a right direction. They are reasonable, and give appropriate weight to Respondents' security concerns. Petitioners therefore respectfully request that the Court enter an order adopting the proposed Revised Procedures For Counsel Access To Non-Enemy Combatant Detainees At The U.S. Naval Base In Guantanamo Bay, Cuba.

Dated: November 21, 2005

Respectfully submitted,

ABU BAKKER QASSIM, A'DEL ABDU AL-HAKIM and SADDIQ AHMAD TURKISTANI

By their attorneys

_____
P. Sabin Willett
Neil G. McGaraghan
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110-1726
Telephone:  (617) 951-8000
Facsimile:   (617) 951-8925

Susan Baker Manning
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC  20036
Telephone:  (202) 778-6150
Facsimile:   (202) 778-6155

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Telephone:  (212) 614-6439