IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABU BAKKER QASSIM, et al.,<br><br>    Petitioners,<br><br>v.<br><br>GEORGE W. BUSH, et al.,<br><br>    Respondents. | Civil Action No. 05-497 (JR) |

Pursuant to 28 U.S.C. § 1746, I, JAY W. HOOD, hereby declare under penalty of perjury under the laws of the United States that to the best of my knowledge, information, and belief, the following is true, accurate, and correct:

1. I am a Brigadier General in the United States Army, with 30 years of active duty service. I currently serve as Commander, Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I have served in that position since March 2004. JTF-GTMO conducts detention and interrogation operations in support of the Global War on Terrorism, coordinates and implements detainee screening operations and supports law enforcement and war crimes investigations. Our detention mission is conducted in a humane manner that protects the security of both detainees and JTF personnel at GTMO. In my capacity as Commander, I am responsible for all aspects of JTF-GTMO operations.

2. The two petitioners in this case (A'Del Abdu Al-Hakim and Abu Baker Qassim) have been determined no longer to meet the criteria to be considered enemy combatants (NLEC). These decisions by the Combatant Status Review Tribunals (CSRT) do not equate to a determination that the detainees are benign in every respect. Prior to the NLEC determinations, these

1

individuals were held as enemy combatants. Both men are ethnic Uighurs who left Kyrgyzstan on or about June 2001 to travel to Afghanistan via Pakistan. They were fleeing a military training camp provided by the Taliban near Tora Bora, Afghanistan when they were captured. Al-Hakim and Qassim admitted that they traveled to this camp to receive training in, among other things, the use of small arms. They both admitted to receiving training before U.S. forces began bombing the region following the September 11th attack on the United States. Al-Hakim and Qassim fled with others to nearby caves, where they remained until Northern Alliance troops forced them to flee towards Pakistan. As Al Hakim and Qassim followed approximately 100 Arabs in search of safe haven in Pakistan, they were captured.

3. I do not have jurisdiction over the Migrant Operations Center (MOC) at Guantanamo, which is run by the Department of Homeland Security (DHS). As such, I would not be in a position to order housing of petitioners there. In any event, in my judgment, it would not be appropriate to house NLECs, including petitioners, at the MOC.

4. Given the background of these NLECs, in my opinion, it would not be appropriate from a security perspective related to the base, the over 5,000 Americans (service members and their families), and the petitioners, for NLECs to have unguarded access to the military base. Further, housing the petitioners or other NLECs in a facility like the MOC, outside the current JTF-GTMO detention operations area, would distance them from security resources, emergency and other medical services, food services (including halal meals), and other humanitarian care services associated with the JTF-GTMO operation.

5. The living conditions for NLECs have been evolving and will continue to do so. NLECs such as petitioners who are currently housed in Camp 4 are provided privileges not afforded enemy

combatant detainees. Also, for several weeks, JTF-GTMO has been in the process of renovating a separate camp facility, called Camp Iguana, to house NLECs such as petitioners. This is scheduled to be completed on or about August 15, 2005. Once Camp Iguana is open, petitioners will move to and reside in a communal living situation with other NLECs in that camp. While there is a fence around the facility, Camp Iguana is located on a cliff overlooking and providing a view of the Caribbean Sea.

6. When the NLECs are in Camp Iguana, in addition to receiving the additional amenities and privileges that they currently receive at Camp 4, they will also have their own bunk house, activity room, air conditioning in all living areas, recreational yard, round-the-clock access to a television set with VCR and DVD capability, a stereo system, additional recreational items (such as soccer, volleyball, ping pong table), unlimited access to a shower facility, additional food items (including a microwave oven and coffee maker), and library materials including movies, books, and magazines. Additionally, I am currently considering providing further recreational activities and amenities at Camp Iguana in the future.

7. Two Uighur NLECs other than petitioners have been housed in Camp 1 for several weeks as a disciplinary measure for refusing to cooperate with guard instructions. This sanction is only temporary, and when Camp Iguana is ready for occupancy, these two Uighur NLECs will reside there along with the other NLECs provided they do not present disciplinary problems.

8. When authorized by appropriate DoD authority, I have the capability to support a limited number of telephone calls by NLECs. To date, I have not received a request from the counsel in the *Qassim* case for telephonic access to their two clients. I have been informed that the *Qassim* counsel have access to a Uighur translator who is a lawful permanent resident of the United

3

States but who does not have a security clearance. I understand that this is a unique situation, involving NLEC clients and habeas litigation, and the *Qassim* counsel cannot currently find a Uighur linguist who can qualify for a security clearance. These extraordinary circumstances set counsel in the *Qassim* case apart from other counsel in other habeas litigation.

Given the circumstances of petitioners' situation and the scarcity of Uighur translators, if a request for telephone access were submitted, I would be willing to permit the counsel to communicate with these two detainees by telephone every two weeks while their case is pending. However, it would be necessary to work out measures or restrictions to address security –related concerns regarding possible disclosure or discussion of classified information, including security procedures at Guantanamo (such as names of U.S. Government personnel stationed or working at Guantanamo and layout of camp facilities), and the status and location of any other detainee not directly related to this counsel's representation of these two clients. Such concerns arise in light of the fact that these petitioners, though NLECs, are aware of certain aspects of the camp layout, operations, and information learned during their prior confinement as enemy combatants with other enemy combatants, including other Uighur enemy combatants. I am willing to authorize these counsel to use the translator described above during their phone calls with the two petitioners, again subject to working out appropriate security measures or restrictions.

9. I have also not received any request that these detainees be permitted to communicate with members of their family over the telephone, although I understand that such a request was raised with the Court. Even before this motion came before the Court, I began exploring the possibilities of permitting all NLECS to make monthly telephone calls to family members. Given the circumstances of their situation, as authorized by DoD authority, I am willing to

4

authorize monthly phone calls between all NLEC detainees and immediate family members over a standard phone line. However, it would be necessary to work out measures or restrictions to address security-related concerns.

Dated: August 8, 2005

*[signature]*

JAY W. HOOD
Brigadier General, USA