1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU BAKKER QASSIM, et      :    Civil Action No. 05-0497
al.,                       :
                           :    December 12, 2005
      Plaintiffs,          :
v.                         :
                           :    2:30 p.m.
GEORGE BUSH, et al.,       :  . . . . . . . . . . . .
      Defendants
. . . . . . . . . . . . . . . .


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:
 For the Plaintiffs:     P. SABIN WILLETT, ESQUIRE
                 BINGHAM McCUTCHEN, LLP
                  150 Federal Street
                 Boston, Massachusetts  02110-1726
                  (617) 951-8684
                  SUSAN BAKER MANNING, ESQUIRE
                 BINGHAM McCUTCHEN, LLP
                  1120 20th Street, NW
                 Suite 800
                  Washington, D.C.  20036-3406
                 (202) 778-6172


For the Defendants:     TERRY M. HENRY, ESQUIRE
                 U.S. DEPARTMENT OF JUSTICE
                 CIVIL DIVISION
                  20 Massachusetts Avenue, NW
                 Room 7144
                  Washington, D.C.  20530
                 (202)514-4107


Court Reporter:     REBECCA KING, RPR, CRR
                  Official Court Reporter
                 Room 4802-B, U.S. Courthouse
                  Washington, D.C. 20001
                 (202) 898-9398


 Proceedings reported by machine shorthand, transcript produced

by computer-aided transcription.

2

1          P R O C E E D I N G S
2          COURTROOM DEPUTY:  Civil action number 05-0297, Qassim
3    versus Bush.  Sabin Willett present for the plaintiff, and Susan
4    Manning, Terry Marcus Henry present for the defendant.
5          THE COURT:  Good afternoon, everybody.  There are two
6    recent pending motions in this case; one is for an order
7    amending the access procedures for counsel under the protective
8    order, the other is for access by the petitioners to
9    representatives of the United Nations Commission on Human
10   Rights.
11         I issued a memorandum order nearly four months ago in
12   this case laying out what seemed to me then and still seems to
13   me to be a genuine dilemma.  The petitioners in this case are
14   two Uighurs, ethnic Chinese Muslims from the western part of
15   China.  They were apprehended somewhere in Afghanistan or
16   Pakistan, taken to Guantanamo Bay, held at Guantanamo Bay as
17   combatants for a long time, then went through the Combatant
18   Status Review Tribunal procedure, and at some point declared to
19   be, quote, "no longer enemy combatants," closed quote, a term of
20   art invented by the military at Guantanamo to describe people
21   who are not enemy combatants, without admitting or denying that
22   they ever were enemy combatants to begin with.
23         The government says it has no place to send them.  At
24   an early hearing in this matter I pressed the government for
25   what power it had to hang on to them even another day longer,

3

1    and the best that Mr. Henry could come up with at the time was,
2    quote, "The executive's necessary power to wind up wartime
3    detentions in an orderly fashion," closed quote.  That's the
4    government's power for hanging on to these people.
5          I issued a memorandum order, as I said, nearly
6    four months ago on August the 19th declining to decide whether
7    the government really had such a wind-up power, because the
8    parties were in agreement that both Hakim and Qassim should be
9    and would be released.  But that hasn't happened.  As far as I
10   can tell, nothing is happening.
11         My first instinct when I heard this case was I didn't
12   want to hear ex parte representations from the government.  I
13   didn't really want to have a public/private part of this, and my
14   suspicions, my instincts were correct for reasons that I didn't
15   expect.  They were correct because what I heard ex parte wasn't
16   any different from what I was hearing in the courtroom.  There

17  isn't any -- the government, if it's making any progress at all,
18  doesn't even want to tell me about it ex parte.
19       So the petitioners insist that I should follow the
20  literal language of the habeas statute, 28 U.S.C. 2243, and
21  recently they have urged that I do so before Congress amends the
22  habeas statute, and order their bodies produced here for a
23  hearing.  The government has opposed that suggestion all along,
24  arguing first that the scope of the habeas writ is still
25  undecided by the Court of Appeals, and second that in any event,

4

1  only the executive can say who enters the United States.
2       The most recent information I have from counsel about
3  their clients is that they met with their clients at Guantanamo
4  on November the 16th, that conditions are essentially unchanged,
5  that in the words of, I think, Ms. Manning's affidavit, they
6  have television but no reception, no radio, no telephone, cut
7  off from the world.
8       Now, let me address the two most recent pending
9  motions.  The first is the motion for access to the UNCHR
10  representatives.  The government first says, well, it's moot.
11  The motion was filed on the 15th; counsel went down there on the
12  16th, they had their meeting.  The motion was that they be
13  permitted to go with counsel.  The mootness point is rejected.
14  It's not moot, if for no other reason than hopefully counsel
15  will have access to go down there again.
16       The government's more important argument is that the
17  petitioners don't have any authority for the motion that they
18  make, which I think is a correct -- I think they're correct on
19  that proposition.  I also think they're correct that an order
20  like that would, in the words of several Supreme Court cases,
21  embarrass the executive in the conduct of foreign relations and
22  interfere with the executive foreign policy role.  So the motion
23  for access to the UNCHR representative must be and will be
24  denied.  That's the motion number 44.
25       The motion to amend the access procedures asked for an

5

1  overhaul of the protective order which petitioners say is built
2  on the faulty premise that they are dangerous people.
3  Petitioners want to reverse the presumption that all
4  communication with the petitioners are classified, they want to
5  allow non-citizens who would otherwise be eligible for clearance
6  to visit with the detainees, they want to allow counsel to
7  provide petitioners with written materials, letters, books,
8  newspapers, magazines, photographs of their children, electronic

9  materials, et cetera.
10         They want a seven-day turnaround for mail instead of
11  having mail disappear into a black hole someplace, they want to
12  allow faxes, they want to allow visits by counsel to Camp
13  Iguana, I think it is, where the detainees are housed, instead
14  of in Camp Echo in chains.
15         They want the government to pay for travel and
16  accommodation costs of counsel visits, since the government
17  won't produce them in the United States; they want to provide a
18  telephone line that will allow access to calls to and from
19  counsel, family, and friends; and they want to allow the
20  petitioners to be recorded, video and audio tape, so that other
21  countries -- so that their family will know that they're safe.
22         I will hear some argument on this point, but I want you
23  to know before I hear it that I'm more interested in another
24  part of this, which I'll get to.  Because it isn't that I'm not
25  interested in this subject, it is first that this court has

6

1  decided, as a court, that issues relating to the protective
2  order should be handled by Magistrate Judge Kay.  I could carve
3  this case out of that, but I'm a little reluctant to do that.
4         And furthermore, I just, as a matter of judicial
5  philosophy, don't think that judges ought to get into the nuts
6  and bolts, the daily details of managing individual detainees,
7  prisoners, prisons, schools, institutions, anything else.  We're
8  not managers, we're not on the ground, we don't know the
9  situation in Guantanamo Bay.  The Defense Department has enough
10  problem enforcing the security regulations it has for everybody
11  without having to start making exceptions in individual cases.
12  It doesn't seem to me like a subject that frankly is fit for the
13  fashioning of decrees from Washington that will govern what
14  happens in Guantanamo.
15         I am more interested today in the fundamental
16  underlying question, which is the basic motion to vacate the
17  stay order and issue a writ directing the immediate release of
18  the petitioners.  It is getting to be time, and it may be time
19  now, to fish or cut bait on this motion.  I think the premise on
20  which I declined to decide this three or four months ago was
21  that the government was making good faith efforts, and that
22  something would happen, and that we were not thinking about
23  indefinite detention of these people because the government
24  wants them released.
25         The time has stretched out to the point where

7

1 indefinite is not an inappropriate word to describe what's
2 happened, and the question is whether I or anybody can or should
3 tolerate that situation.  And if it's intolerable, what I or
4 anybody else can do about it.
5        From the standpoint of the petitioners at Guantanamo
6 Bay, it clearly is intolerable.  It seems to me that I basically
7 have three options.  There's a fourth option, and the fourth
8 option is let's wait a few more months, and I don't frankly
9 think that's an option.  I think we've had enough time.
10        I think I have three options.  The first is to deny the
11 petition for habeas corpus because I don't have any power to do
12 anything, and at least free Mr. Hakim and Mr. Qassim to go to
13 the Court of Appeals with an appealable order; the second is to
14 follow petitioners' suggestion that I order, in the words of the
15 statute, the bodies of Mr. Hakim and Qassim - the living,
16 breathing bodies, I hasten to say - before this court so we can
17 have a hearing on the motion for their immediate release.  The
18 third is simply to order them released and see what happens, see
19 how the government responds to it.
20        The government has its own set of options.  It could,
21 as the petitioners suggested from the get-go, release them into
22 the general population at Guantanamo Bay.  It refuses to do
23 that, and I declined to order them to do that.  It could release
24 them, and I have to put the "release" in quotations, to the
25 detention facility which exists, as I understand, on the same

8

1 Guantanamo facility where there are other stateless persons or
2 persons who cannot be relocated wandering around in some state
3 of freedom.
4        It could bring them here in something like the status
5 of the Cuban Mariel boat prisoners, it could send them back to
6 China.  I don't know what other options the government has, but
7 the government -- such an order, an order simply to release
8 them, would put it to the government as to how to release them
9 and where to release them.  But, of course, since the government
10 already accepts the proposition that they should be released,
11 you might say that the government considers itself already under
12 that order.  It's a self-imposed order, it just doesn't know how
13 to do it.
14        Moving back to the second option, bring them here, the
15 government has made a number of arguments why I cannot do that,
16 because it would violate a whole line of cases making clear that
17 the courts have no authority to overrule exclusion orders.
18 This, of course, is not such a case, and an order to bring them
19 here under the authority of the habeas statute would not violate

20  or reverse an exclusion order, it would simply provide that the
21  Uighur petitioners would have to be brought here to this
22  courthouse in some sort of legal fictional bubble that would --
23  that lawyers and judges have been inventing for centuries.  The
24  fact that their feet touch the ground in the United States has
25  no significance, if, as a matter of law, they are deemed, as the

9

1  Mariel boat people are deemed, never to have arrived in the
2  United States.
3       But my problem -- so I think I could do that.  My
4  problem with that alternative, that middle alternative of the
5  three, is that I can't see where it goes from there.  The
6  petitioners suggest that I would then hold a hearing to make a
7  determination whether the petitioners are, as the government
8  insists that they are, maybe no longer enemy combatants, but not
9  necessarily nice people and dangerous people, and that I would
10  then make a determination as to whether they should be released
11  to the general population in this country.
12       And that is where I have a real issue as to whether I
13  have the legal power to do it.  I would bring them to this
14  country and have a hearing, but I don't see that I've got power
15  to carry out the result of the hearing.
16       So the word "dilemma," which is, I think, a Greek word
17  that implies a problem that has no obvious solution, applies
18  perfectly, I think, to the situation that's before me.  The one
19  thing I am sure of is that one way or another, one side or
20  another has to have an appealable order, and that for the matter
21  to remain pending before me does no service to anybody, since
22  obviously in some sense I'm just a weigh station to the Court of
23  Appeals anyway.
24       Now, I invited you in to argue and I've been doing all
25  the talking.  Mr. Willett, I would like to hear from you.

10

1       MR. WILLETT:  Good afternoon, Your Honor.
2       THE COURT:  Good afternoon.
3       MR. WILLETT:  Let's start with option one.  That's the
4  one where you deny our petition.  The one thing that I think is
5  easiest to resolve in this dilemma is option one, because if we
6  ignore all the metaphysicians who have been arguing about what
7  Rassoul means and we go to what they told me in law school I'm
8  supposed to read, which is the mandate, the order, the order in
9  Rassoul is in the last sentence:  "We reverse the judgment of
10  the Court of Appeals and remand for the District Court,"
11  footnote, not a lieutenant colonel somewhere, "the District

12  Court to consider in the first instance the merits of the
13  petitioners' claims."  And they dropped a footnote to make
14  clear, merits doesn't mean test the pleadings, merits means what
15  we all know it means.  It means facts.
16       So in a precisely parallel case, with the exception
17  that we didn't have the government's concession in that case
18  that in fact they're not enemy combatants, everything else is
19  parallel.  We know that Your Honor has jurisdiction to decide
20  the case, and so we're back to -- I don't think you've decided
21  this, but I think we've talked about, is there a lawful basis
22  for detention.  There is none.  If that is Your Honor's finding
23  and ruling, then I don't see how you could deny the petition for
24  habeas corpus.
25       So we go to options two and three.  Now, you might

11

1   wonder why I don't leap at option three, and it's because I
2   think the most measured, the most legally clear course lies
3   through option two, the one where you bring them here for
4   another hearing where they're present.  And that's because we
5   can begin with a statute that makes the production of the body
6   mandatory, that says that the jailer shall produce the body.
7   All you're doing is applying an act of Congress.  I don't think
8   anybody could question this court in a case where the Supreme
9   Court has said you have jurisdiction, and an act of Congress
10  says that the presumption is that the bodies shall be produced.
11  No case ever says that the bodies shall not be produced.
12       So to go just to that limited next step of we're all
13  here with the petitioners present, there's no conceivable legal
14  challenge that I could think of to that.
15       So then where do we go?  Well, then we are in a dilemma
16  where the courts have actually been before in the somewhat
17  analogous situation of deportation; what do you do when the
18  Attorney General rightly wants to deport someone but no one will
19  take them?  And Zadvadus is that case.
20       Now, Zadvadus is a case where we've got a pretty
21  seriously bad guy, we have a career criminal, convicted thug.
22  He's been convicted of everything from attempted burglary to
23  possession of cocaine.  He's got a long rap sheet, and so Latvia
24  doesn't want him and Germany doesn't want him back, and they
25  have nowhere to send him.

12

1        Even in that case, says the Supreme Court, you can't
2   hold him in prison indefinitely.  You've got to fashion some
3   kind of release until the day they find a Latvia or a Germany to

4  take him.  So we get to that interim step in option two where
5  the men are present.
6        We're kind of in that deportation situation where
7  Mr. Henry wants to effectively deport our clients, but there is
8  no appropriate country to take them.  I hesitate to add, they
9  are in no way, shape, or form criminals.  There's no accusation
10  of any wrong-doing.  They're just unfortunates.
11        So then where do we go?  Where we go is a very small
12  step, and that is to the interim release; in effect the parole
13  that Baker v. Sard and Mapp v. Reno spell out.  The idea is that
14  the habeas case is not over; Your Honor retains jurisdiction of
15  it, and one day when Mr. Henry can report that indeed they have
16  lined up Holland or Sweden or someone to take these men as
17  refugees, there's a case, they have to report to you, and
18  ultimately, in effect, they will be deported.
19        But the question is in the interim period what we do
20  with those men is we order some set of conditions that's
21  appropriate for release.  Mapp and Baker talk about this, and
22  it's probably a scenario that Your Honor is familiar with, more
23  familiar than I in criminal cases.  So perhaps they need to
24  report on a regular basis to the United States Marshal Service,
25  perhaps there are limitations on travel, perhaps you need to be

                                13
1  assured as to where they're going to be housed and how they're
2  going to work and be fed and things like that, all of which we
3  can do.
4        The case isn't over.  It's still your case.  And as I
5  say, if it takes Mr. Henry another year to solve this
6  diplomatically, ultimately it gets solved that way.
7        THE COURT:  Well, I don't want to excessively
8  pigeonhole these cases, Mr. Willett, but Baker vs. Sard is a
9  criminal case.
10        MR. WILLETT:  Indeed.
11        THE COURT:  In a criminal case in the United States, a
12  criminal defendant has a constitutional right to bail, which is
13  constrained, powerfully constrained, by the Bail Reform Act, and
14  as a concession to the constitutionality of the right to bail,
15  Congress enacted this whole structure giving an accused person a
16  right to be released on appropriate conditions.  Neither Qassim
17  nor Hakim is an American citizen, they're not accused of crime.
18  The Bail Reform Act doesn't apply.  If you got them into this
19  courtroom and then argued to me that they had a right to be
20  released, I would ask you where that right comes from.
21        MR. WILLETT:  And Your Honor, I would say, as I think
22  the Court of Appeals said in Baker, it is inherent in the common

23  law writ, quote, "When an action pending in a United States
24  court," that's what we have, "seeks release from what is claimed
25  to be illegal detention," we have that, "the Court's

                                 14
1  jurisdiction to order release as a final disposition of the
2  action includes an inherent power to grant relief pendente lite
3  to grant bail or release pending determination of the merits,"
4  not, I believe, linked to any statutory right of bail or even to
5  any constitutional right.
6          THE COURT:  Yeah, except that the defendant is
7  presumably putatively an American citizen already on American
8  soil.
9          MR. WILLETT:  Perhaps.  Although at least that was not
10  expressly necessary to the Court's reasoning in Baker.
11          Then if you go to Mapp, where you have an alien case,
12  not a citizen, a case that's more akin to what we have here,
13  where they are seeking to deport, I think to Tobago, a resident
14  alien, the Court again reviews authorities from the fifth
15  circuit, from this circuit, and concludes that you have that
16  inherent power as a part of your power as the habeas judge to
17  enter that relief.
18          And I think it fair to say, Your Honor, that the
19  Supreme Court has also noted that habeas is a flexible remedy,
20  one in which courts are encouraged to cut through the forms, I
21  think as Holmes said, to the tissue of the matter, and find a
22  way to alleviate the essential wrong, which is the unlawful
23  imprisonment.
24          I was going to start today by talking about what we're
25  observing in our clients.  I think Your Honor captures it from

                                 15
1  our papers, but we have proceeded from what was almost elation
2  on their part in August after long years of, as one of them
3  said, feeling like he had evaporated from the world - all of a
4  sudden there were hearings and lawyers, things were happening -
5  we've proceeded from elation to frustration.  And that's
6  natural, and it's our job as lawyers to try to explain things to
7  our clients.
8          But I'm deeply concerned about the human impact of the
9  indefinite nature of this, and I do think that the remedy we ask
10  for is a limited one.  As you say, it adds nothing to whatever
11  right they have today with respect to asylum.  I mean, if they
12  have a right today to say that Rassoul's jurisdictional holding
13  gives them an entry to make an asylum petition, which I'm sure
14  Mr. Henry would say they don't, they're not going to get that

15  right because as an interim basis of habeas relief they've been
16  released from the prison.  I think they'll have whatever rights
17  they have today.
18        In any event, as I understand asylum, it's
19  discretionary anyway, so we're only talking about whether they
20  have standing to make an asylum petition.  And then if there was
21  some basis for exercising discretion to deny it, the government
22  would do that.
23        So as a practical matter, I don't see how the interim
24  release while we wait for this diplomatic solution really causes
25  much problem to the government, and it's the only thing anyone

                                    16
1  has been able to come up with that alleviates this really
2  pressing harm that they're suffering.
3        I should say, Your Honor, yesterday I sat in church,
4  and it occurred to me that yesterday my clients entered into
5  their fifth year of incarceration.
6        THE COURT:  That's hard to imagine.  Well, see, you've
7  got them in here -- I've postulated bringing them in here in
8  some legal cocoon --
9        MR. WILLETT:  Whatever Your Honor orders.
10        THE COURT:  -- but you say once they're here, they can
11  petition for asylum?
12        MR. WILLETT:  I think that's the government's concern.
13        THE COURT:  Well, it's your intent, too, is it not?
14        MR. WILLETT:  Your Honor, I don't have an intent beyond
15  getting beyond this hearing and getting them out of Guantanamo.
16        But the fact of the matter is if we're a year from
17  today and they're existing in a kind of parole limbo in the
18  U.S., I mean, someone is going to have to figure out what to do.
19  And I suppose --
20        THE COURT:  Well, what if they're in parole limbo in
21  some detention center someplace?  How would you feel about that?
22        MR. WILLETT:  I don't think we would like that very
23  much.  I mean, that doesn't solve the problem of --
24        THE COURT:  Or if they're in parole status with the
25  Mariel boat people?

                                    17
1        MR. WILLETT:  Your Honor, it's a continued
2  incarceration.  It doesn't solve the problem.
3        THE COURT:  So when you say you want them brought here,
4  what you're saying is you want them brought here and released?
5        MR. WILLETT:  Well, yes.  What I want is the
6  opportunity to show you conditions of release, of interim

7    release, which will satisfy you that there's no danger or harm
8    to anyone and no risk that the government's ultimate effective
9    deportation could be achieved as long as it's not back to China.
10        I can bring into this courtroom resident alien Uighur
11   expatriates who have offered us bedrooms for these men, who have
12   offered us jobs, who have called us on the phone to say how can
13   we help.  We can show you -- we can't have a hearing without
14   them coming, frankly, Your Honor.  We can show you a community
15   of people who can make this work at a practical level, and leave
16   Your Honor with the power to allow for the ultimate
17   deportation --
18        THE COURT:  Now, this hearing that you postulate,
19   you're going to show me conditions.  Is the government not going
20   to want to demonstrate why these people should not be released?
21        MR. WILLETT:  I don't have any doubt that they'll want
22   to do that.
23        THE COURT:  I mean, you've moved to strike the
24   affidavit of, what was it, General Hood?
25        MR. WILLETT:  I did.  Well, General Hood made

                                   18
1    statements about what they were doing in Afghanistan, and no one
2    can cross-examine General Hood.  He wasn't in Afghanistan.
3        I don't care whether you strike the affidavit or not.
4    But if my clients were here, they could tell you what they were
5    doing in Afghanistan, and it had nothing to do with the Taliban.
6    Which is all sort of academic in light of the NEC finding.
7        But the point is, if they're here, they can address any
8    of these sort of innuendoes, I think as they put it, that
9    they're not benign people.  I think that's what it said.  If
10   that's a concern for the Court, we want to be able to address it
11   with the real guys.
12        THE COURT:  Well, all of that begs the question of
13   whether even if I thought they were the sweetest guys in the
14   world, I would have the power to order them released into
15   American society under any circumstances or any conditions.
16        MR. WILLETT:  Well, I think it clear you do.
17        THE COURT:  What I need from you is what your best case
18   is for the proposition that you think I have the power to do
19   that.
20        MR. WILLETT:  The first case is Rassoul, which says you
21   have jurisdiction to decide the merits.  Well, the merits of a
22   habeas case is, are we opening the jail or not.
23        THE COURT:  Well, the only merits that are left to this
24   case, as I understand it, is the merits of the government's
25   assertion that their power to hang on to them at Guantanamo is

19

1  the power to orderly wind up a war.
2      MR. WILLETT:  Right.
3      THE COURT:  That's a legal question.
4      MR. WILLETT:  Well, I mean, Your Honor will make a
5  ruling on that.  And if you find, as we've urged, that there is
6  no such power, then you would issue a ruling --
7      THE COURT:  Then I'm right back where I started from.
8  Then I would issue a ruling saying what?
9      MR. WILLETT:  That they have to be -- well, what you
10  would do is we would suggest that you would grant these interim
11  conditions of release until such time as the ultimate
12  resettlement is arranged.
13      So Rassoul, first case.  Second case --
14      THE COURT:  Well, the dichotomy here is release from
15  custody in Guantanamo Bay is one issue; release them on American
16  soil where they then encounter rights to asylum and whatever
17  else is another question.  You see those as the same issue?
18      MR. WILLETT:  I think that once the Supreme Court says
19  you have jurisdiction over their case, they're here.  They're in
20  this courtroom.  So if the order is for release, then I think
21  it's that door we all walk out of, and we figure it out from
22  there.  I don't think it's you bringing them here; I think
23  they're here.  They're here because the government brought them
24  to Guantanamo, and all you can do, as Holmes said, is ignore the
25  forms and cut through the tissue.  And the tissue here is --

20

1      THE COURT:  You Boston guys keep quoting Holmes to me.
2      MR. WILLETT:  Well, he seems to age well, Your Honor.
3      But the point is, we look for a practical solution.
4  And when we talk about this interim release, it really is a very
5  limited solution; you still have the case, someone can run in
6  here and say there's a parole violation, and, in fact, if I
7  don't persuade you at that hearing that conditions for interim
8  release are appropriate, I suppose back they go to Norfolk and
9  Guantanamo.
10      THE COURT:  Let's see.  I want to give Mr. Henry a
11  chance to talk before it gets too long here, but if I see
12  there's a parole violation, the probation department isn't going
13  to have jurisdiction over these people, pretrial services isn't
14  going to have jurisdiction over these people.  Who oversees this
15  parole we're talking about?
16      MR. WILLETT:  Well, there is not an elaborate
17  jurisprudence of parole in habeas cases, it's true.  We're all

18  kind of making this up as we go along.  But I suppose in the
19  worst case you suspend the release.
20        THE COURT:  Okay.  Thank you, Mr. Willett.
21        MR. WILLETT:  Thank you, Your Honor.
22        THE COURT:  Mr. Henry?
23        MR. HENRY:  Thank you, Your Honor.  As Your Honor has
24  recognized, there are a number of difficult issues associated
25  with this case, and I'm happy to talk about them.  I think the

                                21
1  legal landscape is a little more cut and dry than Mr. Willett
2  would make it seem.
3        But I did want to inform the Court that the diplomatic
4  efforts with respect to potential resettlement of the Uighurs is
5  ongoing, and we are prepared to report to the Court in camera as
6  to the progress of those efforts if you want to hear them.
7        THE COURT:  The only report I want is if they've been
8  released.  If you can't make that report to me, I don't want it
9  in camera.  The last time I heard a report in camera -- I don't
10  want to be in that position.  I just don't want to be in that
11  position.  As I say, it's time to fish or cut bait.
12        MR. HENRY:  Well, Your Honor, as you know, the
13  diplomatic situation does involve issues that we are not -- it's
14  not appropriate to discuss on the public record.  And so we make
15  the offer for Your Honor to hear an in camera report with
16  counsel, and should you change your mind on that, we're happy to
17  provide that.
18        But as to the legal landscape here, I think it is much
19  more straightforward than counsel would have you believe.
20  Counsel made the statement that we're all kind of making this up
21  as we go along.  Actually, that's not the case, Your Honor.  As
22  Your Honor previously indicated, our position is, of course,
23  that the Court does lack the authority to bring the petitioners
24  to the United States.
25        And I would point out that currently the petitioners

                                22
1  are not in the United States.  According to the immigration
2  statutes, the United States is defined specifically, and it does
3  not include Guantanamo Bay.  That's 8 USC 1101(A)38, where the
4  U.S. is defined for purposes of entry, exclusion, deportation,
5  all those kind of things.
6        And so what this case is, it's not a deportation
7  situation, it's not a removal situation.  It does not involve a
8  statutory situation as was involved in the Zadvadus case, but
9  rather the question of bringing the petitioners here involves a

10   question of entry into the United States.
11        And there is a Supreme Court case that is as close as
12   we've found to be on point.  It's Shaughnessy vs. Mezei,
13   345 U.S. 206 from 1953.  That case involved an alien who had --
14   who was refused entry into the United States, and according to
15   the Court, he was stranded - and the Court used that term,
16   "stranded" - on Ellis Island for it looks like, reading the
17   opinion, a matter of years, because other countries would not
18   take him.
19        The question before the Supreme Court was whether
20   habeas would afford the detainee some sort of relief, whether
21   his continued indefinite detention there on Ellis Island was
22   unlawful so as to permit his entry into the U.S. temporarily on
23   bail, if you would, pending the government's efforts to find a
24   place for resettlement for him.  The answer there was clearly
25   no.

                                23
1         And as I said, that case seems to be the most analogous
2    to this case, far more analogous than a Zadvadus type case that
3    involves deportation or removal, where there are specific
4    statutes governing the situation.
5         And as we've pointed out in our briefs back in August
6    on this, there's a long line of case law as well as statute
7    saying that entry into the United States is an executive matter,
8    it's a decision, a discretionary decision, that is reserved to
9    the executive, and Congress has specifically precluded judicial
10   review even through habeas with respect to those discretionary
11   decisions regarding the entry of an alien into the U.S.
12        But beyond the situation of the power of the Court to
13   do as the petitioners request and bring the petitioners here for
14   some sort of hearing, I think if you take a look at the legal
15   standards in the cases that the petitioner cites - for example,
16   the Mapp case - and if you kind of get beyond the analogies or
17   general principles that the petitioners argue and look at the
18   actual legal standards that apply in a request for interim
19   release in a habeas context, like I said in Mapp, you'll see
20   that in order to attain interim release, number one, that relief
21   under Baker vs. Sard is tied to the Court's ultimate authority
22   to award whatever the final relief would be.  And I think Your
23   Honor reflected that there were some serious issues with that.
24        But even beyond that, on the question of interim
25   release, under the Mapp case you have to have a showing of

                                24
1    extraordinary circumstances, and the interim relief, the release

2  on bail, whatever you want to call it, has to be necessary to
3  make the final habeas remedy effective.
4       And what that means is a situation such as in a case
5  called Boyer vs. City of Orlando, which 402 f 2nd, 966.  It's
6  the fifth circuit, 1968.  There you had a petitioner who had
7  been sentenced to a 120-day sentence; the Court ordered interim
8  relief because it was going to take a lot longer than 120 days
9  for his habeas petition to be resolved.  In other words, his
10  case would have been moot before it could have been heard, so
11  the Court decided that interim relief was appropriate.  But we
12  don't have anything like that here.
13       And again, I think Your Honor hit on the point, you've
14  got to think about what the purpose of such a hearing would be
15  and what the end game would be.  The legal cocoon idea that was
16  floated a little bit earlier, I think there's serious question
17  as to whether the Court would have the power to create such a
18  cocoon.  We certainly would have some arguments, you know, with
19  respect to that, but the statutes in the immigration context are
20  almost always keyed on the presence of an individual within the
21  United States.
22       So were you to bring petitioners here, there would be a
23  significant argument that their standing under the various
24  immigration statutes, under asylum law, that sort of thing, had
25  been inalterably changed such that they could be invested with a

                               25
1  status that would not otherwise be available to either aliens
2  who had never entered the United States, or especially in kind
3  of the unique circumstances of this case, wartime detainees that
4  the executive is trying to find a place for resettlement.
5       THE COURT:  Am I not correct that the Mariel boat
6  detainees are deemed never to have set foot in the United
7  States, even though they're locked up somewhere in Pennsylvania?
8       MR. HENRY:  I'm not exactly sure about that, Your
9  Honor, quite frankly.  I know that a lot of those individuals
10  for a number of years were held in prison.
11       Just as a practical matter, our position would be that
12  the conditions in Guantanamo Bay and Camp Iguana -- and let me
13  point out just a couple of facts on the side.  Counsel are
14  permitted to meet with their detainees in Camp Iguana.  There
15  are no security restraints during those meetings, they meet with
16  them in a rec hall.
17       And also there was a representation that somehow these
18  guys had entered their fifth year of detention, unless I
19  misheard.  I'm not quite sure how that's possible, since the war
20  in Afghanistan didn't start until late in 2001.  I believe

21  these individuals --
22         THE COURT:  Well, it's late in 2005.  That's four years
23  ago.  Entering the fifth year means finished four, starting the
24  fifth.
25         MR. HENRY:  I think these individuals were captured in

                                      26
1  2002.
2          But in any event, again the Mariel boat people, I don't
3  have a specific answer on that.  I can certainly find out.  But
4  I know for a number of years those folks were kept in a
5  penitentiary, and we believe that the conditions in Camp Iguana
6  are much better.
7          And again, we are -- the government is serious about
8  finding a place for resettlement of these petitioners.  Its
9  diplomatic efforts are ongoing, and we're happy to report those
10  to the Court whenever you would like to hear them.
11         But in the meantime, for the reasons that we've argued
12  in our brief, based on the Shaughnessy case, we don't believe
13  the Court has the power to bring the petitioners here.  And even
14  if the Court did have the power, I think if you look at the
15  factors in the Mapp case, there's not a good reason to exercise
16  your power to do it, and lots of reasons not to.
17         If I could just comment, in closing, on a couple of
18  points.  As far as the legal authority that the petitioners
19  cite, they refer to footnote 15 in the Rassoul case, they refer
20  to kind of these common law rights to be released, that sort of
21  thing.  I just point out that all of those are involved in the
22  Court of Appeals case, and so hopefully sometime soon we'll get
23  a decision from the Court of Appeals on that.  I had hoped to
24  have it sooner rather than later, but given that the
25  government's diplomatic efforts are serious and ongoing, and for

                                      27
1  all the reasons I've talked about, I don't believe that it would
2  be appropriate for Your Honor to order that the petitioners be
3  brought here.
4          THE COURT:  What about alternative three?
5          MR. HENRY:  Alternative three would be to --
6          THE COURT:  Order you to release them.
7          MR. HENRY:  Well, Your Honor, I guess that presents a
8  number of problems.  You order us to release them; we certainly
9  are not at liberty to release them to a foreign sovereign that
10  has not agreed to take them.  Again, we think there's serious
11  problems with the Court ordering that they be released into the
12  United States, so --

13      THE COURT:  I didn't say into the United States, I said
14   release them, hypothetically.
15      MR. HENRY:  Well, Your Honor, I'm having problems
16   thinking of other options.  I suppose they could release them on
17   Guantanamo Bay, but that presents its own problems that were
18   addressed, I believe, in our prior filings as far as security
19   both of the detainees themselves and other security issues,
20   since Guantanamo Bay is a military reservation.
21      So as Your Honor pointed out, the authority that we
22   claim to continue to hold these individuals in a Camp Iguana
23   type affair is the authority to wind up these detentions as
24   quickly as possible in an orderly fashion.  The Court's order to
25   release them potentially could, I suppose, throw that into

28

1   somewhat of a disarray.
2      But I'm really not sure what else could be done; the
3   option of releasing them on a military base is not a good one,
4   we can't get them to a foreign sovereign, certainly the
5   executive is highly unlikely to admit them to the United States
6   of its own accord.  And so again, it presents some serious
7   problems which I think counsel that the case, as far as those
8   kind of proceedings, continue to be stayed until we get some
9   guidance from the Court of Appeals or we find a place to
10   resettle them, given that the efforts are serious and ongoing.
11      THE COURT:  All right, sir.  Thank you.  Mr. Willett,
12   anything further?
13      MR. WILLETT:  Yes, sir.  A couple of points in
14   response.  According to Mr. Qassim, he was taken into custody by
15   U.S. forces in Pakistan on December 11, 2001.
16      While Mr. Henry was speaking, I leafed through to
17   Justice Kennedy's concurring opinion in Rassoul.  Everybody
18   talks about whether or not you can bring them here, as though
19   they're not already here, here in the United States.  Justice
20   Kennedy says, first, "Guantanamo Bay is in every practical
21   respect a United States territory."  He goes on, "From a
22   practical perspective, the indefinite lease of Guantanamo Bay
23   has produced a place that belongs to the United States,
24   extending the implied protection of the United States."
25      So that is, I think, authority for the proposition that

29

1   they're already here in the law.  I don't know why Your Honor
2   couldn't fashion an order that says your order shall not be
3   deemed an entry to the extent one hasn't been made already, and
4   people may fight about what that means one day.

5          Mezei, the Shaughnessy case, is one that Zadvadus
6   distinguishes because he was a guy who had come here voluntarily
7   to Ellis Island.  I apologize, I don't have the cite, but
8   there's an interesting book, and I'll try to find the cite about
9   that case, and it is speculated that somebody simply opened the
10  door, because he disappeared from Ellis Island.  The case
11  ultimately was dismissed, and presumably he's here, his children
12  are alive and well in the United States today.  I think there
13  was a movie like that not so long ago.
14          THE COURT:  That guy was in the airplane terminal,
15  wasn't he?
16          MR. WILLETT:  In the airport they tried to open the
17  door and he wouldn't do it.
18          The point is here that these guys were brought to
19  Guantanamo, they didn't volunteer, so we say they're here.
20  They're in what Justice Kennedy says is in every practical way
21  the United States.  And then when you go through the little baby
22  steps, I don't think we're asking for very much to get from that
23  to this interim release.
24          Thank you.
25          THE COURT:  All right, counsel.  You've done your best.

                                  30
1   I can't pretend to be pleased at having learned a whole lot that
2   I didn't know when I came in here, but counsel have done their
3   best with what I think is really classically a dilemma.
4          The one thing that I am sure of is that I'm going to
5   act on this motion within the next week or two one way or
6   another.  There isn't going to be any more waiting.  So if
7   anybody has anything to say to me by way of augmenting the
8   record -- I don't -- thank you, Mr. Henry, for your offer to
9   speak to me off the record, but I don't want that.  I'm just not
10  going to be in that position.  If you can tell me that they're
11  going to be released on X date, you can tell me that publicly.
12  Or if you can tell me that they're going to be released on X
13  date and you have a date, I'll accept that.  But "diplomatic
14  efforts are proceeding," no thank you.
15          Within two weeks, at the most, I'm going to act on this
16  motion.  So the matter is submitted, unless anybody has anything
17  else to submit either orally today or in writing in the next
18  week or 10 days.  Thank you very much.  We're adjourned.
19
20
21
22
23

24
25

31

1    CERTIFICATE OF OFFICIAL COURT REPORTER
2
3        I, Rebecca King, certify that the foregoing is a
4    correct transcript from the record of proceedings in the
5    above-entitled matter.
6
7
8
9    _____    _____
10   SIGNATURE OF COURT REPORTER            DATE
11
12
13
14
15
16