**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>JAMAL KIYEMBA, <i>et al.</i>,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td style="text-align:right">Petitioners,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td style="text-align:center">v.</td><td>)<br>)</td><td>Civil Action No. 05-1509 (RMU)</td></tr>
<tr><td>GEORGE W. BUSH, President of<br>the United States, <i>et al.</i>,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td style="text-align:right">Respondents.</td><td>)<br>)<br>)</td><td></td></tr>
</table>

**RESPONDENTS' OPPOSITION TO PETITIONER SADDIQ DOE'S**
**MOTION FOR IMMEDIATE PRODUCTION OF THE BODY AND GRANT**
**OF WRIT, OR, IN THE ALTERNATIVE, GRANT OF INTERIM RELEASE**

Dated:  October 31, 2005

KENNETH L. WAINSTEIN
United States Attorney

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
JAMES J. GILLIGAN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7212
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

# TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    PETITIONER'S REQUEST TO LIFT THE STAY AND DIRECT HIS
      IMMEDIATE RELEASE SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Court's Reasons for Issuing the Stay Remain . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Petitioner Has Not Demonstrated Changed Circumstances
            That Would Justify Lifting the Stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    The confirmation of petitioner's NLEC status
                  does not constitute changed circumstances . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    The legal principles applicable to this case will be
                  established by the decision in the Guantanamo detainee
                  appeals, notwithstanding petitioner's NLEC status . . . . . . . . . . . . . . . . 7

II.   PETITIONER'S MOTION FOR INTERIM RELEASE MUST BE DENIED . . . . . . . . 11

      A.    Federal Courts Lack Authority To Direct That Non-Resident
            Aliens Be Brought Into the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    Even if the Court Had the Authority To Order Petitioner's
            Release Into the United States, It Should Decline To Do So . . . . . . . . . . . . . . . 16

            1.    Petitioner has not demonstrated extraordinary
                  circumstances as required to allow interim release . . . . . . . . . . . . . . . . 16

            2.    The caution required by the Supreme Court in this
                  area dictates that interim release be denied . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                          )
JAMAL KIYEMBA, *et al.*,                  )
                                          )
                    Petitioners,          )
                                          )
          v.                              )          Civil Action No. 05-1509 (RMU)
                                          )
GEORGE W. BUSH, President of              )
   the United States, *et al.*,           )
                                          )
                    Respondents.          )
———————————————————————

## RESPONDENTS' OPPOSITION TO PETITIONER SADDIQ DOE'S
## MOTION FOR IMMEDIATE PRODUCTION OF THE BODY AND GRANT
## OF WRIT, OR, IN THE ALTERNATIVE, GRANT OF INTERIM RELEASE

### INTRODUCTION

Petitioner Saddiq Doe has filed what is, in all but name only, a second motion for

reconsideration of this Court's September 13, 2005, Memorandum Order ("September 13

Order") (dkt. no. 8) staying this case. Following shortly on the heels of Petitioners' Motion for

Reconsideration of September 13 Order ("Pet'rs' Recon. Mot.") (dkt. no. 14), Petitioner Saddiq

Doe['s] . . . Motion for Immediate Production of the Body and Grant of Writ, or, in the

Alternative, Grant of Interim Release ("Pet'r's Mot.") (dkt. no. 29), asks the Court to vacate the

September 13 stay, and order his immediate release from the quarters at Guantanamo Bay where

he and certain other ethnic Uighers who have been determined no longer to be enemy combatants

are now housed. As grounds for this request, he relies on arguments nearly identical to those

petitioners advanced in support of their motion for reconsideration, which, as respondents have

already shown in opposition to that motion, are without merit. They supply no better ground for

lifting the stay than they do for reconsidering the decision to enter the stay in the first place.

This Court granted respondents' motion for a stay of these proceedings in light of the inefficiency of attempting to address the instant *habeas corpus* petition prior to the D.C. Circuit's resolution of the appeals in <u>Khalid v. Bush</u> and <u>In re Guantanamo Detainee Cases</u>, which present many of the same issues raised by the petitioners here, and the resolution of which by the Court of Appeals will establish the legal principles applicable to petitioners' claims in this case.  The D.C. Circuit, however, has yet to issue its decision in the Guantanamo detainee appeals, and the stay, therefore, should remain in place.

In support of his position to the contrary, petitioner Saddiq Doe continues principally to argue, as petitioners did in their motion for reconsideration, that because respondents have now confirmed that Saddiq Doe is no longer considered an enemy combatant, his claims will not be governed by the pending Guantanamo detainee appeals, and the stay should be lifted.  When the Court issued the stay, however, the parties had already brought to its attention the possibility that one (or more) of the petitioners in this case might have been determined by Combatant Status Review Tribunals ("CSRTs") to be no longer enemy combatants ("NLECs").  The confirmation of that fact does not constitute changed circumstances that warrant lifting the stay.  Moreover, petitioner's NLEC status has no bearing on the reasons for issuing (or maintaining) the stay, because the common-law arguments he advances as grounds requiring the release of NLEC detainees such as himself are nearly identical to arguments raised by the detainee-petitioners before the D.C. Circuit, and will likely be resolved by the Court of Appeals in its disposition of those cases.  Under these circumstances, the Court had no legal obligation to act immediately on petitioner's claims, as he maintains, but acted well within its discretion under the rules of procedure applicable to *habeas corpus* cases to stay this case pending the D.C. Circuit's decision.

Petitioner alternatively requests "interim release," somewhere in the District of Columbia, pending the conclusion of these proceedings.  That request must be denied because the law, by its express terms and tradition, vests exclusive authority to permit non-resident aliens entry into the United States with the Executive Branch.  By the same token, such authority is withheld from the courts.  Moreover, even if a court's authority under the *habeas corpus* statute encompassed the authority to order that a non-resident alien be granted entry into the United States, petitioner has not shown, as he must, that extraordinary and exceptional circumstances require his interim release in order to make his *habeas corpus* remedy effective.  In all events, the Court should resist petitioner's importuning for precipitous action in an area of the law where the Supreme Court has instructed that the lower courts should proceed with caution.  Releasing petitioner, a non-resident alien having no apparent means of supporting himself outside his current living arrangements at Guantanamo Bay, would not only be utterly impractical, but an order directing his interim release would impinge upon the Executive Branch's authority over matters concerning wartime detainees.  For these reasons, explained more fully below, petitioner Saddiq Doe's requests to lift the stay, to order his immediate release, or, alternatively, to grant him interim release, should be denied.

## ARGUMENT

**I.  PETITIONER'S REQUEST TO LIFT THE STAY AND DIRECT HIS IMMEDIATE RELEASE SHOULD BE DENIED.**

### A.    The Court's Reasons for Issuing the Stay Remain.

A court may vacate a stay of proceedings "[w]hen circumstances have changed such that the court's reasons for imposing the stay no longer exist or are inappropriate."  Canady v. Erbe Elektromedizin GmbH, 271 F. Supp. 2d 64, 74 (D.D.C. 2002) (citations omitted).  See also

United States v. A Certain Parcel of Land, Moultonboro, 781 F. Supp. 830, 834 (D.N.H. 1992). This Court granted respondents' motion for a stay of these proceedings in light of the pending appeals in In re Guantanamo Detainee Cases, 355 F. Supp.2d 443 (D.D.C. 2005), appeal pending on petition for interlocutory appeal, No. 05-5064 (D.C. Cir.), and in Khalid v. Bush, 355 F. Supp.2d 311 (D.D.C. 2005), appeals pending Nos. 05-5062, 05-5063 (D.C. Cir.). As the Court observed in its September 13 Order, "the D.C. Circuit has yet to issue an opinion" in these cases, and "[a]ccordingly, the state of the law in this circuit concerning the habeas rights of [Guantanamo Bay] detainees is unclear." In issuing its stay order, the Court remarked upon "the inefficiency of resolving the merits of the instant habeas petition prior to the D.C. Circuit issuing a ruling that will cover similar matters." September 13 Order at 1-2.

None of these circumstances has changed since the Court issued its September 13 Order. Although the D.C. Circuit heard oral argument in Khalid and In re Guantanamo Detainee Cases on September 8, 2005, as yet it has still not issued a decision. Thus, the *habeas corpus* rights of Guantanamo Bay detainees remain just as unclear in this circuit today as they did on September 13. In the continued absence of a decision from the D.C. Circuit that will determine the legal analysis applicable to petitioner's claims, it would be just as inefficient now to attempt to resolve the merits of Saddiq Doe's petition as it would have been on September 13 when this Court decided that these proceedings should be stayed. In short, all of the reasons for which the Court stayed this case remain, and petitioner is therefore without grounds for seeking to vacate the stay, or moving for his immediate release.

4

B.    **Petitioner Has Not Demonstrated Changed Circumstances
That Would Justify Lifting the Stay.**

1.    **The confirmation of petitioner's NLEC status does
not constitute changed circumstances.**

As the principal basis for lifting the stay, petitioner cites respondents' determination that

he is "no longer an enemy combatant" -- an "NLEC" -- in consequence of which, he maintains,

this case is not controlled by the Guantanamo detainee appeals.  Those cases, he reasons, concern

only the government's authority to detain enemy combatants, whereas this case presents the

question of respondents' power to maintain custody of an NLEC.  Therefore, he concludes, the

stay should be lifted and the merits of his petition decided immediately.  Pet'r's Mot. at 1;

Memorandum of Law in Support of Motion of Petitioner Saddiq Doe . . . for Immediate

Production of the Body and Grant of Writ, or in the Alternative, Grant of Interim Release

("Pet'r's Mem.") (dkt. no. 29)  at 1-2, 5.

Far from establishing "changed circumstances" that warrant lifting the stay, these

arguments merely register petitioner's disagreement (for the second time, see Pet'r's Recon.

Mem. at 1-2, 4-5) with the Court's reasons for issuing the stay in the first place.  In his

opposition to Respondents' Motion for Order To Show Cause Why Case Should Not Be

Dismissed for Lack of Proper "Next Friend" Standing, or, in the Alternative, To Stay

Proceedings Pending Related Appeals [etc.] ("Resps.' Show-Cause Mot.") (dkt. no. 3), petitioner

asserted that he and possibly other petitioners in this case had already been determined by a

Combatant Status Review Tribunal to be NLECs.  Opposition to Motion for Order To Show

Cause Why Case Should Not Be Dismissed for Lack of Proper "Next Fried" Standing (dkt. no. 7)

at 4-5 ("upon information and belief, Petitioner Saddiq Doe has been exonerated by the

Government in a [CSRT]"); see id. at 8-9 (petitioners here are Uighers, who "have been found to

be non-enemy combatants"). Indeed, respondents themselves addressed that possibility and explained that the requested stay was nevertheless warranted because "[a]ny issue of whether a petitioner possesses substantive legal rights under the Constitution, treaties, or statutes regarding his detention would be the subject of and affected by resolution of the pending appeals" regardless of petitioners' combatant status. Resps.' Show-Cause Mot. at 19 n. 18. Presumably, therefore, the Court also took this possibility into account when it concluded that the D.C. Circuit's ruling in the pending Guantanamo detainee appeals will cover matters "similar" to those at issue in this case. September 13 Order at 2.

Nothing has changed since then except confirmation of Saddiq Doe's identity and, thereby, his status as an NLEC, based on information that petitioner's counsel only belatedly provided to respondents on September 28. See Respondents' Opposition to (1) Petitioners' Motion for Leave To File Surreply [etc.] and (2) Petitioner's Motion for Reconsideration of September 13, 2005 Order ("Resps.' Recon. Opp.") (dkt. no. 19) at 6-7 (citing Declaration of Terry M. Henry, Exh. C).[1] The confirmation of this possibility, which both the Court and the parties had the opportunity to weigh before the Court decided to stay this case, does not constitute a changed circumstance that justifies lifting the stay. Indeed, it reinforces the wisdom of entering the stay. As respondents have previously noted, Resps.' Recon. Opp. at 12 n. 8, the government intends to release all NLECs such as petitioner as soon as suitable countries for transfer can be found where it is not more likely than not that they will be tortured. Confirmation that petitioner is an NLEC and is slated, as such, for release regardless of the outcome of this

---

[1] Petitioner continues gratuitously to assert that respondents "ha[ve] done everything possible . . . to hide the fact that [he] is not an enemy combatant." Pet'r's Mem. at 2. Respondents have already thoroughly rebutted this unfounded accusation, see Resps.' Recon. Opp. at 3-9, and will not address it at length again herein.

litigation, is all the more reason for maintaining rather than lifting the stay.  If there is any Guantanamo detainee *habeas corpus* case in which it would be appropriate to forge ahead with plenary proceedings during the pendency of the Guantanamo detainee appeals, it is surely not this one, in which respondents are already engaged in efforts to bring about petitioner's release.

> **2.      The legal principles applicable to this case will be established by the decision in the Guantanamo detainee appeals, notwithstanding petitioner's NLEC status.**

Petitioner's contentions to the contrary notwithstanding, his status as an NLEC has no legal bearing, in the final analysis, on the Court's reasons for entering the stay -- the fact that the D.C. Circuit's ruling in Khalid and In re Guantanamo Detainee Cases will cover matters similar to those raised by the petition in this case.   Both this case and the cases on appeal pose questions regarding the substantive legal rights of all alien wartime detainees under the Constitution, treaties, and statutes of the United States, and the powers conferred on the federal courts by the *habeas corpus* statute with respect to the claims of such detainees, regardless of their status as enemy combatants or as persons whom the government has decided to release as soon as appropriate destination countries can be found.

Petitioner suggests that he is asserting a legal ground for his release that is not now "being tested in the Court of Appeals," the "threshold obligation" assertedly imposed upon the government by the common law of *habeas corpus*, independent of any obligation under the Constitution, statutes, or treaties, "to point to some lawful basis for [his] imprisonment."  Pet'r's Mem. at 11.  That argument, however -- that there is an independent "common law" right to release under the *habeas corpus* statute even if no violation of constitutional or other cognizable rights has been shown -- is similar, if not identical, to one of the main arguments being pressed by the detainee-petitioners on appeal.  Compare Pet'r's Mem. at 11-12 ("We rest on the

7

Government's threshold obligation to point to some lawful basis for imprisonment. This

obligation arises under the common law of habeas corpus that long predated our Constitution and

exists independently of it. 'Habeas corpus is,' as the Supreme Court explained, 'a writ

antecedent to statute, . . . throwing its root deep into the genius of our common law.'") (footnote

omitted), with Brief for the Guantanamo Detainees, Nos. 05-5064, 05-5095, et seq. (D.C. Cir.)

(excerpts filed herewith as Exhibit 1) at 18 ("Relief under the habeas statute . . . does not depend

on showing a violation of the Constitution. . . . As the Supreme Court pointed out in Rasul [v.

Bush, 124 S. Ct. 2686, 2692 (2004)], the statutory entitlement to judicial review of federal

detentions is part of our common law heritage, throwing its root deep into the genius of our

common law.'"). Thus, the outcome in Khalid and In re Guantanamo Detainee Cases will likely

determine the fate of petitioner's argument in this Court as well.

      Petitioner relatedly argues that respondents' determination of his status as an NLEC

amounts to a "concession" that the government "has no lawful basis" to detain him, and therefore

that the terms of the *habeas corpus* statute require his immediate release. Pet'r's Mem. at 1-2,

5-6, 10-11. As respondents have already explained, however, the Executive's firmly established

authority to detain suspected enemy combatants, see, e.g., Hamdi v. Rumsfeld, 124 S. Ct. 2633,

2640 (2004) (explaining that "[t]he capture and detention of lawful combatants and the capture,

detention, and trial of unlawful combatants, by 'universal agreement and practice,' are 'important

incident[s] of war'") (citation omitted), necessarily includes the authority to wind up that

detention in an orderly fashion after a detainee has been determined to no longer be an enemy

combatant, or after hostilities have ended. See Resps.' Recon. Opp. at 12-13 n. 10. The United

States has historically exercised that authority, see id., and is exercising it in this case while it

continues efforts to release petitioner to a suitable country as soon as one can be found.

<center>8</center>

While purporting to dispute the existence of this authority, petitioner merely complains, at bottom, that the living arrangements at Guantanamo Bay are not as hospitable as those assertedly made for detainees following hostilities in the Gulf War and World War II. Pet'r's Mem. at 6-10. But even setting aside the myriad differences between those situations and the circumstances presented by the global war on terror, the distinctions that petitioner attempts to draw have nothing to do with the basis of the government's detention authority, merely the manner in which it has been exercised.[2] Petitioner's passing reference to Article 118 of the Third Geneva Convention relative to the treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 (1955), see Pet'r's Mem. at 6, is unavailing, first, because the Third Geneva Convention

---

[2] Notably, though, the living conditions for NLECs like petitioner have been and continue to be ameliorated during the transition period pending their release. Until recently, detainees designated as NLECs were located in a communal living facility in which detainees were free to move about with nearly all-day access to exercise yards and other recreational opportunities. See Declaration of Col. Michael I. Bumgarner, ¶¶ 4-7 (submitted with Respondents' Memo. in Opp. to Petrs' Mot. to Vacate Stay Order and Issue Writ Directing Immediate Release of Petitioners (dkt. no. 25) in Qassim v. Bush, No. 05-0497 (JR)) (also filed herewith as Exhibit 2). In Camp 4 detainees were allowed to play soccer and volleyball, and were provided games such as chess, checkers, and playing cards, as well as books available from a librarian. Id. ¶ 4. They were served meals family-style on picnic benches under an awning, offered weekly movies, and provided special food items. Id. ¶ 5. In mid-August they were transferred to a separate facility, Camp Iguana, newly renovated for the purpose of housing NLECs such as petitioner. See Declaration of Jay W. Hood, ¶ 5 (submitted with Respondents' Supp. Mem. Pursuant to the Court's Invitation at the Aug. 1 Hrg. (dkt. no. 27) in Qassim) (also filed herewith as Exhibit 3). At Camp Iguana petitioner resides in a communal living situation in a facility overlooking the Caribbean Sea, id., where in addition to enjoying the amenities and privileges available at Camp 4, NLEC detainees have their own bunk house, activity room, air conditioning in all living areas, recreational yard, around-the-clock access to a television set with VCR and DVD capability, a stereo system, additional recreational items (such as a ping pong table), unlimited access to a shower facility, additional food items, and library materials. Id. ¶ 6.

In a further attempt to distinguish the historical precedents for "wind up" detention, petitioner argues (with 20-20 hindsight) that in none of them did the detention turn out to be indefinite in duration. Pet'r's Mem. at 6. But at the time, during the months and sometimes years it took to complete the repatriation or resettlement of the prisoners involved, the wind up of the detentions certainly must have appeared just as indefinite as petitioner's may appear now.

does not confer individual rights enforceable in federal court, as the D.C. Circuit only recently held in Hamdan v. Rumsfeld, 415 F.3d 33, 39-41 (D.C. Cir. 2005), and, second, because the plain terms of Article 118 presuppose that repatriation is possible, and cannot be taken to require the immediate release of detainees like petitioner who, for humanitarian reasons, cannot be repatriated or resettled until such time as an appropriate host country can be found.[3/]

At bottom, moreover, any dispute here about the validity of the government's "wind up" detention authority is only germane under petitioner's theory that it is incumbent upon the government in a *habeas corpus* proceeding to establish grounds in the first instance for the challenged detention. See Pet'r's Mem. at 1, 12. As discussed above, the existence of any such threshold obligation is among the questions presented for decision in the Guantanamo detainee appeals. Thus, once again, petitioner's contentions actually reinforce the wisdom of the Court's decision to await the D.C. Circuit's guidance before attempting to address this and the other "similar matters" that the Court of Appeals' decision will cover. September 13 Order at 2.

All that being the case, the Court acted well within its authority to stay further proceedings notwithstanding petitioner's contentions that he is statutorily entitled to immediate review of his *habeas corpus* claims. Pet'r's Mem. at 10-11. Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts (the "2254 Rules") (which are also applicable to *habeas corpus* cases, such as this one, brought under provisions other than § 2254, see 2254 Rule 1(b)) allows a court to "order the respondent to file an answer, motion, or other response [to a petition] within a fixed time, or to take other action the judge may order. . .."

---

[3/]  Contrary to the impression given in petitioner's memorandum, Judge Robertson, in his August 19, 2005 memorandum order in Qassim, expressed some reservations but declined to resolve the parties' dispute over the existence of the government's "wind up" detention authority. Qassim, supra n. 2, Memorandum Order dated August 19, 2005 (dkt. no. 34) at 3.

Thus, Rule 4, "which ha[s] the force of a superseding statute, 28 U.S.C. § 2072(b) . . . loosened

up the [three-day] deadline for responses" under 28 U.S.C. § 2243, and "leaves it up to the

district court to fix the deadline." Bleitner v. Welborn, 15 F.3d 652, 653-54 (7th Cir. 1994). See

also Castillo v. Pratt, 162 F. Supp. 2d 575, 577 (N.D. Tex. 2001) ("[t]he discretion afforded by

Rule 4 . . . 'prevails' over the strict time limits of 28 U.S.C. § 2243"); Kramer v. Jenkins, 108

F.R.D. 429, 431 (N.D. Ill. 1985) ("in [a] conflict between Rule 4 . . .and 28 U.S.C. § 2243, Rule

4 must prevail"). Accordingly, the stay issued on September 13 represents a proper exercise of

the Court's authority consistent with Rule 4 of the 2254 Rules. It should remain in place at least

until the D.C. Circuit has issued its decision in the Guantanamo detainee appeals, and petitioner's

demand that the Court order his immediate release should be rejected.

## II.    PETITIONER'S MOTION FOR INTERIM RELEASE MUST BE DENIED.

### A.    Federal Courts Lack Authority To Direct That Non-Resident Aliens Be Brought Into the United States.

In the alternative to immediate release, petitioner also seeks "interim" release pending

final adjudication of his claims. Pet'r's Mem. at 12-15. Although he never specifies exactly

where, his memorandum suggests that he contemplates being relocated somewhere "in this

District," that is to say, Washington, D.C. Id. at 15. So understood, petitioner's request must be

denied, for the fundamental reason that it lies beyond a court's power to grant it.

As explained in Baker v. Sard, 420 F.2d 1342, 1243 (D.C. Cir. 1969) (per curiam), on

which petitioner relies, any authority a court possesses under the *habeas corpus* statute to order

release of a petitioner *pendente lite* is an inherent attribute of its "jurisdiction to order release as a

final disposition of the action." But neither this Court nor any other has authority under the

*habeas corpus* statute to order as a final disposition that a non-resident alien be permitted to enter

11

this country from a foreign territory such as Guantanamo Bay, Cuba. <u>See</u> Immigration & Nationality Act ("INA") § 101(a)(38), 8 U.S.C. § 1101(a)(38) (defining "United States" for geographical purposes as including only "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the [U.S.] Virgin Islands"). To make a "lawful entry . . . into the United States," someone in petitioner's position would have to be "admitted," INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A), which for three reasons a federal court has no authority to compel.

First, without a visa (or border crossing card, which is not relevant here), an alien is inadmissible and cannot lawfully enter the country. 8 U.S.C. § 1182(a)(7). Under established precedent, this Court cannot order the issuance of a visa to petitioner. <u>See</u>, <u>e.g.</u>, <u>City of New York v. Baker</u>, 878 F.2d 507, 512 (D.C. Cir. 1989).[4] As the D.C. Circuit and "every other circuit to consider the issue" has made clear, only consular officers of the United States can issue visas. <u>See id</u>. at 512 (citing 8 U.S.C. §§ 1101(a)(9) & (16), 1104 (a)(1), 1201(a)). "[C]ourts are without authority to displace the consular function in the issuance of visas." <u>Id</u>. Accordingly, any "district court[] order that purports to direct the issuance of visas is without force and effect." <u>Id</u>.; <u>accord</u> <u>Saavedra Bruno v. Albright</u>, 197 F.3d 1153, 1159-60 (D.C. Cir. 1999).

Second, an order requiring petitioner's release into the United States would also run counter to over a century of Supreme Court jurisprudence recognizing that the admission of aliens is the quintessential sovereign function reserved exclusively to the political branches of government. As the Court explained as long ago as 1893, "[t]he power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the

---

[4]  <u>See also</u> <u>Centeno v. Shultz</u>, 817 F.2d 1212, 1213 (5th Cir. 1987) (per curiam); <u>Li Hing of Hong Kong, Inc. v. Levin</u>, 800 F.2d 970 (9th Cir. 1986); <u>Wan Shih Hsieh v. Kiley</u>, 569 F.2d 1179, 1181 (2d Cir. 1978); <u>Montgomery v. French</u>, 299 F.2d 730, 735 (8th Cir. 1962).

government." Fong Yue Ting v. United States, 149 U.S. 698, 713 (1893). It is "to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene." Id.; see also Lem Moon Sing v. United States, 158 U.S. 538, 546-547 (1895); Fok Yung Yo v. United States, 185 U.S. 296, 305 (1902) ("Congressional action has placed the final determination of the right of admission in executive officers, without judicial intervention, and this has been for many years the recognized and declared policy of the country").

Because non-resident aliens have no constitutional right to enter the United States or otherwise be present in the country, see, e.g., Landon v. Plasencia, 459 U.S. 21, 33 (1982); Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950), courts must honor Congress's prescriptions regarding the admission or exclusion of aliens. Indeed, for over a hundred years, the Supreme Court has faithfully refused to permit judicial intervention in this area when Congress has not expressly provided for it. See Fiallo v. Bell, 430 U.S. 787, 796 (1977) ("[t]he conditions of entry for every alien . . . have been recognized as matters . . . wholly outside the power of [the courts] to control") (citation omitted); Knauff, 338 U.S. at 542-43; Nishimura Ekiu v. United States, 142 U.S. 651 (1892). See also INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999); Shaughnessy v. Mezei, 345 U.S. 206, 210, 213 (1953); Heikkila v. Barber, 345 U.S. 229, 233-34 (1953).

Third, consistent with this jurisprudence, Congress has vested sole (and unreviewble) discretion to admit or exclude an alien with the Executive Branch. Specifically, under the INA, issuance of a visa is discretionary; a consular officer "may" issue a visa to an alien who has made a proper application for it. INA § 221(a)(1); 8 U.S.C. § 1201(a)(1). The INA unambiguously states that, "[n]otwithstanding any other provision of law," no court shall have jurisdiction to

review "any . . . decision . . . the authority for which is specified . . . to be in the discretion of the

Attorney General or the Secretary of Homeland Security other than the granting of [asylum]."

INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).[5/]  Earlier this year, Congress clarified that

this comprehensive preclusion of judicial involvement in the admission or exclusion of aliens

encompasses habeas review.  In the Real ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat.

302 (May 11, 2005), Congress amended the INA to make explicit that no court has jurisdiction

under 28 U.S.C. § 2241 or "any other habeas corpus provision" to review such discretionary

decisions.  Real ID Act § 106(a); see also id., § 101(f)(2).  Thus, a federal court has no power

under the *habeas corpus* statute to supplant the Executive Branch's authority over the admission

of aliens to this country by ordering the admittance of a wartime detainee such as petitioner.

    Nor can the Court order that the government "parole" petitioner, that is, to temporarily let

him into the country.  Although the INA authorizes the parole of aliens who have applications for

admission pending, INA § 212(d)(5), 8 U.S.C. § 1182(d)(5), the decision to parole -- just like the

decision to admit -- is vested solely in the Executive Branch's unreviewable discretion.  8 U.S.C.

§ 1182(d)(5)(A) (the Secretary of Homeland Security "may . . . in his discretion" parole aliens

into the United States); see also INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii) (precluding

judicial review of agency parole decisions).[6/]  Aside from admission and parole, there is no way

---

    [5/]  Enacted by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996
("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-628 (Sept. 30, 1996), and as amended by the
REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 302 (May 11, 2005).

    [6/]  That proposition is not undermined by Haitian Centers Council, Inc. v. Sale, 823 F.
Supp. 1028 (E.D.N.Y. 1993), in which a District Court held that the Attorney General abused her
discretion in denying parole to certain Haitian detainees at Guantanamo.  The Haitian Centers
Council decision was issued both before the 1996 enactment in IIRIRA of the bar on review of
discretionary decisions at INA § 242(a)(2)(B)(ii), and before the 2005 amendment of that
                                                                              (continued...)

for petitioners to be lawfully present in the United States.  See 8 U.S.C. § 1182(a)(9) (an alien is "unlawfully present" if "present in the United States without being admitted or paroled").

In short, far from authorizing "the judicial department . . . to intervene" in matters concerning the admission of non-resident aliens, Fong Yue Ting, 149 U.S. at 713, Congress instead vested exclusive and unreviewable discretion over such matters with the Executive Branch, and therefore under more than a century of settled Supreme Court precedent, such matters lie "wholly outside the power of [the Court] to control." Fiallo, 430 U.S. at 796.  Even if it violated the Constitution or laws of the United States to continue to hold petitioner pending his release (and it assuredly does not),[7] any *habeas corpus* authority the Court might have to order petitioner's release would not encompass the authority to order him brought into the United States.  Inasmuch as the power to order interim release is an inherent attribute of the power to order release as a final disposition, Baker, 420 F.2d at 1343, it necessarily follows that this court has no authority under the *habeas corpus* statute to order that petitioner be released within the territory of the United States on an interim basis.[8]

---

[6] (...continued)
provision by the Real ID Act to explicitly encompass habeas review as well as agency actions taken outside of removal proceedings.  Further, the decision ultimately was vacated by a "Stipulated Order Approving Class Action Settlement Agreement" (Feb. 22, 1994), as recognized by Cuban American Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412 (11th Cir. 1995).

[7] As non-resident aliens with no prior voluntary connection to the United States, petitioners do not enjoy constitutional rights.  See, e.g., Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005), on appeal, Nos. 02-5062, 02-5063 (D.C. Cir.).

[8] Petitioner cites Baker, 420 F.2d at 1343, and Mapp v. Reno, 241 F.3d 221 (2d Cir. 2001), as giving him a right under the *habeas corpus* statute to release in the United States pending final adjudication of the writ.  Petrs' Supp. Mem. at 2-3.  However, Baker and Mapp both involved persons already within the United States, so interim release did not concern, and posed no problem of, admitting or paroling a non-resident alien into this country.

15

**B.    Even if the Court Had the Authority To Order Petitioner's
Release Into the United States, It Should Decline To Do So.**

**1.    Petitioner has not demonstrated extraordinary
circumstances as required to allow interim release.**

Even if the Court could disregard the clear bar to ordering petitioner's entry into the

United States, the courts' power to order interim release of a *habeas corpus* petitioner "is a

limited one, to be exercised in special cases only." Mapp, 241 F.3d at 226. "'The petitioner

must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary

circumstances exist[ ] that make the grant of [interim release] *necessary to make the habeas

remedy effective.*'" Id. (citation omitted; emphasis added).  While the substantiality of

petitioner's claims remains a matter that will largely be determined by the D.C. Circuit in the

Guantanamo detainee appeals, it is clear that petitioner has not made a showing that interim

release is "necessary to make [his] habeas remedy effective."

Petitioner contends that interim release "is necessary to make habeas effective, because

without it[,] the wrong habeas addresses -- indefinite, illegal imprisonment -- will continue."

Pet'r's Mem. at 14.  But that could be said in any *habeas corpus* case.  In every case the

petitioner's detention "will continue," absent interim release, until the merits of his claims are

adjudicated.  Petitioner has offered no explanation why interim relief is any more necessary to

make release "effective" in his case than in any other case where release from confinement is the

ultimate remedy sought.  See Mapp, 241 F.3d at 230-31 (no basis for interim release without

showing why release was necessary to make the relief sought, reconsideration by the government

of the petitioner's eligibility for waiver of deportation, "effective"); cf. Boyer v. City of Orlando,

402 F.2d 966, 968 (5th Cir. 1998) (petitioner entitled to interim release to make post-conviction

remedies "truly effective" where otherwise petitioner's 120-day sentence "would long have been

16

served" before *habeas corpus* proceedings could be completed). Far from demonstrating

"extraordinary or exceptional circumstances," the reasoning advanced by petitioner would render

interim release a routine matter rather than a "limited" remedy reserved for "special cases."

Mapp, 241 F.3d at 226.

Also falling well short of demonstrating that interim release is "necessary to make the

habeas remedy effective" in this instance, id., is petitioner's unsupported speculation that his

presence in the District of Columbia might facilitate as yet hypothetical future efforts by the

United Nations High Commission for Refugees (UNHCR) to refer him to an asylee country.

Pet'r's Mem. at 15. Even assuming that petitioner met UNHCR's criteria for refugee status, or

that UNHCR could locate a host country for him with any greater facility than respondents, the

Court should refrain from bringing petitioner to the United States simply to promote efforts by

petitioner or his counsel to engage the assistance of such organizations on his behalf. Efforts to

resettle petitioner and other ethnic Uighers in another country fall squarely within the

Executive's purview over foreign policy matters, see, e.g., Schneider v. Kissinger, 412 F.3d 190,

195 (D.C. Cir. 2005) (noting that the President possesses "'plenary and exclusive' power in the

international arena," and acts "'as the sole organ of the federal government in the field of

international relations'" (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304,

320 (1936))), as well as the Executive's authority to deal appropriately and effectively with

issues of repatriating and resettling wartime detainees. See Hamdi, 124 S. Ct. at 2647 (plurality

opinion) ("core strategic matters of warmaking belong in the hands of those who are best

positioned and most politically accountable for making them."); Curran v. Laird, 420 F.2d 122,

130 (D.C. Cir. 1969) (en banc) ("the Executive should be accorded wide and normally

unassailable discretion with respect to the conduct of the national defense and the prosecution of national objectives through military means").

The government's attempts to pursue resettlement options for NLEC detainees such as petitioner have been diligent, ongoing, and multifaceted, and have included outreach to appropriate governments and organizations. The Court should not inject itself into matters so firmly and traditionally committed to the Executive at petitioner's behest..[9]

## 2. The caution required by the Supreme Court in this area dictates that interim release be denied.

In addition to the insuperable legal obstacles to the relief that petitioner seeks, he surely cannot mean that he should be plucked from the communal living facility at Camp Iguana where he and several other ethnic Uighers are now housed, where his material needs are met, and where numerous amenities are provided, only to be turned out into the streets of Washington, D.C.,

---

[9]  The Court should also decline to order petitioner brought into the United States because doing so would arbitrarily and materially alter petitioner's standing under the immigration laws and perhaps invest him with immigration-related rights and privileges that have never been available to aliens outside the United States, much less so to wartime detainees. Specifically, once inside the United States, petitioner would be able to apply for asylum, or for "withholding of removal," forms of relief currently unavailable to him because he is not "physically present in" the United States. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1); 8 U.S.C. § 1231(b)(3); see also Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993) (addressing essentially identical predecessor remedy of withholding of deportation under former 8 U.S.C. § 1253(h)).  An order by this Court commanding petitioner's entry into the United States would directly intrude upon the Executive's legitimate authority in this area.  When an alien interdicted in the Caribbean region has a "credible fear" of persecution or torture, the government's longstanding practice is to bring that alien to Guantanamo Bay for additional screening and third country resettlement, as warranted, but such migrants are not entitled to apply for statutory-based protections such as asylum or withholding of removal.  See Haitian Refugee Center, Inc. v. Baker, 953 F.2d 1498, 1509-10 (11th Cir. 1992).  The interim relief petitioner seeks could set a precedent for other courts to issue orders allowing aliens interdicted on the high seas and held at Guantanamo Bay to enter the United States, where they too would then become eligible to submit asylum applications.  The Court should not issue an order that would have such potential dramatic and adverse consequences for immigration matters.

where he has no known family, friends, or other social connections, and left to feed, clothe, shelter, and otherwise fend for himself pending the conclusion of these proceedings. Nor can he seriously mean to suggest that respondents should be expected to release him into civilian society without any means of tracking his whereabouts, monitoring his activities, or ensuring his departure when respondents locate a suitable host country for him. The sheer impracticality of interim release for a non-resident alien like petitioner, having no affiliation whatsoever with American society, is also reason enough alone to deny it.[10/]

Petitioner points to a supposed failure on respondents' part "to proffer any evidence suggesting that . . . he would be a threat to the community or himself," Pet'r's Mem. at 15, but this contention turns matters on their head. It is petitioner's burden to demonstrate "extraordinary or exceptional circumstances" establishing that he is entitled to interim relief, Mapp, 241 F.3d at 226, not respondents' burden to show that he is not.

In any event, while the formal, rigorous review of enemy combatant status provided by the CSRT ultimately determined that petitioner did not fall with the definition of enemy combatant, that does not necessarily imply a finding that an individual is benign in all respects, provide a character reference, or serve as a guarantee that a detainee could be appropriately and safely assimilated into American society. That is all the more so considering that determining the

---

[10/] As discussed in greater detail below, the petitioners in Qassim, ethnic Uighers, like petitioner here, who have been accorded NLEC status, also requested interim release from Guantanamo Bay to an unspecified location "in or near the District of Columbia," where, according to them, a Uigher community of legally resident aliens had offered to provide food and shelter to them. See Qassim, Supplemental Memorandum in Support of Motion To Vacate Stay Order [etc.] (dkt. no. 37) at 8; Second Supplemental Memorandum in Support of Motion To Vacate Stay Order [etc.] (dkt. no. 39) at 3. Petitioner makes no similar representations here, but even if he had done so, assurances such as these are too vague and indefinite to warrant petitioner's removal from Camp Iguana, where his material needs are provided for under the least restrictive conditions consistent with respondents' legitimate security interests.

combatant status of a detainee is not an exact science.  The Department of Defense has learned,

for example, that some former Guantanamo detainees who were released upon judgments that

they no longer presented a threat have re-emerged in combat and terrorism activities following

their release.  That is not to question petitioner's NLEC status in this specific case, but it does

counsel against precipitously releasing a wartime detainee into the midst, and perhaps

jeopardizing good order, safety, and security, of a civilian community lacking the safeguards

available at Guantanamo Bay.

        Finally, petitioner declares emphatically that "this case is now situated precisely" as

Qassim, and cites Judge Robertson's August 19, 2005 Memorandum Order in that case ("August

19 Order") (dkt. no. 34) as support for his arguments here.  Pet'r's Mot. at 2; Pet'r's Mem. at 2

n. 2, 5-6.  Petitioner's reliance on Judge Robertson's order is self-defeating, however, because

regardless of the extent to which this case and Qassim may or may not be similarly situated,

Judge Robertson's order decidedly does not support the immediate relief that petitioner requests

of the Court in this case.

        In Qassim, as in this case, the Court entered a stay of proceedings pending the Court of

Appeals' decision in Khalid and In re Guantanamo Detainee Cases.  Qassim, Order dated April

13, 2005 (dkt. no. 14).  Thereafter, upon learning that petitioners in Qassim had been determined

no longer to be enemy combatants, petitioners' counsel moved the Court to vacate the stay and to

order their clients' immediate release.  See id., August 19 Order at 1-2, 4.  Observing that the

"parties agree that [petitioners] should and will be released," id. at 3, Judge Robertson declined

then to order (and has not since ordered) the immediate or interim release of the NLEC

petitioners in Qassim (instead setting the matter down for a further hearing on their living

conditions).  Id. at 7.

20

In so doing, the Court in Qassim heeded the Supreme Court's admonition in Hamdi that lower courts should "proceed with the caution that is necessary" and take only "prudent and incremental" steps when faced with novel issues presented by the *habeas corpus* petitions of military detainees captured in the global war on terror. 124 S. Ct. at 2652. Especially so long as the legal principles applicable to petitioner's claims remain unresolved by the Court of Appeals, the Court in this case should likewise avoid precipitous action that could impinge upon the Executive's wartime authority to wind up petitioner's custody.

## **CONCLUSION**

For the foregoing reasons, petitioner's requests to vacate the September 13 stay of proceedings, to order his immediate release, or, in the alternative, to order his interim release, should be denied.

Dated:  October 31, 2005

<div style="margin-left: 40%;">

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

DOUGLAS N. LETTER
Terrorism Litigation Counsel

</div>

  */s/ James J. Gilligan*
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
JAMES J. GILLIGAN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 72123
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

22