## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

ZAKIRJAN,

      Petitioner/Plaintiff,

v.

GEORGE W. BUSH, *et al.*,

      Respondents/Defendants.

Case No. 05-Cv-2053 (HHK) (AK)

## REPLY MEMORANDUM IN FURTHER SUPPORT OF PETITIONER'S MOTION TO MODIFY THE COURT'S NOVEMBER 21, 2005 ORDER REQUIRING 30 DAYS' NOTICE BEFORE PETITIONER IS TRANSPORTED OR REMOVED

Petitioner Zakirjan Hassam ("Petitioner") hereby submits this reply memorandum in further support of Petitioner's Motion to Modify the Court's November 21, 2005 Order Requiring 30 Days' Notice Before Petitioner is Transported or Removed ("Motion").

## PRELIMINARY STATEMENT

On May 5, 2006, the government transported five non-enemy combatants to Albania. These men, all ethnic Uighurs and citizens of China, were provided no meaningful notice prior to their transfer; indeed, their counsel was not advised of the transfer until it had been completed and, arguably, the Uighurs were already beyond the reach of the Court's jurisdiction. While Albania is to be commended for accepting the Uighurs, the fact remains that the Uighurs are now in a country in which their language is a novelty, where they have no social network of friends or family, and where it is still unclear whether they will even be permitted to resettle. Until their status in Albania is certain, the specter of their extradition to China remains. See infra. at 9 n.6; see also May 16, 2006, Declaration of Sabin Willett in Connection with Status Report Concerning Petitioners-Appellants and Request for Briefing Schedule ¶¶ 25-31, Qassim v. Bush, No. 05-5477 (D.C. Cir.) ("Willett Decl.").

Given the timing of the transfer – one business day prior to a scheduled oral argument before the United States Court of Appeals for the District of Columbia addressing the Uighurs' claim that the district court has the authority to, and should, order the release of non-enemy combatants – it appears that the government's primary, if not exclusive, motivation for the transfer was to avoid judicial review of the Uighurs' claims.  There is no evidence that the government gave any weight to the interests of the Uighurs in being transferred to a community in which they could easily assimilate.

The government agrees that Mr. Hassam, like the Uighurs, is innocent of all charges and should be released.  It refuses, however, to discuss when or under what circumstances that release will occur.  By this Motion, Petitioner merely seeks advance <u>notice</u> of his release.  Requiring such notice would provide the Court with an opportunity to determine whether the government is acting in a manner consistent with international law and U.S. policy, and enable his counsel to effectively assist his resettlement efforts.  The government cannot provide any rational basis for opposing this simple request.  <u>See</u> Memorandum Order dated September 13, 2005, <u>Kiyemba v. Bush</u>, 05-cv-1509 (RMU) (D.D.C.) (docket no. 8) (ordering, in case involving a non-enemy combatant, "that the respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having actual or implicit knowledge of this Order by personal service or otherwise, may not remove the petitioners from GTMO unless this court and counsel for petitioners (if counsel has been appointed or retained) receive thirty days' advance notice of such removal").

**ARGUMENT**

I.     **The Court's March 16, 2006 Stay Order Does Not Preclude The Court From Ordering The Government To Provide 30 Days' Advance Notice Of Any Intended Release Of Petitioner**

Petitioner recognizes that the order entered by the Court on March 16, 2006 "order[s] that all action in [this case] is stayed" pending the jurisdictional ruling in the cases before the D.C. Circuit and the Supreme Court.  Order dated March 16, 2006 (docket no. 46) ("March 16 Stay"); <u>see</u> Opposition at 2.  Petitioner respectfully submits, however, that it is within the Court's discretion to lift the stay in order to grant the requested relief, and that it should so in the interest of justice.  See <u>Keystone Tobacco Co. v. U.S. Tobacco Co.</u>, 217 F.R.D. 235, 237 (D.D.C. 2003) ("Reconsiderations of interlocutory orders 'are within the discretion of the trial court' and are 'therefore subject to the complete power of the court rendering them to afford such relief from them as justice requires.'") (quoting <u>Citibank (South Dakota), N.A. v. Federal Deposit Insurance Corp.</u>, 857 F. Supp. 976 , 981 (D.D.C. 1994)).[1]

---

[1]  Respondents do <u>not</u> assert in the Opposition that their appeal of the Novemenber 21 Order somehow divests the Court of jurisdiction over the instant motion.  <u>See, e.g.</u>, <u>Decatur Liquors, Inc. v. District of Columbia</u>, 2005 U.S. Dist. LEXIS 4246, *6 (D.D.C. 2005) (noting that under certain circumstances "[t]he filing of a notice of appeal . . . confers jurisdiction on the court of appeals and divests the district court over those aspects of the case involved in the appeal.").  Nor could they; the "aspect[] of the case" before the D.C. Circuit is the government's appeal of the November 21 Order, which requires the government to give advance notice if it transfers Mr. Hassam <u>without</u> releasing him.  <u>See</u> November 21 Order (granting "30-days' notice prior to transporting or removing [P]etitioner from Guantánamo Bay Naval Base, <u>unless such transportation or removal is for the purpose of releasing</u> [P]etitioner  Zakirjan from detention.") (emphasis added).  Here, the "aspect" of the case on appeal does not address the propriety of granting 30-days' notice prior to Petitioner's release; the Court thus retains jurisdiction to grant the requested relief.  <u>See</u> <u>Barnstead Broad. Corp. v. Offshore Broad. Corp</u>, 869 F. Supp. 35, 38 (D.D.C 1994) ("When an appeal is taken from an interlocutory order, such as the grant or denial of an injunction . . . the district court retains jurisdiction to act with respect to matters not related to the issues involved in the appeal.") (citations omitted).  In addition, the changed circumstances presented in Petitioner's Motion warrant reconsideration of the November 21 Order despite the government's appeal.  <u>See</u> <u>Decatur Liquors</u> at **8-9 ("It would be inadvisable for this Court, <u>absent changed circumstances or a change in the law</u>, to reconsider and dissolve a preliminary injunction issued after due consideration of briefs and arguments where the propriety of its initial determination is also under review by the D.C. Circuit.") (emphasis added); <u>see also</u> <u>Barnstead Broad. Corp.</u> at 38 ("Transfer of jurisdiction upon appeal is a discretionary

3

**II.    The Court Has Jurisdiction To Order The Government To Provide 30 Days' Advance Notice Of Any Intended Release Of Petitioner**

The government argues that the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-44 (2005) ("DTA"), has "creat[ed] . . . an exclusive review mechanism in the D.C. Circuit, [and that] the Court [therefore] has no jurisdictional basis to order the relief requested by [P]etitioner." Opposition at 5. This argument fails first and foremost because it is based upon the flawed presupposition that the United States Supreme Court and/or the United States Court of Appeals for the District of Columbia will necessarily reach the same conclusion.[2] To date, the government has not prevailed in persuading any court that the DTA has the far reaching effect that it supports; the Court thus clearly possesses the authority to issue the order sought by the instant motion, which would enable the Court to fashion an appropriate remedy for Petitioner – i.e., a form of release that will not cause him further harm – in the event the government's interpretation of the DTA is ultimately rejected. See Memorandum Order dated June 16, 2006 Rabbani v. Bush, 05-cv-1607 (RMU) (D.D.C.) (docket no. 19) (holding that proceedings will be stayed during the pendency of the appeals in the D.C. Circuit, but further holding that "[t]he fact that the D.C. Circuit has not yet issued its decision in the related appeals (or that this case is stayed pending the D.C. Circuit's decision on those appeals) does not prevent the government from processing the [factual] returns.").

---

rule designed to avoid the confusion and waste of time that would arise if two courts were considering the same issues simultaneously.") (citations omitted).

[2] See Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005), cert. granted, 126 S. Ct. 622 (2005) (oral argument held on March 28, 2006); Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals pending Nos. 05-5062, 05-5063 (D.C. Cir.), and In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005), appeal pending on petition for interlocutory appeal, No. 05-5064 (D.C. Cir.) (oral argument held on March 22, 2006).

The government's position that the DTA bars Petitioner's *habeas* claim or the relief requested herein is in any event wrong.  First, the DTA does not apply to *habeas* petitions, like the one before the Court, that were pending on or before the date of its enactment.  Section 1005(e)(l) of the DTA amends the federal *habeas corpus* statute, 28 U.S.C. § 2241, by adding to that statute a new subsection (e), which provides that "no court . . . shall have jurisdiction to rear or consider . . . an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba."  However, Section 1005(e)(1) does not provide, as the government suggests, that the new jurisdiction-stripping language contained in § 2241(e) applies retroactively to cases such as this, which were pending prior to the enactment of the DTA.  Specifically, section 1005(h) of the DTA, entitled "EFFECTIVE DATE," provides:

> (1)     IN GENERAL - This section shall take effect on the date of the enactment of this Act.

> (2)     REVIEW OF COMBATANT STATUS TRIBUNAL AND MILITARY COMMISSION DECISIONS - Paragraphs (2) and (3) of subsection (e) shall apply with respect to any claim whose review is governed by one of such paragraphs and that is pending on or after the date of the enactment of this Act.

Sections 1005(e)(l) and 1005(h) do not state that the jurisdiction-stripping provision applies to pending *habeas* petitions.  To the contrary, section 1005(h)(l) merely states that: "[t]his section [1005] shall take effect on the date of the enactment of this Act."  As the Supreme Court has made clear, "[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date."  Landgraf v. USI Film Prods., 511 U.S. 244, 257 (1994).  The effective-upon-enactment formula is "an especially inapt way to reach pending cases."  Id. at 258 n.10.  Thus, without more, the jurisdiction-stripping provision of section 1005(e)(l) – and thus §2241(e) –

cannot be applied to cases that were pending prior to the enactment of the DTA.

Second, the jurisdiction-stripping provision of section 1005(h)(2) has no bearing on cases such as this, which involve the continued detention of non-enemy combatants. Section 1005(h)(2) is expressly limited to sections 1005(e)(2) and 1005(e)(3), and provides that those two sections, and only those two sections, "shall apply with respect to any claim whose review is governed by one of such paragraphs and that is pending on or after the date of the enactment of this Act." As the government recognizes, "section 1005(e)(2) of the Act states that the D.C. Circuit 'shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant.'" Opposition at 4 (emphasis added) (quoting section 1005(e)(2) of the DTA).[3] Mr. Hassam is not an enemy combatant; this much is beyond debate. Section 1005(e)(2) thus has no application here. And section 1005(e)(3) – the only other section covered by the jurisdiction-stripping section of 1005(h)(2) – is also irrelevant, as it is expressly limited to the "Review of Final Decisions of Military Commissions," a process to which Mr. Hassam has never been subjected.

In sum, 1005(e)(1), which governs *habeas* claims, omits any reference to pending claims and thus cannot be applied retroactively. And while sections 1005(e)(2) and 1005(e)(3) apply to claims "pending on or after the date of the enactment of this Act," those sections do not relate to claims asserted by individuals such as Mr. Hassam who have already been determined by the government not to be enemy combatants. See Clay v. United States, 537 U.S. 522, 528 (2003) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and citations

---

[3] See also id. (government asserting that "the Act creates an exclusive review mechanism in the D.C. Circuit to address the validity of the detention of such aliens held as enemy combatants.")

omitted); <u>Bates v. United States</u>, 522 U.S. 23, 29-30 (1997) (stating that it is "generally presumed that Congress acts intentionally in the disparate inclusion or exclusion" of particular language).

Whatever else Congress may have intended, it did not intend the DTA to apply to non-enemy combatants such as Mr. Hassam. Rather, its intent was to replace the former Combatant Status Review Tribunal ("CSRT") and *habeas* regime for <u>enemy combatants</u> with a new set of rules for future CSRTs, and a modified mechanism for their review. By expressly addressing judicial review of combatant determinations while saying nothing at all about non-combatant determinations, Congress demonstrated that it did not intend the jurisdiction-stripping provision of section 1005(e)(l) to apply here.[4] <u>See</u> <u>Kelly v. Robinson</u>, 479 U.S. 36, 43 (1986) ("[I]n expounding a statute, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.") (internal quotation marks and citations omitted); <u>see also</u> <u>Asiana Airlines v. F.A.A.</u>, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of interpretation requires us to construe a statute so that no provision is rendered inoperative or superfluous, void or insignificant.") (internal quotation marks and citations omitted). Indeed, this could not have been the intended effect of Congress, as it would have the

---

[4] The Act's text and architecture compel this result. Sections 1001-1004 address the treatment of enemy combatants. Section 1005 is entitled "Procedures for Status Review of Detainees Outside the United States." Subsections (a) through (d) impose rulemaking and reporting requirements and address the probative value of coerced statements. Subsections (f) and (g) are definitional, and subsection (h) contains the Act's effective-date provisions. Only section 1005(e) addresses judicial review at all. And nothing in subsection (e) addresses the rights of persons determined <u>not</u> to be enemy combatants. To the contrary, section 1005(e)(2)(A) provides:

> (A) IN GENERAL. Subject to subparagraphs (B), (C), and (D), the
> United States Court of Appeals for the District of Columbia Circuit shall
> have exclusive jurisdiction to determine the validity of any final decision
> of a Combatant Status Review Tribunal that an alien is properly detained
> as an <u>enemy combatant</u>.

(emphasis added).

perverse effect of creating a system in which the executive could indefinitely detain innocent men without any judicial review.

### III.    The Court Should Order The Government To Provide 30 Days' Advance Notice Of Any Intended Release Of Petitioner

The government concedes, as it must, that it is appropriate for the Court to reconsider the terms of an interlocutory order "where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court."  Opposition at 6 (quoting Singh v. George Washington Univ., 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (citing Cobell v. Norton, 355 F. Supp. 2d 531, 539 (D.D.C. 2005)).  "[T]he decision whether to reconsider its interlocutory rulings is within the Court's discretion.  So, even if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so."  Cobell v. Norton, 355 F. Supp. 2d 531, 540 (D.D.C. 2005); see id. at 539 (stating that "as justice requires" is the standard for reviewing interlocutory orders, and that "asking 'what justice requires' amounts to determining, . . . whether reconsideration is necessary under the relevant circumstances").

It is beyond reasonable dispute that a significant change in the facts has occurred since the Court entered the November 21 Order, thereby justifying the requested modification. The release of the Qassim v. Bush, 05-cv-0497 (JR), and Mamet v. Bush, 05-cv-1886 (EGS), petitioners – one business day before oral arguments on the merits of the *habeas* petition in Qassim v. Bush, No. 05-5477 (D.C. Cir.) – casts into doubt whether the transfer of those men was the result of the governments' "active" efforts to locate suitable countries for the release of non-enemy combatant detainees still held at Guantánamo, see Opposition at 1, or simply a last-ditch effort to avoid judicial review of the indefinite detention of those innocent men.  The

apparently haphazard manner in which the <u>Qassim</u> and <u>Mamet</u> petitioners were released clearly hampered their counsels' efforts to assist them in their resettlement in Albania,[5] and raises a serious question as to whether the government could have located a country better suited for their resettlement had it actively engaged the petitioners and their counsel in resettlement efforts prior to their release.  <u>See</u> Motion at 3-4.[6]

   The government's assertion that its decision not to provide any advance notice of its recent release of the Uighurs because there was no "live court order" requiring it to do so proves too much.  <u>See</u> Opposition at 7-8 (complaining that "Petitioner's counsel inexplicably omits . . . that neither [<u>Qassim v. Bush</u>, 05-cv-0497 (JR) nor <u>Mamet v. Bush</u>, 05-cv-1886 (EGS)] involved a live court order requiring respondents to provide advance notice of any release by the petitioners in those cases.  Thus, that respondents did not provide advance notice of the releases in those cases was no 'failure' of any kind . . . ").  The relief requested by Petitioner is necessary precisely because of the government's continued insistence that it has the authority, absent court order, to transfer innocent men such as the Uighurs to the custody of foreign governments in the dark of night without providing any prior notice to their counsel or the Court.  Mr. Hassam is not a terrorist.  He is not a criminal.  He is an innocent man who deserves, at the very least, advance

---

[5]  <u>See</u> Willett Decl.

[6]  In response, the government cites to its Response to Petitioners' Status Report and Request for Briefing Schedule, dated May 19, 2006, <u>Qassim</u>, No. 05-5477 (D.C. Cir.) ("<u>Government's</u> Status Report") (Opposition, Ex. 1).  Albania should of course be praised for the assistance it has provided to the released Uighurs.  But, whether the Uighurs' conditions in Albania have improved in the several weeks since their arrival, <u>cf.</u> Andrew Wiggins, <u>Tale of 5 Muslims: Out of Guantanamo And Into Limbo</u>, The Wall Street J., June 2, 2006, at A1 (quoting former detainee Abu Bakker Qassim, "I think Allah must be testing our patience," as freedom "is not what we expected."), simply does not impact Petitioner's contention that the requested modification of the November 21 Order could help obviate the difficulties that counsel for the Uighurs faced in trying to assist their clients resettlement efforts.  <u>See</u> Motion at 4; <u>see also</u> Bruce Konviser, <u>A Strange Kind of Freedom</u>, Toronto Star, June 13, 2006 (quoting Argita Totozani, Albania's National Commissioner for Refugees, as stating "[The Uighurs'] future is not here . . . . There is not a Uighur community (here).  They don't speak any Albanian . . . There is no integration possibility for them here.  We realized their future is not in Albania.").

notice of the government's intent to release him, so that he can express any concerns he may

have with the proposed release and work with his counsel to mitigate any consequent legal or

logistical difficulties.

In addition, the report by the Committee Against Torture, <u>Consideration of</u>

<u>Reports Submitted by Sates Parties Under Article 19 of the Convention: Conclusions and</u>

<u>recommendations by the Committee against Torture: United States of America</u>,

CAT/C/USA/CO/2 (Advanced Unedited Version), May 18, 2006 ("CAT Report"), casts doubt

on the government's assertion that the transfer or release of Petitioner will necessarily be carried

out in a manner consistent with U.S. policies and procedures. <u>See</u> Opposition at 10.  The

government provides no explanation for its belief that the CAT Report is "factually baseless and

legally erroneous in many important respects," instead asserting in conclusory fashion that the

Court should simply ignore this evidence.  In fact, however, the Committee Against Torture is a

treaty-based body created pursuant to Article 17 of the Convention Against Torture and Other

Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-

20, 1465 U.N.T.S. 85 ("Convention"), to which the United States is a signatory.[7]   Under Article

19 of the Convention, parties to the convention, including the United States, are required to

submit periodic reports on their implementation of the Convention to the Committee Against

Torture.  <u>See</u> Background Information on the U.S. Second Periodic Report.  The United States

submitted its "Second Periodic Report of the United States of America to the Committee Against

Torture" on May 6, 2005 (available at http://www.state.gov/g/drl/rls/45738.htm), and the CAT

Report cited by Petitioner was issued in response to the submission of the United States.  <u>See</u>

---

[7]  The United States signed the Convention on April 18, 1988, and ratified it on October 21, 1994.  <u>See</u>
Background Information on the U.S. Second Periodic Report on the Convention Against Torture, U.S.
Dep't of State, Hearing in Geneva, Switzerland, May 5 – May 8, 2006 (available at
http://www.state.gov/g/drl/rls/66071.htm).

CAT Report ¶¶ 1-3.  In short, the Court should reject the government's attempt to discredit the CAT Report; at the very least, it provides further support to Petitioner's "well-founded fear of being 'released' to the custody of a foreign government where he may face mistreatment, continued detention without due process or torture."  Motion at 4-5.  Petitioner should not in any event be forced to rely solely upon the "sworn declarations of high-level Executive Branch officials" that the United States will not send Petitioner to a foreign country under circumstances in which he could be subjected to further interrogation, detention without due process or torture. See e.g., Al-Joudi v. Bush, 2005 U.S. Dist. LEXIS 6265, *12 (D.D.C. April 4, 2005) (noting, in the context of deciding whether to grant a preliminary injunction required 30 days' advance notice of any intended removal, that "[w]hile the Government presents declarations that attempt to mitigate theses concerns [of transfer to a country where they might be tortured or indefinitely confined], they neither refute Petitioners' claims nor render them frivolous.").

         Finally, the governments' assertion that "[t]ransfers and releases generally are matters of diplomatic sensitivity" is, at best, a red herring.  Opposition at 8.  The purpose of the requested relief is not to interfere with government's ability to "carry on appropriate diplomatic relations and dialogue," Opposition at 8-9, but to provide Petitioner with an opportunity to voice any concerns he may have about his proposed release to the Court, his counsel and the government.   The government cannot point to any rational basis for denying Petitioner this opportunity.   And to the extent any of the information is in fact "sensitive," the Court may, if it sees fit, direct that the notice of Petitioner's release be filed under seal, and schedule a hearing shortly thereafter to determine the manner in which Petitioner and his counsel may use that information.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court modify the November 21, 2005 order, and require respondents to provide 30 days' advance notice of any intended transport or removal of Petitioner from Guantánamo, whether for purposes of release or otherwise.

Dated: June 21, 2006                              Respectfully submitted,

                                                  Counsel for Petitioner Zakirjan:

                                                  CLEARY GOTTLIEB STEEN & HAMILTON LLP

                                                  By: _____/s/_____
                                                        Jonathan I. Blackman (NY3846)
                                                  One Liberty Plaza
                                                  New York, New York 10006
                                                  (212) 225-2000

Of Counsel:
  Christopher P. Moore (NY4936)
  John Van Sickle (NY6487)
  Lia Monahon (NY6366)
  Patrick A. Sheldon (NY1598)


                                                  CENTER FOR CONSTITUTIONAL RIGHTS
                                                  Barbara Olshansky (NY0057)
                                                  Gitanjali S. Gutierrez (NY1234)
                                                  666 Broadway, 7th Floor
                                                  New York, New York 100012
                                                  Tel: (212) 614-6437
                                                  Fax: (212) 614-6499