# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

ZAKIRJAN, *et al.*,

      Petitioner/Plaintiff,

v.

GEORGE W. BUSH, *et al.*,

      Respondents/Defendants.

Case No. 05 Cv 2053  (HHK)

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S EMERGENCY MOTION FOR IMMEDIATE RELEASE AND/OR PRODUCTION OF THE BODY

Petitioner Zakirjan (hereinafter "Petitioner") respectfully requests that the Court (i) issue an order requiring Respondents to release Petitioner, a man whom all agree is <u>not</u> an enemy combatant, and/or (ii) issue an order requiring Respondents to transfer Petitioner to Washington, D.C. until such time as a suitable destination country for Petitioner can be determined. **Petitioner further requests, pursuant to Local Civil Rule 7(f), that the Court schedule a hearing on this motion as soon as possible**.

### PRELIMINARY STATEMENT

By this motion, Petitioner seeks an order requiring the government to do what it concedes it must:  release an innocent man from unlawful detention.  Despite the fact that the government has known for <u>more than nine months</u> (perhaps several years) that Petitioner is innocent and should be released, he remains imprisoned against his will.

The government has had months, if not years, to locate a suitable destination country for Petitioner, yet provides no explanation for its failure to do so.  Rather, after apparently abducting and imprisoning Petitioner without any lawful or proper basis, the government seems content to keep Petitioner locked up, with no meaningful ability to

communicate with family, friends, or even his counsel.  The Court should not accept any further

delay in Petitioner's release.  As Judge Robertson has recognized, "it's time to fish or cut bait."

Transcript of Status Conference Before the Honorable James Robertson in <u>Qassim v. Bush</u>,

05CV-0497, dated Dec. 12, 2005, at 21 ("Dec. 12 Tr.") (Judge Robertson noting government's

substantial delay in locating suitable destination country for non-enemy combatants, and stating

that he will rule on the motion for immediate release of petitioners in that matter in short order).[1]

The need for urgent action in this case has never been greater, as there is

significant risk that the case may be thrown into confusion within days by a legislative proposal

that would purport to link habeas jurisdiction to physical presence outside Guantánamo Bay.   In

light of the government's attempt through legislative efforts to strip this Court of jurisdiction

over the claims of an innocent man, the Court should immediately issue an order requiring

Petitioner's release from unlawful detention while it indisputably possesses jurisdiction to do so.

In addition, the Court should order the transfer of Petitioner to Washington, D.C. until such time

as an appropriate destination country can be located.

### BACKGROUND

**A.    The Government Concedes Petitioner Is <u>Not</u> An Enemy Combatant**

Although Respondents determined <u>more than nine months ago</u> that Petitioner is

<u>not</u> an enemy combatant and must be released, he remains imprisoned against his will.[2]  <u>See</u>

Respondents' Memorandum In Opposition To Petitioner's Motions For Temporary Restraining

---

[1]  The Dec. 12 Tr. is attached as Exhibit 1 to the Declaration of Christopher P. Moore in Support of Petitioner's Emergency Motion for Immediate Release and/or Production of the Body.

[2]  Petitioner is a citizen of Russia who is being detained at the Guantánamo Bay Naval Base in Cuba.  <u>See</u> October 14, 2005 Declaration of Sabin Willett in Support of Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ¶ 6 ("Willett Decl.").  The total amount of time that Petitioner has been held in Guantánamo Bay in the custody and control of Respondents is unknown to counsel, but known to Respondents.  <u>See</u> Petition for Writ of Habeas Corpus ¶ 27, dated October 17, 2005 (the "Petition").

Order And Preliminary Injunction Barring Transfer Or Release Or Requiring Advance Notice Of

Transfer Or Release, dated November 3, 2005 ("Opp. Br.") at 3 ("confirm[ing] . . . that

[Petitioner] was determined in his CSRT [Combatant Status Review Tribunal] to be no longer

classified as an enemy combatant."); Defense Department Special Briefing on Combatant Status

Review Tribunals, Presenter:  Secretary of The Navy Gordon England (March 29, 2005) ("[t]he

Combatant Status Review Tribunals for all of the DOD detainees at Guantánamo are

completed"); Defense Department Special Briefing on Administrative Review Boards for

Detainees at Guantánamo Bay, Cuba, Presenter:  Director, Office for the Administrative Review

of the Detention of Enemy Combatants, Rear Adm. James McGarrah, (July 8, 2005) ("we

finished the Combatant Status Review Tribunals back in March of this year").

        While the government claims that it is actively engaged in seeking a suitable

destination country for Petitioner, it provides no basis for why it has failed to do so during the

many months, if not years, that have passed since it determined that Petitioner's detention is

unlawful.  In fact, the government has done everything in its power to prevent Petitioner from

communicating with the outside world, thus unnecessarily interfering with Petitioner's

independent efforts to identify an appropriate destination country.  For example, it has refused to

provide non-enemy combatants such as Petitioner access to representatives of the United Nations

High Commission for Refugees, an organization charged with assisting refugees such as

Petitioner in their resettlement efforts.  It also continues to prevent Petitioner from speaking with

his counsel, who has repeatedly requested telephone access.  Of course, the sole basis for the

government's position that communications with Petitioner – whether with U.N. officials or his

own counsel – should be limited is that Petitioner remains imprisoned in a military facility.

Transfer of Petitioner to Washington, D.C. would dispose of any purported obstacles to providing Petitioner with the meaningful access to the outside world to which he is entitled.

**B.     After Months – If Not Years – Of Unwarranted Delay In Releasing Petitioner, The Government Now Seeks To Strip The Court Of Habeas Jurisdiction In Attempt To Prevent Petitioner From Challenging His Continued Unlawful Detention**

Upon information and belief, a legislative proposal that may be enacted within days would purport to link habeas jurisdiction to physical presence outside Guantánamo Bay.  It is unclear what legal effect, if any, the proposed jurisdiction-stripping provision would have upon this case.  However, it seems apparent from the government's conduct in this and related matters involving Guantánamo detainees that upon enactment of any such provision the government would seek to shift the focus in this matter from Petitioner's right to a prompt release to whether that provision precludes the Court from granting such relief (e.g., whether the provision is retroactive and, if so, violates the Suspension Clause).  See Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").  By immediately granting the Writ of Habeas Corpus and ordering Petitioner's release from unlawful detention, the Court would avoid such confusion.

The proposed legislation, upon information and belief, also seeks to preclude any other action against the United States, or its agents, relating to any aspect of the detention by the Department of Defense of an alien at Guantánamo Bay, Cuba, who a) is in military custody, or b) has been determined to have been properly detained as an enemy combatant.  As noted above, Petitioner is indisputably not an enemy combatant.  He does, however, remain "in military custody."  It is thus imperative that the Court order Petitioner's immediate release from custody; without such relief, upon enactment of the proposed jurisdiction-stripping provision the

4

government will likely argue that indisputably innocent men such as Petitioner have no means to

challenge their indefinite detention.

**C.     Judge Robertson Has Recognized The Need To Promptly Address Request By Non-Enemy Combatants For Immediate Release**

Earlier this week, on December 12, 2005, Judge Robertson concluded that enough

was enough; the government's delay in locating a suitable destination country for non-enemy

combatants would not be tolerated any longer:

> The government says it has no place to send [petitioners].  At an earlier hearing in this matter I pressed the government for what power it had to hang on to them even another day longer, and the best that [counsel to the government] could come up with at the time was, quote, "The executive's necessary power to wind up wartime detentions in an orderly fashion," closed quote.  That's the government's power for hanging on to these people.  I issued a memorandum order . . .  nearly four months ago . . . declining to decide whether the government really has such wind-up power, because the parties were in agreement that [petitioners] should be released.  But that hasn't happened.  As far as I can tell, nothing is happening. . . .

> It is getting to be time, and it may be time now, to fish or cut bait on this motion [for immediate release and/or production of the body].  I think the premise which I declined to decide this three or four months ago was that the government was making good faith efforts, and that something would happen, and that we were not thinking about indefinite detention of these people because the government wants them released.  The time has stretched out to the point where indefinite is not an inappropriate word to describe what's happened, and the question is whether I or anybody else can or should tolerate that situation. . . .

> The one thing I am sure of is that one way or another, one side or another has to have an appealable order, and that for the matter to remain pending before me does no service to anybody, since obviously in some sense I'm just a weigh station to the Court of Appeals anyway. . . .

> [I]f you [the government] can tell me that they're going to be released on X date and you have a date, I'll accept that.  But 'diplomatic efforts are proceeding,' no thank you.  Within two weeks, at the most, I'm going to act on this motion.

Dec. 12 Tr. at 3, 7, 9, 30.

This case is no different.  There simply is no legal basis for delaying any further the inevitable entry of an order requiring Petitioner's release.  Indeed, as noted above, there is a substantial risk that Petitioner's release will be delayed indefinitely if the Court does not act prior to the enactment of the purported jurisdiction-stripping legislation.

## POINT I

### THE COURT SHOULD ENTER AN ORDER GRANTING THE WRIT OF HABEAS CORPUS AND ORDER RESPONDENTS TO RELEASE PETITIONER FROM HIS UNLAWFUL DETENTION

Respondents concede that Petitioner is innocent and that he must be released.  <u>See</u> Respondents' Memorandum in Opposition to Petitioner's Motions for Temporary Restraining Order and Preliminary Injunction, dated November 3, 2005, at 3 ("[Petitioner] was determined in his CSRT to be no longer classified as an enemy combatant."); <u>id.</u> at 22, n.14 ("here, the government intends to release petitioner").  By this motion, Petitioner merely seeks an order requiring Respondents to release him, as promised.

## A.      There Is No Legal Basis for Imprisoning Petitioner

"The central purpose of any system of criminal justice is to convict the guilty <u>and free the innocent</u>."  <u>Herrera v. Collins</u>, 506 U.S. 390, 398 (1993) (emphasis added).  Here, the government continues to imprison – apparently for reasons of its own convenience – a man it has already found to be blameless.  It has no authority to do so.

The government contends that it derives its authority to imprison "enemy combatants" at Guantánamo Bay, Cuba from the Authorization for Use of Military Force passed by Congress in the wake of the September 11 attacks.  Pursuant to that joint resolution, Congress authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks [of September 11, 2001] . . . or harbored such organizations or persons."  Authorization

6

for Use of Military Force, Pub.L. 107-40, §§ 1-2, 115 Stat. 224.  Acting pursuant to that

authorization, the President sent U.S. Armed Forces into Afghanistan to wage a military

campaign against al Qaeda and the Taliban regime that had supported it.  In a November 13,

2001 executive order, the President also purported to authorize the Secretary of Defense to detain

persons the executive has "reason to believe" are members of al Qaeda, terrorists, or those who

"knowingly harbored" such individuals.  As is well known, the Secretary of Defense detained

hundreds of men at Guantánamo Bay, Cuba without charge or hearing as so-called "enemy

combatants."

Over two and a half years later, and nine days after the Supreme Court issued its

Rasul and Hamdi decisions, the executive branch issued regulations finally defining an "enemy

combatant" and establishing the CSRT process.[3]  It defined an "enemy combatant" as "an

individual who was part of or supporting the Taliban or al Qaeda forces, or associated forces that

are engaged in hostilities against the United States or its coalition partners.  This includes any

person who has committed a belligerent act or has directly supported hostilities in aid of enemy

armed forces."  Order Establishing Combat Status Review Tribunal issued by Deputy Secretary

of Defense Paul Wolfowitz (July 7, 2004) ("Wolfowitz Order") at ¶ d.[4]  See also Khalid v. Bush,

355 F. Supp. 2d 311, 315 n.2 (D.D.C. 2005) (Leon, J.) (noting that this definition "applies to

foreign nationals held at Guantánamo"), appeal docketed.

Deputy Secretary Wolfowitz's order specifically provides:  "Following the

hearing of testimony and the review of documents and other evidence, the Tribunal shall

---

[3]  The Supreme Court noted in Hamdi that up to that time the government "ha[d] never provided any court with the full criteria it uses in classifying individuals" as "enemy combatants."  Hamdi v. Rumsfeld, 542 U.S. 507, 516 (2004).

[4]  Available at www.defenselink.mil/news/Jul2004/d20040707review.pdf.

determine in closed session by majority vote <u>whether the detainee is properly detained as an enemy combatant</u>."  Wolfowitz Order at ¶ g(12) (emphasis added).  <u>See also</u> Memorandum issued by Secretary of the Navy Gordon England implementing CSRT procedures (July 29, 2005) at 1 (noting that the CSRT was established to determine whether detainees at Guantánamo "are properly classified as enemy combatants <u>and to permit each detainee the opportunity to contest such designation</u>") (emphasis added).[5]

Deputy Secretary Wolfowitz's order further provides:

> *Non-Enemy Combatant Determination*.  If the Tribunal determines that the detainee shall no longer be classified as an enemy combatant, the written report of this decision shall be forwarded directly to the Secretary of Defense or his designee.  The Secretary or his designee shall so advise the Secretary of State, in order to permit the Secretary of State to coordinate the transfer of the detainee for release to the detainee's country of citizenship or other disposition consistent with domestic and international obligations and the foreign policy of the United States.

Wolfowitz Order at ¶ *i*.

Whether the CSRT process is adequate under Rasul need not be decided in this case, because both sides <u>agree</u> that Petitioner is not an "enemy combatant."  Assuming for the sake of argument that the President has extrajudicial power to define enemy combatants and adjudicate their status, it must be the case that the executive branch determines a person <u>not</u> to be an enemy combatant, no extrajudicial basis remains to justify imprisonment.[6]  Indeed, the

---

[5]  Available at www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

[6]  <u>Cf.</u> <u>Rasul v. Bush</u>, 542 U.S. 466, 484 n.15 (2004) ("Petitioner's allegations—that, although they have engaged neither in combat nor in acts of terrorism against the United States, they have been held in Executive detention for more than two years in territory subject to the long-term, exclusive jurisdiction and control of the United States, without access to counsel and without being charged with any wrongdoing—unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'"); <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 533 (2004) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker.").

government stated in filings with this Court that a prisoner who is exonerated by the CSRT will

be released.  See, e.g., Respondents Memorandum in Opposition to Petitioner's Motions for

Temporary Restraining Order and Preliminary Injunction at 8; Declaration of Ambassador

Pierre-Richard Prosper dated March 8, 2005, at ¶ 3 ("Prosper Decl.") ("Detainees have been

transferred for release when it is determined that they no longer meet the criteria of enemy

combatants or no longer pose a continuing threat to the United States.").

It is undisputed that the CSRT has determined that Petitioner is not properly

detained as an "enemy combatant."  Having contended that the tribunal process was adequate to

determine whether a prisoner was or was not an "enemy combatant," the government can hardly

ignore the result of its own process which it controlled minutely, even to the level of depriving

the prisoner of counsel and an opportunity to confront the evidence against him.  As to the

government, the CSRT's determination is final and binding.  Petitioner must therefore be

released.

Equitable considerations and the public interest also mandate Petitioner's release.

"[T]he public has a strong interest in ensuring that its laws do not subject individuals to

indefinite detention without due process, '[i]t is always in the public interest to prevent the

violation of a party's constitutional rights.'"  Abdah v. Bush, No. Civ. A. 04-1254 (HHK), 2005

WL 711814 (D.D.C. Mar. 29, 2005) (Kennedy, J.) (quoting G & V Lounge, Inc. v. Mich. Liquor

Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994)).  The public also has a strong interest in

confidence that its public institutions reflect a rule of law, rather than the unchecked power of the

executive.  At some point the Courts simply must call a halt.

**B.     The Government Has No "Wind-Up" Power To Detain**

In Qassim, Judge Robertson addressed another non-combatant case.  He noted

that the "status of 'enemy combatant' has been, until now, the only handhold for the

9

government's claim of executive authority to hold detainees at Guantánamo."  See Judge

Robertson's August 19, 2005 Order at 5 in Qassim v. Bush, No. 05-CV-0497.  There, as here,

he noted, the government asserted "the Executive's necessary power to wind up wartime

intentions in an orderly fashion."  Id.  Judge Robertson rejected this argument, finding that

"[t]here is no basis for this claimed authority except the Executive's assertion of it."  See id.

Judge Robertson was correct.  The government cites no authority for its claimed

power indefinitely to imprison non-enemy combatants as a "wind up" to its claimed war powers,

and none exists.  See Rasul v. Bush, 542 U.S. 466, 488 (2004) (recognizing that indefinite

detention "suggests a weaker case of military necessity and much greater alignment with the

traditional function of habeas corpus") (Kennedy, J., concurring); INS v. St. Cyr, 533 U.S. 289,

302-03 (2001); Brown v. Allen, 344 U.S. 443, 532 (1953) (Jackson, J., concurring), overruled

on other grounds; Williams v. Taylor, 529 U.S. 362, 410-11 (2000); Ex Parte Burford, 7 U.S.

448, 453 (1806).

This is not a case in which an avowed "enemy combatant" remains in a prison

camp after a war ends.  See Article 118 of the Geneva Convention (III) relative to the treatment

of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 (1955) ("Prisoners of War shall be released

and repatriated without delay after the cessation of active hostilities.") (emphasis added); see also

Hamdi, 542 U.S. at 520.  It is a case where a man who never was an "enemy combatant" was

imprisoned in secret, and remains imprisoned today, despite the fact that the government itself

has determined that there is no basis for his detention.  The separation from family and loved

ones here is draconian and interminable.  There is no effective contact with the outside world at

all.  Indeed, although a petition was filed in October, this Petitioner has been denied contact even

with his counsel for months.

**C.      The Court Has The Authority And Obligation To Enter The Order At This Time**

That the government has not been able to find an appropriate destination country to which Petitioner should be released is of no consequence to the Court's authority to enter the order, and does not render Petitioner's continued detention legal.

Habeas corpus tests the legality of imprisonment.  "[T]he office of the writ is 'to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.'"  Harris v. Nelson, 394 U.S. 286, 291 (1969) (quoting Fay v. Noia, 372 U.S. 391, 401-02 (1963)).  The writ test requires the jailer to justify the detention in law.  "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive Detention, and it is in that context that its protections have been strongest."  Rasul, 542 U.S. at 474 (2004) (quoting INS v. St. Cyr, 533 U.S. 289, 301 (2001)).  "The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial."  Brown v. Allen, 344 U.S. 443, 533 (1953) (Jackson, J., concurring).

Rasul obliges this Court now to make the determination whether the detention is lawful.  In all material respects but one – the crucial fact that Petitioner is not an enemy combatant – Rasul was the same case as this one.  It involved Guantánamo prisoners who challenged their imprisonment on habeas grounds.  It held "that § 2241 confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention."  Rasul, 542 U.S. at 484 (emphasis added).  Because Rasul obliges this Court to hear and decide the Guantánamo habeas cases on their merits, and because the government concedes Petitioner must be released, there is no lawful basis upon which the Court might deny the writ.

Petitioner thus respectfully requests that the Court immediately issue an order requiring Respondents to release Petitioner, as there is significant risk that the case may be

thrown into confusion within days by a legislative proposal that would purport to link habeas

jurisdiction to physical presence outside Guantánamo Bay.

We hope and trust the government would not use such an order as "cover" to try

to illegally render Petitioner to a country in which he would be subjected to further unlawful

detention, interrogation or torture.  As alleged in the Petition for Writ of Habeas Corpus,

Petitioner fears being returned to his home country of Russia.  <u>See</u> Petition for Writ of Habeas

Corpus ¶ 40.  We would urge the Court in its order, to enjoin such action.  Indeed, the

government's decision not to return Petitioner to Russia during the more than nine months it has

known he is not an enemy combatant amounts to an implicit concession that Petitioner's fears

are valid.[7]

## POINT II

### THE COURT SHOULD ISSUE AN ORDER REQUIRING RESPONDENTS TO TRANSFER PETITIONER TO WASHINGTON, D.C. UNTIL A SUITABLE DESTINATION COUNTRY CAN BE DETERMINED

Petitioner should be produced before the Court so that the court may make

appropriate orders for his release, parole, and/or continued detention pending outcome of his

habeas petition.  Respondents argue that they are obligated not to send Petitioner to a country

where it is more likely than not that he will be tortured, and Petitioner agrees.[8]  However,

Petitioner denies that the government has the authority, given the illegality of his detention, to

detain him indefinitely in a military prison thousands of miles away from this Court and his

counsel until <u>the government</u> has located such a country.  Petitioner's presence in the district will

---

[7]  <u>See also</u> Urgent Action, Amnesty International, <u>Russian Federation: Further Information on Torture/Health Concern/Arbitrary detention: Rasul Kudaev (M), in his 20s,</u> (Dec. 8, 2005), <u>available at</u> http://web.amnesty.org/library/print/ENGEUR460612005; Kim Murphy, <u>Dark Days in Prisons at Home and Abroad,</u> L.A. Times, Dec. 9, 2005, at A1.

[8]  <u>See</u> Prosper Decl. ¶ 4; Declaration of Matthew C. Waxman, dated June 2, 2005, ¶ 6.

facilitate the ultimate resolution of this case by, among other things, providing counsel, United Nations representatives and the Court access to Petitioner.

**A.      This Court Should Order That Petitioner Be Brought Into The District**

It is beyond reasonable dispute that the Court not only has the power to order Respondents to produce Petitioner before the Court, but in fact must do so.  In <u>Rasul</u>, the Supreme Court ruled that this Court has jurisdiction over petitions for writ of habeas corpus filed on behalf of Guantánamo detainees.  The habeas corpus statute, 28 U.S.C. § 2243, directs in mandatory terms that the Petitioner be brought here:  "Unless the application for the writ and the return present only issues of law the person to whom the writ is directed <u>shall be required</u> to produce at the hearing the body of the person detained" (emphasis added).[9]

This statutory injunction applies to persons outside the territorial boundaries of a judicial district, and the courts contemplate that such persons may need to be produced in court for the purposes of fashioning relief.  In <u>Braden v. 30th Judicial Circuit Court</u>, 410 U.S. 484 (1973), the Supreme Court rejected earlier reliance on the physical location of the petitioner, and ruled that a Kentucky federal court had jurisdiction in habeas over a petition brought by a prisoner in Alabama, even though the necessary import of the decision was that the petitioner might have to be transported to Kentucky.  The Supreme Court has made no distinction between citizen and alien as to this proposition:  while it involved a U.S. citizen, <u>Braden</u> felt it necessary to overrule <u>Ahrens v. Clark</u>, 335 U.S. 188 (1948), a case involving aliens, and <u>Rasul</u>, though itself an alien case, relied on <u>Braden</u>.[10]  "In England prior to 1789, in the Colonies, and in this

---

[9]  There is of course no factual dispute as to the unlawfulness of Petitioner's detention.  However, there are clearly relevant factual issues concerning Respondents' contention that they have been unable to locate a suitable destination country, a dilemma that necessarily stems from factual determinations made by Respondents concerning Petitioner.

[10]  <u>Ex parte Mitsuye Endo</u>, 323 U.S. 283 (1944), also supports this proposition, albeit indirectly.  It involved a victim of the internment camps set up in California for Americans of Japanese ancestry.  The

Nation during the formative years of our Government, the writ of habeas corpus was available to nonenemy aliens as well as to citizens." St. Cyr, 533 U.S. at 301-02. See also Ledesma-Valdes v. Sava, 604 F. Supp. 675 (S.D.N.Y. 1985) (fact that aliens were in aircraft out of New York air space did not deprive court of habeas jurisdiction).

The justices who decided Rasul contemplated that their ruling meant that district judges would be ordering produced in the District of Columbia the bodies of men imprisoned at Guantánamo. First, the words mean that very thing: production of the body. Habeas corpus is "[a] writ issuing out of a court of justice . . . requiring the body of a person to be brought before the judge or into the court for the purpose specified in the writ." Johnson v. Eisentrager, 339 U.S. 763, 778 n.10 (1950) (quoting V The Oxford English Dictionary at 2 (1933)). By ruling that this Court had jurisdiction to "hear" a habeas case, the Supreme Court must have intended that the district judge would be subject to 28 U.S.C. § 2243 cl. 5, which makes production of the body mandatory in cases where there is a factual dispute.

That the Court intended this result is seen most plainly in the close examination of Eisentrager found in each of the Rasul opinions—majority, concurrence, and dissent. Eisentrager arose out of the detention of prisoners of war after World War II in China and Germany. It held those places beyond the reach of habeas. The majority wrote, "[a] basic consideration in habeas corpus practice is that the prisoner will be produced before the court. This is the crux of the statutory scheme established by the Congress; indeed, it is inherent in the very term, 'habeas corpus.'" Eisentrager, 339 U.S. at 778.[11] The Supreme Court proceeded,

---

Supreme Court reversed dismissal of a habeas petition where, during its pendency, the petitioner was removed by the Government from the district where she had brought her petition. Her absence did not prevent the case from proceeding. By inference then, the Supreme Court contemplated that the petitioner might have to be brought to the district where the Court sat.

[11] The statutory language at issue was identical.

"[t]o grant the writ to these prisoners might mean that our army must transport them across the seas for hearing."  In <u>Rasul</u>, six justices concluded that <u>Eisentrager</u> did not bar relief because Guantánamo is a very different place than Germany, but the key point for present purposes is that those justices recognized that their ruling meant physically transporting prisoners from the U.S. naval base to Washington.  <u>See</u> <u>Rasul</u>, 542 U.S. at 484-85.  Indeed, Justice Scalia rested the most passionate lines of his dissent on this very point:  he quoted <u>Eisentrager</u>'s admonition that a grant of the writ <u>would mean transporting men across the seas for hearing</u>, citing that as the necessary effect of the majority's decision.  <u>Id.</u> at 499-500.  In short, the Supreme Court majority intended, and the minority agreed, that Guantánamo prisoners would be present in this district for hearings.

The majority's analysis in <u>Rasul</u> makes equally plain that it did not consider that this presence would conflict with the immigration laws.  Courts would not be causing prisoners to immigrate here because, in law, they are <u>already</u> before the Court.  Writing for the majority, Justice Stevens concluded that Guantánamo petitioners are within the "territorial jurisdiction" of the United States.  <u>See</u> <u>id.</u> at 480.  He found that the United States "exercises complete jurisdiction and control over the Guantánamo [Bay Naval] Base."  <u>Id.</u> at 467.  Concurring, Justice Kennedy concluded that "Guantánamo Bay is in every practical respect a United States territory."  <u>Id.</u> at 487.  The majority rejected the notion that the "geographical coverage of the statute [varies] depending on the detainee's citizenship," <u>id.</u> at 481 (quotation omitted), and Justice Kennedy agreed.  "From a practical perspective, the indefinite lease of Guantánamo Bay has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it."  <u>Id.</u> at 487 (citation omitted).  In short, when the Supreme Court concluded that this Court had jurisdiction of the Guantánamo habeas cases, and that the petitioners were in

15

a "place that belongs to the United States," its ruling did not mean that Petitioners are to be "brought" to the United States. It meant they are already here. Thus there is ample statutory and case authority for ordering the jailer to produce the body in the court house.[12]

**B.     Upon Transfer Of Petitioner To Washington, D.C. The Court Should Hold A Hearing To Determine Whether Petitioner May Be Paroled Within the District**

Upon transfer of Petitioner to the district, (i) the Court could conduct a hearing with the Petitioner present, (ii) Petitioner could seek a grant of conditions by which he might be paroled into the care of a local refugee organization or other sponsor, (iii) in the event Petitioner were so paroled, the Court would retain jurisdiction of the habeas petition, and (iv) the Government would retain the right and power to attempt to pursue its diplomatic resettlement efforts.

As discussed above, there is no question that the habeas statue requires Respondents to produce Petitioner before this Court. Moreover, the Court has broad discretion in the remedy it orders, including the power to release petitioner into the United States, whether to enforce habeas relief or under parole pending final resolution a habeas petition. 28 U.S.C. § 2243 provides that the Court is to "dispose of the matter <u>as law and justice require</u>" (emphasis added). This provision is intended to give the habeas judge broad discretion in forming a decree. <u>Carafas v. LaVallee</u>, 391 U.S. 234, 239 (1968); <u>cf. Hilton v. Braunskill</u>, 481 U.S. 770, 775 (1987). Because the remedy is equitable, the Court is to fashion its decree so as to most

---

[12] Respondents have asserted in related matters that a federal court cannot order the government to produce a Guantánamo detainee in this District because to do so would require the government to issue a visa. However, no visa would be required, because Petitioner is already within the territorial jurisdiction of the United States. <u>See</u> <u>Rasul</u>, 542 U.S. at 480. Moreover, even if a visa were required, the Executive clearly has the power to issue one in connection with its obligation to comply with the plain language of 28 U.S.C. § 2243 requiring the production of Petitioner in this Court. That Respondents may not wish to do so would not provide a legal basis for refusing to comply with an order of this Court requiring production of the body any more so than a prison warden's claim that he need not produce a prisoner because it is within his sole purview whether to unlock the prison cell or whether to use state-owned trucks to transport the prisoner to the courthouse.

effectively do substantial justice.  Bragg v. Norris, 128 F. Supp. 2d 587 (E.D. Ark. 2000).

Nowhere is the imperative for fashioning a practical decree more urgent that in a case of "actual

innocence."  See Schlup v. Deleo, 513 U.S. 298 (1995).  Because justice in this case requires

Petitioner's immediate release, and because, according to Respondents he cannot at this time be

released into any third country, the most practical remedy is to transfer Petitioner to Washington,

D.C. for a determination by this Court as to whether he may be paroled until a more permanent

resettlement can be arranged.

   In the Supreme Court's 2004 Guantánamo decisions, indefinite detention was a

matter of great concern.  See Rasul, 542 U.S. at 485 (discussing the "legality of the Executive's

potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing");

id. at 2701 ("[I]n light of . . . the indefinite pretrial detention of the detainees, I would hold that

federal-court jurisdiction is permitted in these cases") (Kennedy, J., concurring); see also

Zadvydas v. Davis, 533 U.S. 678, 702 (2001) (finding it error to deny habeas petitions

challenging indefinite detention, even where detention had been authorized by Congress).  As

Petitioner's right to habeas corpus relief is meaningless absent action by this Court, the Court

should order his immediate release and/or transfer to the district to determine whether there is a

more suitable alternative to continued imprisonment in Guantánamo.

   While Respondents admit that the sole reason they continue to imprison Petitioner

is their inability to identify a suitable third country that will accept Petitioner, it is clear that this

impediment is in fact the result of Petitioner's confinement.  If Petitioner were present in the

district his counsel he could meet regularly with his counsel; such meetings have been precluded

by Respondents thus far for the sole reason that Petitioner is held in a military base.  In addition,

Petitioner could seek assistance from organizations such as the United Nations High

—

Commissioner for Refugees ("UNHCR"), which has to date been denied any meaningful access to Guantánamo Bay.  Most countries accept an annual quota of refugees referred by the UNHCR.  On information and belief, the restrictions on base access at Guantánamo have so far made it difficult, if not impossible, for the UNHCR to conduct its "due diligence" of detainees.  Were the Petitioner to be present in the district, however, UNHCR representatives could more readily assess whether Petitioner is a suitable candidate for resettlement in another country.  Finally, none of this would interfere with Respondents' own purported efforts to identify a suitable third country (Respondents have to date not informed Petitioner of a single step they have taken to identify a suitable third country destination), and indeed it may relieve Respondents of a task they remain unable, or unwilling, to complete.

Case law makes it clear that the Court, upon appropriate factual findings, would have the power to order "parole," that is, release on conditions.  The power is an incident to—a lesser-included subset of—habeas jurisdiction itself.  It is not simply an analog to a bail statute. Johnston v. Marsh, 227 F.2d 528 (3d Cir. 1955) (court has power to order bail in habeas even in absence of bail statute).  In Baker v. Sard, 420 F.2d 1342 (D.C. Cir. 1969), the Court of Appeals stated that "[w]hen an action pending in a United States court seeks release from what is claimed to be illegal detention, the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief pendente lite, to grant bail or release, pending determination of the merits."  Id. at 1343 (emphasis added); see also Gaines v. Manson, 194 Conn. 510 (1984) (habeas judge not limited to dilemma of ordering discharge or denying all relief).

This inherent power applies equally in cases involving aliens.  See Mapp v. Reno, 241 F.3d 221 (2d Cir. 2001) (involving an alien).  In Mapp, the Second Circuit held that there

was inherent power to admit the petitioner to bail—power derivative not from any bail statute but from the power to grant final relief in a habeas case. Id. at 226. Likewise, in Whitfield v. Hanges, 222 F. 745 (8th Cir. 1915), another habeas corpus challenge to deportation brought by aliens, the Eighth Circuit concluded, "the court has ample power to admit the alien to bail or to take his own recognizance." Id. at 756 (citing Chin Yow v. United States, 208 U.S. 8, 13 (1908)).

This proposition—that the habeas judge has power to grant release into the general population, goes beyond lawful aliens and applies even to an alien who has not been admitted to the United States. Two authorities bear close consideration on this point. First, in Lee Fong Fook v. Wixon, 170 F.2d 245 (9th Cir. 1948), a habeas petitioner who claimed to be a citizen was denied admission at the Port of San Francisco as an alien. While the dispute was pending—at a time when he had been deemed an alien by the authority with jurisdiction over the question—the petitioner was released on bail (i.e., into California) "to enable him more effectively to pursue his administrative remedy [by gathering evidence of his birth in the U.S.]." Id. at 246. The district court dismissed his petition. The Court of Appeals vacated, noting that the petitioner should have been afforded a full opportunity to contest the immigration finding at an administrative hearing. But the point is this: the Ninth Circuit specifically approved the parole into the continental United States of a habeas petitioner at a time when he had made no "entry" and had been found by the relevant authority to be an unlawful alien.

More recently, in Clark v. Martinez, 543 U.S. 371 (2005), the Supreme Court confirmed a similar principle and approved release into the general population of aliens who had never been admitted to the United States. The case involved Cubans who arrived in the United States as part of the Mariel boatlift. Under the law then effective, such refugees were not lawful

aliens, and not "admitted" to the United States, but rather "paroled" into the United States.[13]  A year later, they could adjust their status to that of lawful permanent resident, unless they fell within statutory exclusions, including exclusions for those who commit crimes.  Both petitioners committed serious crimes in the United States, and thus lost the right to be admitted.  Thus they were unlawful aliens who had never been admitted to the United States—which is likely the immigration "status" that the Government would assert applies to the Petitioners.[14]  The men were ordered deported to Cuba, but because Cuba would not accept them, they remained detained pursuant to statute.  They then brought habeas corpus petitions under the authority of Zadvydas v. Davis, 533 U.S. 678 (2001).  The government sought to distinguish Zadvydas because the petitioners were lawful, resident aliens whose criminal acts subjected them to deportation, while the Martinez petitioners were never lawful, resident aliens, had never even been "admitted" to the United States, and had no express statutory right to release.  This effort failed.  Following Zadvydas' proscription against indefinite imprisonment, the Supreme Court held that the illegal, criminal aliens were entitled to release into the U.S. population.

The Court clearly has power to parole Petitioner, a non-enemy combatant against whom no criminal charges have been made.  Accordingly, the Court should order that he be immediately transferred from Guantanamo to Washington, D.C., for a determination as to whether it should do so pending his permanent resettlement.

---

[13] Under immigration law, the Attorney General has discretion to "parole" into the territory of the United States an alien who has never been admitted. 8 C.F.R. § 212.5(a) (2004).

[14] While Petitioners would reserve all their rights with respect to immigration matters (whatever those rights may be), those matters simply are not before the Court, and we seek no order in any way addressing their immigration status.

# CONCLUSION

For the foregoing reasons and for any other reason that may become known to the Court, Petitioner respectfully requests that the Court 1) issue an order requiring Respondents to release Petitioner from detention and/or 2) issue an order requiring Respondents to transfer Petitioner to the district until such time as a suitable destination country may be determined.

Dated:  December 16, 2005

Respectfully submitted,

Counsel for Petitioner Zakirjan:

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By:_____/s/_____
       Jonathan I. Blackman (NY3846)
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Of Counsel:
  Christopher P. Moore (NY4936)
  John Van Sickle (NY6487)


CENTER FOR CONSTITUTIONAL RIGHTS
Barbara Olshansky (NY0057)
Tina Monshipour Foster (NY5556)
Gitanjali S. Gutierrez (NY1234)
666 Broadway, 7th Floor
New York, New York 10012
Tel.:  (212) 614-6437
Fax:  (212) 614-6499